# 14-2135

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

J. Robert Arbuthnot, Individually and on behalf of all others similarly situated, The City of Providence, Individually and on behalf of all others similarly situated,

Plaintiff - Appellee,

v.

Donald Robert Pierson, II,

Objector - Appellant,

Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller,
Defendants - Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX OF APPELLANT DONALD ROBERT PIERSON II – VOL. I

Joseph Darrell Palmer
Law Offices of Darrell Palmer PC
2244 Faraday Avenue, Suite 121
Carlsbad, CA 92008
Phone: (858) 215-4064 / Fax: (866) 583-8115
darrell.palmer@palmerlegalteam.com

Attorney for Appellant Donald Robert Pierson II

# TABLE OF CONTENTS

**Description**                                                    **Page**

## VOLUME I

District Court Docket, Case No. 11-cv-7132 …………………    AA1
*J. Robert Arbuthnot v. Aeropostale et al.*

Complaint …………………………………………………….    AA12
(Docket #1)

Amended Class Action Complaint ……………………………    AA37
(Docket #21)

Decision and Order Denying Motion to Dismiss …………….    AA105
(Docket #28)

Answer to Amended Class Action Complaint …………………    AA139
(Docket #29)

Motion for Class Certification …………………………………    AA174
(Docket #31)

Motion for Preliminary Approval of Settlement ………………    AA180
(Docket #52)

Motion for Preliminary Approval – Memo of Law ……………    AA185
(Docket #53)

Declaration of Jonathan Gardner ISO Motion for Preliminary
Approval of Settlement ………………………………………….    AA205
(Docket #54) (Part I)

## VOLUME II

Declaration of Jonathan Gardner ISO Motion for Preliminary
Approval of Settlement ………………………………………….    AA298
(Docket #54) (Part II)

Order Granting Preliminary Approval of Class Action
Settlement …………………………………………………………    AA315
(Docket #55)

Memo of Law ISO Motion for Attorneys' Fees ……………… AA329
(Docket #60)

Declaration of Jonathan Gardner ISO Motion for Final
Approval of Class Action Settlement, Plan of Allocation
And Motion for Attorneys' Fees ………………………………… AA358
(Docket #61)

Objection of Donald Robert Pierson II to Proposed
Settlement …………………………………………………………… AA399
(Docket #62)

Reply Memo of Law In Further Support of Motion for Final
Approval of Class Action Settlement, Plan of Allocation
And Motion for Attorneys' Fees ………………………………… AA407
(Docket #64)

Reply Declaration of Jonathan Gardner ……………………… AA424
(Docket #65)

Memo Opinion and Order Granting Final Approval of
Class Action Settlement, Plan of Allocation and
Attorney Fees ……………………………………………………… AA475
(Docket #66)

Final Order and Judgment …………………………………… AA512
(Docket #67)

Lead Counsel's Submission Concerning Time Spent
Responding to Pierson Objection …………………………… AA524
(Docket #71)

Objector's Response to Lead Counsel's Submission
Concerning Time Spent Responding to Pierson Objection ……. AA528
(Docket #72)

Notice of Appeal ………………………………………………… AA537
(Docket #73)

Order Closing Case ……………………………………………… AA539
(Docket #74)

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:11−cv−07132−CM−GWG

The City of Providence v. Aeropostale, Inc. et al
Assigned to: Judge Colleen McMahon
Referred to: Magistrate Judge Gabriel W. Gorenstein
Case in other court:  US Court of Appeals, Second Circuit,
      14−02135
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 10/11/2011
Date Terminated: 05/14/2014
Jury Demand: Plaintiff
Nature of Suit: 850
Securities/Commodities
Jurisdiction: Federal Question

**Lead Plaintiff**

**The City of Providence**
*Individually and on Behalf of All Others*
*Similarly Situated*

represented by **Iona Maria May Evans**
Labaton &Sucharow LLP (NYC)
140 Broadway
New York, NY 10005
(917) 699−5933
Fax: (212) 687−7714
Email: jevans@labaton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Christopher Moehlman**
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
(212) 907−0821
Fax: (212) 883−7521
Email: mmoehlman@labaton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole M. Zeiss**
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
212−907−0700
Fax: 212−818−0477
Email: nzeiss@labaton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen R. Astley**
Robbins Geller Rudman &Dowd LLP (FL)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
(561)−750−3000
Fax: (561)−750−3364
Email: sastley@rgrdlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carol Cecilia Villegas**
Labaton &Sucharow LLP (NYC)
140 Broadway
New York, NY 10005
(212)−907−0824
Fax: (212)−818−0477
Email: cvillegas@labaton.com
*ATTORNEY TO BE NOTICED*

**Daniel E. Bacine**

**AA1**

Barrack, Rodos &Bacine
3300 Two Commerce Street
2001 Market Street
Philadelphia, PA 19103
(215) 963−0600
Fax: (215) 963−0838
Email: dbacine@barrack.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Gardner**
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005
212−907−0839
Fax: 212−818−0477
Email: jgardner@labaton.com
*ATTORNEY TO BE NOTICED*

**Lisa M. Lamb**
Barrack, Rodos &Bacine
2001 Market St.
3300 Two Commerce Square
Philadelphia, PA 19103
215 963−0600
Fax: (215) 963−0838
Email: lport@barrack.com
*ATTORNEY TO BE NOTICED*

**Mark S. Goldman**
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212)−907−0702
Fax: (212) 818−0477
Email: mgoldman@labaton.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Aeropostale, Inc.**                represented by   **Joseph S. Allerhand**
Weil, Gotshal &Manges LLP (NYC)
767 Fifth Avenue, 25th Fl.
New York, NY 10153
(212) 310−8000
Fax: (212) 833−3148
Email: joseph.allerhand@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Alan Radin**
Weil, Gotshal &Manges LLP (NYC)
767 Fifth Avenue, 25th Fl.
New York, NY 10153
2123108000
Fax: 2128333148
Email: stephen.radin@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas P. Johnson**              represented by   **Joseph S. Allerhand**
(See above for address)
*LEAD ATTORNEY*

**AA2**

*ATTORNEY TO BE NOTICED*

**Stephen Alan Radin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marc D. Miller**                    represented by    **Joseph S. Allerhand**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Alan Radin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Objector**

**Donald Robert Pierson , II**        represented by    **Forrest Scott Turkish**
*Individual*                                            Forrest Scott Turkish, Law Office
595 Broadway
Bayonne, NJ 07002
(201)−339−8866
Fax: (201)−339−8456
Email: fsturkish@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/11/2011 | 1 | COMPLAINT against Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller. (Filing Fee $ 350.00, Receipt Number 18662)Document filed by J. Robert Arbuthnot.(ama) (ama). (Entered: 10/14/2011) |
| 10/11/2011 |  | SUMMONS ISSUED as to Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller. (ama) (Entered: 10/14/2011) |
| 10/11/2011 |  | Magistrate Judge Theodore H. Katz is so designated. (ama) (Entered: 10/14/2011) |
| 10/11/2011 |  | Case Designated ECF. (ama) (Entered: 10/14/2011) |
| 10/18/2011 | 2 | ORDER SCHEDULING AN INITIAL PRETRIAL CONFERENCE: Initial Conference set for 1/6/2012 at 09:45 AM in Courtroom 14C, 500 Pearl Street, New York, NY 10007 before Judge Colleen McMahon. (Signed by Judge Colleen McMahon on 10/18/2011) (cd) (Entered: 10/18/2011) |
| 11/18/2011 | 3 | NOTICE OF APPEARANCE by David Avi Rosenfeld on behalf of J. Robert Arbuthnot (Rosenfeld, David) (Entered: 11/18/2011) |
| 12/12/2011 | 4 | MOTION to Appoint Counsel., MOTION to Appoint J. Robert Arbuthnot to serve as lead plaintiff(s). Document filed by J. Robert Arbuthnot. (Attachments: # 1 Exhibit A)(Rosenfeld, David) (Entered: 12/12/2011) |
| 12/12/2011 | 5 | MEMORANDUM OF LAW in Support re: 4 MOTION to Appoint Counsel. MOTION to Appoint J. Robert Arbuthnot to serve as lead plaintiff(s).. Document filed by J. Robert Arbuthnot. (Rosenfeld, David) (Entered: 12/12/2011) |
| 12/12/2011 | 6 | DECLARATION of David A. Rosenfeld in Support re: 4 MOTION to Appoint Counsel. MOTION to Appoint J. Robert Arbuthnot to serve as lead plaintiff(s).. Document filed by J. Robert Arbuthnot. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Rosenfeld, David) (Entered: 12/12/2011) |

**AA3**

| 12/12/2011 | 7 | MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s)., MOTION to Appoint Counsel *Labaton Sucharow LLP as Lead Counsel*. Document filed by City of Providence and/or the Board of Investment Commissioners. (Attachments: # 1 Text of Proposed Order)(Keller, Christopher) (Entered: 12/12/2011) |
|---|---|---|
| 12/12/2011 | 8 | MEMORANDUM OF LAW in Support re: 7 MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s). MOTION to Appoint Counsel *Labaton Sucharow LLP as Lead Counsel*. MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s).. Document filed by City of Providence and/or the Board of Investment Commissioners. (Keller, Christopher) (Entered: 12/12/2011) |
| 12/12/2011 | 9 | DECLARATION of Michael W. Stocker in Support re: 7 MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s). MOTION to Appoint Counsel *Labaton Sucharow LLP as Lead Counsel*. MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s).. Document filed by City of Providence and/or the Board of Investment Commissioners. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Stocker, Michael) (Entered: 12/12/2011) |
| 12/21/2011 | 10 | NOTICE OF APPEARANCE by Jonathan Gardner on behalf of City of Providence and/or the Board of Investment Commissioners (Gardner, Jonathan) (Entered: 12/21/2011) |
| 12/29/2011 | 11 | MEMORANDUM OF LAW in Opposition re: 7 MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s). MOTION to Appoint Counsel *Labaton Sucharow LLP as Lead Counsel*. MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s).. Document filed by J. Robert Arbuthnot. (Rosenfeld, David) (Entered: 12/29/2011) |
| 12/30/2011 | 12 | MEMORANDUM OF LAW in Support re: 7 MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s). MOTION to Appoint Counsel *Labaton Sucharow LLP as Lead Counsel*. MOTION to Appoint City of Providence and/or the Board of Investment Commissioners to serve as lead plaintiff(s).. Document filed by City of Providence and/or the Board of Investment Commissioners. (Attachments: # 1 Exhibit A)(Keller, Christopher) (Entered: 12/30/2011) |
| 01/05/2012 | 13 | NOTICE OF APPEARANCE by Michael Walter Stocker on behalf of City of Providence and/or the Board of Investment Commissioners (Stocker, Michael) (Entered: 01/05/2012) |
| 01/06/2012 | 14 | CALENDAR NOTICE: Please take notice that the above captioned matter has been re–scheduled for a: Rule (16) Conference to Wednesday, January 11, 2012 at 9:30 A.M. before the Honorable Colleen McMahon, United States District Judge in Courtroom 14C, U.S. District Court, 500 Pearl Street, New York, New York 10007. (Signed by Judge Colleen McMahon on 1/6/2012) (mro) (Entered: 01/06/2012) |
| 01/09/2012 | 15 | WAIVER OF SERVICE RETURNED EXECUTED. Document filed by City of Providence and/or the Board of Investment Commissioners. (Gardner, Jonathan) (Entered: 01/09/2012) |
| 01/09/2012 | 16 | WAIVER OF SERVICE RETURNED EXECUTED. Document filed by City of Providence and/or the Board of Investment Commissioners. (Gardner, Jonathan) (Entered: 01/09/2012) |
| 01/09/2012 | 17 | WAIVER OF SERVICE RETURNED EXECUTED. Document filed by City of Providence and/or the Board of Investment Commissioners. (Gardner, Jonathan) (Entered: 01/09/2012) |
| 01/11/2012 | | Minute Entry for proceedings held before Judge Colleen McMahon: Initial Pretrial Conference held on 1/11/2012. Decision: Initial conference held. The City of Providence and/or the Board of Investment Commissioners is appointed Lead Plaintiff and Labaton Sucharow is appointed Lead Counsel pursuant to the PSLRA |

**AA4**

| | | (see conference transcript for details). Lead Plaintiff has 30 days to file an amended complaint. Defendants have 30 days after that to file a motion to dismiss. Any opposition is due two weeks (14 days) after that, and any reply is due 1 week (7 days) later. The Clerk of the Court is directed to remove the motions at Docket Nos. 4 and 7 from the Court's list of outstanding motions.(Submitted by Benjamin T. Alden). (Court Reporter Linda) (mde) (Entered: 01/11/2012) |
|---|---|---|
| 01/11/2012 | 18 | NOTICE OF APPEARANCE by Joseph S. Allerhand on behalf of Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller (Allerhand, Joseph) (Entered: 01/11/2012) |
| 01/11/2012 | 19 | NOTICE OF APPEARANCE by Stephen Alan Radin on behalf of Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller (Radin, Stephen) (Entered: 01/11/2012) |
| 02/06/2012 | 20 | NOTICE OF APPEARANCE by Carol Cecelia Villegas on behalf of City of Providence and/or the Board of Investment Commissioners (Villegas, Carol) (Entered: 02/06/2012) |
| 02/10/2012 | 21 | AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS amending 1 Complaint against Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller with JURY DEMAND. Document filed by City of Providence and/or the Board of Investment Commissioners. Related document: 1 Complaint filed by J. Robert Arbuthnot.(djc) (Received in night de. on 2/10/12 at 7:04 p.m.) Modified on 2/15/2012 (djc). (Entered: 02/15/2012) |
| 03/12/2012 | 22 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller.(Allerhand, Joseph) (Entered: 03/12/2012) |
| 03/12/2012 | 23 | MOTION to Dismiss *the Amended Class Action Complaint*. Document filed by Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller.(Allerhand, Joseph) (Entered: 03/12/2012) |
| 03/12/2012 | 24 | MEMORANDUM OF LAW in Support re: 23 MOTION to Dismiss *the Amended Class Action Complaint*.. Document filed by Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller. (Allerhand, Joseph) (Entered: 03/12/2012) |
| 03/12/2012 | 25 | DECLARATION of Joseph S. Allerhand in Support re: 23 MOTION to Dismiss *the Amended Class Action Complaint*.. Document filed by Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27)(Allerhand, Joseph) (Entered: 03/12/2012) |
| 03/26/2012 | 26 | MEMORANDUM OF LAW in Opposition re: 23 MOTION to Dismiss *the Amended Class Action Complaint*.. Document filed by The City of Providence. (Gardner, Jonathan) (Entered: 03/26/2012) |
| 04/02/2012 | 27 | REPLY MEMORANDUM OF LAW in Support re: 23 MOTION to Dismiss *the Amended Class Action Complaint*.. Document filed by Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller. (Allerhand, Joseph) (Entered: 04/02/2012) |
| 03/25/2013 | 28 | DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS denying 23 Motion to Dismiss. Defendant's motion to dismiss the Amended Complaint is denied. The Clerk of the Court is directed to remove the motion at Docket No. 23 from the Court's list of pending motions. Plaintiff has 30 days to move for class certification. Meanwhile, merits discovery will commence; it will not be stayed, since whether a class is certified or not we will be litigating the merits. All merits discovery, including expert discovery, must be complete by September 30, 2013. Plaintiffs expert report is due June 7, 2013; if Defendants retain an expert the report is due August 23, 2013. These dates will not be extended. Class discovery must proceed simultaneously. (Signed by Judge Colleen McMahon on 3/25/2013) (ft) (Entered: 03/25/2013) |

**AA5**

| 03/25/2013 | | Set/Reset Deadlines: Discovery due by 9/30/2013. Expert Discovery due by 9/30/2013. (ft) (Entered: 03/25/2013) |
|---|---|---|
| 04/08/2013 | 29 | ANSWER to 21 Amended Complaint,. Document filed by Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller.(Allerhand, Joseph) (Entered: 04/08/2013) |
| 04/19/2013 | 30 | NOTICE OF APPEARANCE by Iona Maria May Evans on behalf of The City of Providence (Evans, Iona) (Entered: 04/19/2013) |
| 04/24/2013 | 31 | MOTION to Certify Class. Document filed by The City of Providence.(Gardner, Jonathan) (Entered: 04/24/2013) |
| 04/24/2013 | 32 | MEMORANDUM OF LAW in Support re: 31 MOTION to Certify Class.. Document filed by The City of Providence. (Gardner, Jonathan) (Entered: 04/24/2013) |
| 04/24/2013 | 33 | DECLARATION of Jonathan Gardner in Support re: 31 MOTION to Certify Class.. Document filed by The City of Providence. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Gardner, Jonathan) (Entered: 04/24/2013) |
| 04/24/2013 | 34 | DECLARATION of Jeffrey Padwa in Support re: 31 MOTION to Certify Class.. Document filed by The City of Providence. (Gardner, Jonathan) (Entered: 04/24/2013) |
| 04/29/2013 | 35 | MEMO ENDORSED ON JOINT CASE MANAGEMENT PLAN: On or before May 1, 2013, the parties plan to jointly submit a proposed protective order to the Court pursuant to Fed. R. Civ. P. 26(c) and Individual Practices and Procedures of Judge McMahon. ENDORSEMENT: This case to be conferenced in person ASAP on 5/3/2013 at 11:00 a.m. (Signed by Judge Colleen McMahon on 4/29/2013) (rsh) (Entered: 04/29/2013) |
| 04/29/2013 | 36 | ENDORSED LETTER addressed to Judge Colleen McMahon from Joseph S. Allerhand dated 4/25/2013 re: Defendants Aeropostale, Inc., Thomas P. Johnson, and Marc D. Miller respectfully request a referral to a new Magistrate Judge (this Action was previously referred to the Honorable Theodore H. Katz, now retired) for the resolution of a threshold discovery dispute: having survived a motion to dismiss by relying on information allegedly obtained from nine so−called "confidential witnesses." must plaintiff now disclose the identities of these "confidential witnesses." ENDORSEMENT: Actually, I can resolve this. There are no "confidential witnesses" in this case. Identify them immediately. If you need a protective order, enter into one as long as it contains the language required by my rules. (Signed by Judge Colleen McMahon on 4/29/2013) (rsh) (Entered: 04/29/2013) |
| 04/30/2013 | 37 | MOTION for Extension of Time to File Response/Reply *to the Motion for Class Certification*. Document filed by Aeropostale, Inc., Thomas P. Johnson, Marc D. Miller.(Allerhand, Joseph) (Entered: 04/30/2013) |
| 05/01/2013 | 38 | STIPULATED ORDER FOR THE PRODUCTION AND USE OF CONFIDENTIAL INFORMATION...regarding procedures to be followed that shall govern the handling of confidential material...ENDORSEMENT: So Ordered. (Signed by Judge Colleen McMahon on 5/1/2013) (cd) (Entered: 05/01/2013) |
| 05/02/2013 | 39 | MEMO ENDORSED granting 37 Joint Motion for Extension of Time to File Response/Reply re 31 MOTION to Certify Class. ENDORSEMENT: OK. Responses due by 7/2/2013 Replies due by 8/2/2013. (Signed by Judge Colleen McMahon on 5/2/2013) (cd) (Entered: 05/02/2013) |
| 05/03/2013 | | Minute Entry for proceedings held before Judge Colleen McMahon: Pretrial Conference held on 5/3/2013. Decision: Conference held. All documents must be produced by August 2, 2013. All depositions, except for expert depositions, must be completed by November 1, 2013. Plaintiffs industry expert report is due by November 22, 2013. Defendants industry expert report is due by December 20, 2013. All expert depositions must be completed by January 17, 2014.(Submitted By Benjamin A. Gianforti). (mde) (Entered: 05/03/2013) |

**AA6**

| 07/17/2013 | 40 | STIPULATION AND ORDER REGARDING CLASS CERTIFICATION: Pursuant to Fed. R. Civ. P. 23(a) and (b)(3), this Action is certified to proceed as a class action on behalf of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Aeropostale from March 11, 2011 through August 18, 2011, inclusive (the "Class Period") and who were damaged thereby (the "Class"), and as further set forth in this document. (Signed by Judge Colleen McMahon on 7/17/2013) (cd) (Entered: 07/17/2013) |
| --- | --- | --- |
| 08/08/2013 | 41 | ENDORSED LETTER addressed to Judge Colleen McMahon from Jonathan Gardner dated 8/6/2013 re: On July 17, 2013, the Court entered a joint stipulation and order certifying a class of individuals who purchased or otherwise acquired the common stock of Aeropostale, Inc. between March 11, 2011 and August 18, 2011 and were damaged thereby. Dkt. 40. Lead Plaintiff proposes that notice be sent to class members, pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") after the close of non−expert merits discovery on November 1, 2013 and after the parties have an opportunity to attempt to mediate the dispute. ENDORSEMENT: My only condition on granting this request is that there be no further delay − So do not ask for a discovery extension. Which means − get any discovery disputes adjudicated by the Magistrate in August and September. (Signed by Judge Colleen McMahon on 8/8/2013) (rjm) (Entered: 08/08/2013) |
| 09/09/2013 | 42 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Specific Non−Dispositive Motion/Dispute: Discovery Disputes. Referred to Magistrate Judge Gabriel W. Gorenstein (Signed by Judge Colleen McMahon on 9/9/2013) (rsh) (Additional attachment(s) added on 9/9/2013: # 1 order) (mde). Modified on 9/12/2013 (rsh). (Entered: 09/09/2013) |
| 09/09/2013 | | NOTICE OF REDESIGNATION TO ANOTHER MAGISTRATE JUDGE. The above entitled action has been redesignated to Magistrate Judge Gabriel W. Gorenstein. Please note that this is a reassignment of the designation only. (pgu) (Entered: 09/09/2013) |
| 09/09/2013 | | NOTICE OF REASSIGNMENT OF A REFERRAL TO ANOTHER MAGISTRATE JUDGE. The referral in the above entitled action has been reassigned to Magistrate Judge Gabriel W. Gorenstein, for Specific Non−Dispositive Motion/Dispute. Magistrate Judge Theodore H. Katz no longer referred to the case. (pgu) (Entered: 09/09/2013) |
| 09/09/2013 | 43 | ENDORSED LETTER addressed to Judge Colleen McMahon from Joseph S. Allerhand dated 9/9/2013 re: Counsel writes to update the Court concerning the discovery disputes addressed in the parties' respective September 3 and 5, 2013 letters. ENDORSEMENT: The entire discovery situation is hereby referred to a Magistrate Judge for resolution. (Signed by Judge Colleen McMahon on 9/9/2013) (ft) (Entered: 09/09/2013) |
| 09/10/2013 | 44 | ORDER: 1. The above−referenced action has been referred to this Court for adjudication of discovery disputes. 2. All discovery deadlines remain in effect and will not be altered by the undersigned. 3. Discovery motions— that is, any application pursuant to Rules 26 through 37 or 45 −not only must comply with Paragraph 2.A. of the Court's Individual Practices but also must be made promptly after the cause for such a motion arises. In addition, absent extraordinary circumstances no such application will be considered if made later than 30 days prior to the close of discovery. Untimely applications will be denied. 4. The Court notes that a letter dated September 9, 2013 appears on the docket sheet (Docket # 43). To the extent a party seeks relief from the Court, the letter on the docket sheet is insufficient to do so. Instead, any request must be presented to the undersigned in accordance with Paragraph 2.A. of the Court's Individual Practices. (Signed by Magistrate Judge Gabriel W. Gorenstein on 9/10/2013) (cd) (Entered: 09/10/2013) |
| 09/11/2013 | 45 | ORDER re application in the 9/10/2013 letter. Conference set for Monday, 9/16/2013 at 11:30 AM in Courtroom 6B, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Gabriel W. Gorenstein, and as further set forth in this document. (Signed by Magistrate Judge Gabriel W. Gorenstein on 9/11/2013) (cd) (Entered: 09/11/2013) |

**AA7**

| 09/11/2013 | | ***DELETED DOCUMENT. Deleted deadlines: Motions due by 10/18/2013. Responses due by 11/15/2013. Replies due by 11/29/2013. These deadlines were incorrectly filed in this case. (lmb) (Entered: 09/13/2013) |
|---|---|---|
| 09/13/2013 | 46 | NOTICE OF APPEARANCE by Matthew Christopher Moehlman on behalf of The City of Providence. (Moehlman, Matthew) (Entered: 09/13/2013) |
| 09/16/2013 | | Minute Entry for proceedings held before Magistrate Judge Gabriel W. Gorenstein: Interim Pretrial Conference held on 9/16/2013. Discovery order issued. See transcripts. (lmb) (Entered: 09/20/2013) |
| 10/02/2013 | 47 | TRANSCRIPT of Proceedings re: Motions Conference held on 9/16/2013 before Magistrate Judge Gabriel W. Gorenstein. Court Reporter/Transcriber: Shari Riemer, (518) 581−8973. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/28/2013. Redacted Transcript Deadline set for 11/7/2013. Release of Transcript Restriction set for 1/3/2014.(sdi) (Entered: 10/02/2013) |
| 10/02/2013 | 48 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Motions Conference proceeding held on 9/16/2013 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(sdi) (Entered: 10/02/2013) |
| 10/04/2013 | 49 | **FILING ERROR − DEFICIENT DOCKET ENTRY − MOTION for Stephen R. Astley to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208−8940794. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by The City of Providence. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Astley, Stephen) Modified on 10/4/2013 (wb). (Entered: 10/04/2013)** |
| 10/04/2013 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice regarding Document No. 49 MOTION for Stephen R. Astley to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208−8940794. Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): Missing Certificate of Good Standing. Certificate of Good Standing has to be issued from the Supreme Court of Florida with a Clerk of Court signature. Re−file the document as a Corrected Motion to Appear Pro Hac Vice and attach a valid Certificate of Good Standing, issued within the past 30 days. (wb) (Entered: 10/04/2013)** |
| 10/04/2013 | 50 | AMENDED MOTION for Stephen R. Astley to Appear Pro Hac Vice *(Corrected)*. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by The City of Providence. (Attachments: # 1 Certificate of Good Standing, # 2 Text of Proposed Order)(Astley, Stephen) (Entered: 10/04/2013) |
| 10/07/2013 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 50 AMENDED MOTION for Stephen R. Astley to Appear Pro Hac Vice *(Corrected)*. Motion and supporting papers to be reviewed by Clerk's Office staff.AMENDED MOTION for Stephen R. Astley to Appear Pro Hac Vice *(Corrected)*. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 10/07/2013)** |
| 10/09/2013 | 51 | ORDER FOR ADMISSION PRO HAC VICE granting 50 Motion for Stephen R. Astley to Appear Pro Hac Vice. Applicant is admitted to practice Pro Hac Vice in the above captioned case in the United States District Court for the Southern District of New York. (Signed by Judge Colleen McMahon on 10/9/2013) (ft) (Entered: 10/09/2013) |
| 01/29/2014 | 52 | MOTION for Settlement *Preliminary Approval of Settlement and Approval of Notice*. Document filed by The City of Providence. (Attachments: # 1 Text of Proposed Order)(Gardner, Jonathan) (Entered: 01/29/2014) |

**AA8**

| 01/29/2014 | 53 | MEMORANDUM OF LAW in Support re: 52 MOTION for Settlement *Preliminary Approval of Settlement and Approval of Notice.*. Document filed by The City of Providence. (Gardner, Jonathan) (Entered: 01/29/2014) |
|---|---|---|
| 01/29/2014 | 54 | DECLARATION of Jonathan Gardner in Support re: 52 MOTION for Settlement *Preliminary Approval of Settlement and Approval of Notice.*. Document filed by The City of Providence. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Gardner, Jonathan) (Entered: 01/29/2014) |
| 01/30/2014 | 55 | ORDER GRANTING 52 PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, APPROVING FORM AND MANNER OF NOTICE, AND SETTING DATE FOR HEARING ON FINAL APPROVAL OF SETTLEMENT: NOW, THEREFORE, IT IS HEREBY ORDERED, this 30th day of January 2014 that: Preliminary Approval of the Settlement. The Court has reviewed the Stipulation and preliminarily finds the Settlement set forth therein to be fair, reasonable, and adequate, subject to further consideration at the Settlement Hearing described below in Paragraph 2. Settlement Hearing. A Settlement Hearing pursuant to Rule 23(e) of the Federal Rules of Civil Procedure is hereby scheduled to be held before the Court on May 9, 2014, at 10:00 a.m. for the purposes as set forth herein. (Signed by Judge Colleen McMahon on 1/30/2014) (ja) (Entered: 01/31/2014) |
| 01/30/2014 | | Set/Reset Hearings: Settlement Conference set for 5/9/2014 at 10:00 AM before Judge Colleen McMahon. (ja) (Entered: 01/31/2014) |
| 03/21/2014 | 56 | NOTICE OF APPEARANCE by Nicole M. Zeiss on behalf of The City of Providence. (Zeiss, Nicole) (Entered: 03/21/2014) |
| 04/04/2014 | 57 | MOTION to Approve Class Action Settlement and Plan of Allocation. Document filed by The City of Providence.(Gardner, Jonathan) (Entered: 04/04/2014) |
| 04/04/2014 | 58 | MEMORANDUM OF LAW in Support re: 57 MOTION to Approve Class Action Settlement and Plan of Allocation.. Document filed by The City of Providence. (Gardner, Jonathan) (Entered: 04/04/2014) |
| 04/04/2014 | 59 | MOTION for Attorney Fees *and Payment of litigation expenses*. Document filed by The City of Providence.(Gardner, Jonathan) (Entered: 04/04/2014) |
| 04/04/2014 | 60 | MEMORANDUM OF LAW in Support re: 59 MOTION for Attorney Fees *and Payment of litigation expenses.*. Document filed by The City of Providence. (Gardner, Jonathan) (Entered: 04/04/2014) |
| 04/04/2014 | 61 | DECLARATION of Jonathan Gardner in Support re: 59 MOTION for Attorney Fees *and Payment of litigation expenses.*, 57 MOTION to Approve Class Action Settlement and Plan of Allocation.. Document filed by The City of Providence. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Gardner, Jonathan) (Entered: 04/04/2014) |
| 04/18/2014 | 62 | RESPONSE to Motion re: 59 MOTION for Attorney Fees *and Payment of litigation expenses.*, 57 MOTION to Approve Class Action Settlement and Plan of Allocation. *Objection Of Donald Robert Pierson II To Proposed Settlement And Notice Of Intent To Appear.* Document filed by Donald Robert Pierson, II. (Turkish, Forrest) (Entered: 04/18/2014) |
| 04/28/2014 | 63 | NOTICE OF APPEARANCE by Forrest Scott Turkish on behalf of Donald Robert Pierson, II. (Turkish, Forrest) (Entered: 04/28/2014) |
| 05/02/2014 | 64 | REPLY MEMORANDUM OF LAW in Support re: 59 MOTION for Attorney Fees *and Payment of litigation expenses.*, 57 MOTION to Approve Class Action Settlement and Plan of Allocation. . Document filed by The City of Providence. (Attachments: # 1 Text of Proposed Order Proposed Final Order and Judgment, # 2 Text of Proposed Order Proposed Order Approving Plan of Allocation, # 3 Text of Proposed Order Proposed Order Awarding Attorneys' Fees and Expenses)(Gardner, Jonathan) (Entered: 05/02/2014) |
| 05/02/2014 | 65 | DECLARATION of Jonathan Gardner in Support re: 59 MOTION for Attorney Fees *and Payment of litigation expenses.*, 57 MOTION to Approve Class Action |

**AA9**

| | | Settlement and Plan of Allocation.. Document filed by The City of Providence. (Attachments: #_1 Exhibit 1, #_2 Exhibit 2, #_3 Exhibit 3)(Gardner, Jonathan) (Entered: 05/02/2014) |
|---|---|---|
| 05/09/2014 | | Minute Entry for proceedings held before Judge Colleen McMahon: Settlement Hearing held on 5/9/2014. Decision: Settlement hearing held. See transcript for details. (Submitted by Zachary Vaughan). (Court Reporter Anne Hairston). (mde) (Entered: 05/09/2014) |
| 05/09/2014 | 66 | MEMORANDUM OPINION AND ORDER GRANTING LEAD PLAINTIFF'S MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AND ATTORNEYS' FEES AND EXPENSES 104322 re_59 MOTION for Attorney Fees *and Payment of litigation expenses*, filed by The City of Providence,_57 MOTION to Approve Class Action Settlement and Plan of Allocation, filed by The City of Providence. For the foregoing reasons, the Court hereby (1) finds that due and adequate notice was directed to persons and entities who are Class Members, advising them of the Plan of Allocation and of their right to object thereto, and a full and fair opportunity was accorded to persons and entities who are Class Members to be heard with respect to the Plan of Allocation and as further set forth herein. (Signed by Judge Colleen McMahon on 5/9/2014) (ja) Modified on 5/12/2014 (nt). (Entered: 05/09/2014) |
| 05/14/2014 | 67 | FINAL ORDER AND JUDGMENT: that the Court hereby fully and finally approves the Settlement as set forth in the Stipulation in all respects, and finds that the Settlement is, in all respects, fair, reasonable, and adequate, and in the best interests of Lead Plaintiff and the Class. The Amended Class Action Complaint for Violation of the Federal Securities Laws, filed on February 10, 2012 (the "Complaint"), is hereby dismissed in its entirety, with prejudice, and without costs to any Party, except as otherwise provided in the Stipulation, and as further set forth in this judgment. There is no just reason for delay in the entry of this Judgment as a final judgment in this Action. Accordingly, the Clerk of the Court is expressly directed to immediately enter this Judgment in this Action. (Signed by Judge Colleen McMahon on 5/14/2014) (tn) (Entered: 05/14/2014) |
| 05/14/2014 | | Terminate Transcript Deadlines (tn) (Entered: 05/14/2014) |
| 05/15/2014 | 68 | TRANSCRIPT of Proceedings re: CONFERENCE held on 5/9/2014 before Judge Colleen McMahon. Court Reporter/Transcriber: Ann Hairston, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/9/2014. Redacted Transcript Deadline set for 6/19/2014. Release of Transcript Restriction set for 8/18/2014.(Rodriguez, Somari) (Entered: 05/15/2014) |
| 05/15/2014 | 69 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 5/9/14 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(Rodriguez, Somari) (Entered: 05/15/2014) |
| 05/16/2014 | 70 | NOTICE of Response to the Courts OSC Portion Of Its Memorandum Opinion And Order Dated May 9, 2014 re:_66 Memorandum &Opinion,,,. Document filed by Donald Robert Pierson, II. (Attachments: #_1 Affidavit Declaration of Forrest Turkish ISO Response)(Turkish, Forrest) (Entered: 05/16/2014) |
| 05/23/2014 | 71 | RESPONSE in Support of Motion re:_59 MOTION for Attorney Fees *and Payment of litigation expenses.,_57 MOTION to Approve Class Action Settlement and Plan of Allocation. *Concerning Time Lead Counsel Spent Responding to Turkish Objection.* Document filed by The City of Providence. (Attachments: #_1 Affidavit, #_2 Exhibit A)(Gardner, Jonathan) (Entered: 05/23/2014) |
| 05/30/2014 | 72 | REPLY MEMORANDUM OF LAW in Opposition re:_59 MOTION for Attorney Fees *and Payment of litigation expenses.,_57 MOTION to Approve Class Action Settlement and Plan of Allocation. *Reply to Lead Counsel's submission of time responding to the Pierson Objection..* Document filed by Donald Robert Pierson, |

**AA10**

| | | II. (Turkish, Forrest) (Entered: 05/30/2014) |
|---|---|---|
| 06/06/2014 | 73 | NOTICE OF APPEAL from 66 Memorandum &Opinion,,,. Document filed by Donald Robert Pierson, II. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Turkish, Forrest) (Entered: 06/06/2014) |
| 06/06/2014 | | Appeal Fee Due: for 73 Notice of Appeal. Appeal fee due by 6/20/2014. (tp) (Entered: 06/09/2014) |
| 06/09/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 73 Notice of Appeal. (tp) (Entered: 06/09/2014) |
| 06/09/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 73 Notice of Appeal filed by Donald Robert Pierson, II were transmitted to the U.S. Court of Appeals. (tp) (Entered: 06/09/2014) |
| 06/10/2014 | 74 | ORDER CLOSING CASE: It is not worth the time or the trouble to prepare an opinion addressing in detail the many self–serving statements and incredibly weak arguments (including the defense of his rote objection to "gold standard" notice to the members of the class) in Objector's response to the court's order to show cause – particularly in a circuit that routinely second– guesses sanctions awarded by a district court. I thus limit myself to a few observations as set forth herein... The clerk of the court is directed to close this case. (Signed by Judge Colleen McMahon on 6/10/2014) (ja) (Entered: 06/10/2014) |
| 06/23/2014 | | USCA Appeal Fees received $ 505.00 receipt number 465401098511 on 06/20/2014 re: 73 Notice of Appeal filed by Donald Robert Pierson, II. **[USCA Case No.. 14–2135–cv.]** (nd) (Entered: 06/23/2014) |
| 06/23/2014 | | USCA Case Number 14–2135 from the US Court of Appeals, Second Circuit assigned to 73 Notice of Appeal filed by Donald Robert Pierson, II. (nd) (Entered: 06/23/2014) |
| 08/29/2014 | 75 | MOTION Lead Plaintiff's Notice of Motion for an Appeal Bond . Document filed by The City of Providence. (Attachments: # 1 Proposed Order)(Gardner, Jonathan) (Entered: 08/29/2014) |
| 08/29/2014 | 76 | MEMORANDUM OF LAW in Support re: 75 MOTION Lead Plaintiff's Notice of Motion for an Appeal Bond . . Document filed by The City of Providence. (Gardner, Jonathan) (Entered: 08/29/2014) |
| 08/29/2014 | 77 | DECLARATION of Jonathan Gardner in Support re: 75 MOTION Lead Plaintiff's Notice of Motion for an Appeal Bond .. Document filed by The City of Providence. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Gardner, Jonathan) (Entered: 08/29/2014) |

**AA11**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Judge McMahon

———————————————————— x

J. ROBERT ARBUTHNOT, Individually and
on Behalf of All Others Similarly Situated,

                    Plaintiff,

      vs.

AEROPOSTALE, INC., THOMAS P.
JOHNSON and MARC D. MILLER,

                  Defendants.

———————————————————— x

Civil Action No. 11 CIV 7132

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL



RECEIVED
OCT 11 2011
U.S.D.C. S.D.N.Y.
CASHIERS

AA12

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Aeropostale, Inc. ("Aeropostale" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the common stock of Aeropostale between February 3, 2011 and August 3, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**AA13**

## PARTIES

6.      Plaintiff J. Robert Arbuthnot, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Aeropostale during the Class Period and has been damaged thereby.

7.      Defendant Aeropostale operates as a mall-based specialty retailer of casual apparel and accessories. It designs, markets, and sells merchandise principally targeting 14 to 17 year-old young women and men.

8.      Defendant Thomas P. Johnson ("Johnson") was, at all relevant times, Chief Executive Officer of Aeropostale.

9.      Defendant Marc D. Miller ("Miller") was, at all relevant times, Chief Financial Officer and Senior Vice President of Aeropostale.

10.     The defendants referenced above in ¶¶8-9 are referred to herein as the "Individual Defendants."

11.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Aeropostale, were privy to confidential and proprietary information concerning Aeropostale, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Aeropostale, as discussed in detail below.  Because of their positions with Aeropostale, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual

- 2 -

**AA14**

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Aeropostale's business.

13.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Aeropostale's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Aeropostale common stock would be

- 3 -

**AA15**

based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Aeropostale common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Aeropostale's business, operations and management and the intrinsic value of Aeropostale common stock; (ii) allowed certain Company insiders, including Defendants Johnson and Miller, to collectively sell 143,401 shares of their personally-held Aeropostale common stock for gross proceeds in excess of $3.5 million; and (iii) caused plaintiff and members of the Class to purchase Aeropostale common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased the common stock of Aeropostale during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Aeropostale stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by

- 4 -

AA16

Aeropostale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public misrepresented material facts about the business, operations and management of Aeropostale;

(c)     whether the price of Aeropostale common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 5 -

**AA17**

## SUBSTANTIVE ALLEGATIONS

22.     Defendant Aeropostale describes itself as a "mall-based, specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old young women and men through its Aeropostale® stores and 7 to 12 year-old kids through its P.S. from Aeropostale® stores."

23.     The Class Period begins on February 3, 2011.  On that date, Aeropostale issued a press release announcing its January 2011 sales results and guidance for the fourth quarter of 2010.  For January 2011, net sales increased 7% to $120.4 million, compared to $112.5 million for the same period the previous year.  For the quarter, total net sales increased 5% to $838.9 million.  As a result, the Company "raised its fourth quarter earnings guidance to a range of $0.96 to $0.97 per share, versus its previously issued guidance of $0.94 to $0.96 per share."

24.     On March 10, 2011, Aeropostale issued a press release announcing its financial results for the fourth quarter and fiscal year of 2010, the period ended January 29, 2011.  For the quarter, the Company reported diluted net earnings of $0.95 per diluted share and net sales of $839.3 million.  Defendant Johnson, commenting on the results, stated, in pertinent part, as follows:

> In 2010 the Aeropostale brand continued to build momentum and popularity, we opened our flagship Times Square store, and we continued the roll-out of our children's concept 'P.S. from Aeropostale.' While we are proud of our many accomplishments, our performance in the back-half was below our expectations. The teen retail environment was highly promotional and we believe that we did not execute to our full potential. Moving into 2011, we recognize our opportunities and are more determined than ever to show the power of the Aeropostale brand.

With regard to the Company's outlook for the first quarter and full year 2011, Defendants stated, in pertinent part, as follows:

> For the first quarter of fiscal 2011, the Company expects earnings in the range of $0.35 to $0.38 per share, compared to earnings of $0.48 per share last year. For the full year, the Company expects net earnings in the range of $2.20 to $2.40 per diluted share.

> Mr. Johnson, continued, "Our outlook for the first quarter reflects the impact from clearing through holiday inventories, and our outlook for the full year reflects

- 6 -

**AA18**

industry wide inflationary pressures. As we look forward into 2011, we recognize that the entire sector faces near term challenges. We are, however, focused on leveraging our flexible promotional business model to navigate through the current environment and delivering on our initiatives to position ourselves for future growth."

25.     Following the press release, Defendants held a conference call with analysts and

investors to discuss the earnings announcement and the Company's operations.  With regard to the

Company's outlook for 2011, Defendant Johnson stated, in pertinent part, as follows:

Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give the customers what they want. At the same time, Aeropostale, along with the rest of the industry, is facing inflationary pressures. We are working diligently to mitigate the cost increases by leveraging our vendor relationships, raising ticket prices strategically, offering our customers creative promotions and being more conservative with our initial buys.

However, there is still uncertainty surrounding the macroeconomic environment and the consumers' response to higher prices. Accordingly, we will manage the business carefully and focus on delivering key initiatives that will enable us to maximize our sales and profitability. For the rest of 2011, our key initiatives continue to be focused in three primary areas -- executing our product initiatives, enhancing our processes and technology, and concentrating on future growth drivers.

With regard to the Company's inventory, Defendant Miller stated, in pertinent part, as follows:

JANET KLOPPENBURG, ANALYST, JJK RESEARCH: A couple of questions. If you could please talk about the inventory situation -- it feels really high -- and what the expectations are for inventory levels at the end of the first quarter. And also, given the gross margin pressure that it sounds like you are under, I'm wondering if there were any savings opportunities on the occupancy or store operating expense line or elsewhere that might help to offset that.

MARC MILLER: On inventory levels, as we said, coming over Q4 our inventories per retail square foot were up 9%. We have been aggressively marking down through February and early March. And as result, as I updated in the opening remarks, we are currently sitting at a 4% increase in retail per square foot, and it's even lower than that on an absolute units basis.

So we feel like we are appropriately attacking the inventory problem. Our goal, as always, is to end the quarter as cleanly as possible from an inventory standpoint.

With regard to the Company's women's fashion division, Defendant Johnson stated, in pertinent

part, as follows:

**AA19**

EVREN KOPELMAN, ANALYST, WELLS FARGO SECURITIES: Can you talk a little bit more about the girls business? Do you think it's more of a major fashion shift if your customer is changing, she is getting older? Maybe more than a product issue, is it a brand issue? Can you talk a little bit more about maybe what -- from that perspective what's going on with the girls business?

TOM JOHNSON: Sure. We don't believe at all it's brand issue. We think that we just need to be very focused on our core customer and deliver what she wants. We have done it in the past, we have been very good at it and we will continue to do that.

But no, we do not think that there's a brand issue at all. If anything, our graphic business is stronger than ever, both in the girls and the guys business. Just as a point of reference, last year we sold 200 million units, 50 million graphic T-shirts. So we think that the brand is just as strong as ever.

26.     The statements referenced above in ¶¶23-25 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them:

        (a)     that Aeropostale was experiencing declining demand for its women's fashion division, which makes up 70% of the Company's sales;

        (b)     that Aeropostale was enduring pressure on its profit margins as a result of increasing inventory and higher discounts on its clothing; and

        (c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

27.     On May 5, 2011, Aeropostale issued a press release announcing its preliminary first quarter financial results.  For the quarter, the Company reported net sales of $469.2 million and expected earnings of approximately $0.20 per diluted share – well below the Company's previously issued guidance.  Defendant Johnson, commenting on the results, stated, in pertinent part, as follows:

Clearly we are not satisfied with our sales and margin performance for the first quarter. We were more promotional than anticipated on our spring assortment and clearance merchandise. Additionally, our core customers continue to be pressured by challenging macroeconomic conditions while, at the same time, the teen retail sector remains intensely promotional. As we move forward through the year, our entire management team is keenly focused on our key initiatives: regaining the balance and

- 8 -

**AA20**

clarity of our merchandise assortment, managing our cost structure, and leveraging our strong financial position. We remain very confident in our business model, in the ability and determination of our organization, and in the strength and positioning of our brand.

28.     In reaction to the announcement, the price of Aeropostale stock fell $4.20 per share, or 16.5%, to close at $21.29 per share, on heavy trading volume. However, Defendants continued to conceal the true scope of the problems at the Company.

29.     On May 19, 2011, Aeropostale issued a press release announcing its first quarter financial results and second quarter financial guidance. For the quarter, the Company reported diluted net earnings per share of $0.20 per share, net income of $16.4 million and net sales of $469.2 million. With regard to the Company's outlook for the second quarter, Defendants stated, in pertinent part, as follows:

> For the second quarter of fiscal 2011, the Company expects earnings in the range of $0.11 to $0.16 per share. Based on current business trends and uncertainty surrounding the retail environment in the back-half of the year, the Company is not reiterating or providing an update to its previously issued full year guidance at this time. Moving forward, the Company expects to provide quarterly guidance.

> Thomas P. Johnson, Chief Executive Officer, commented, "Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories to position ourselves appropriately for the important back to school selling season. While we are disappointed with our current performance, we are confident that our entire organization is focused on the right initiatives to regain market share. Our goals for the remainder of the year remain very clear - regain balance and clarity in our merchandise assortments, mitigate industry wide cost increases, and manage our cost structure conservatively and carefully."

30.     Following the Company's first quarter press release, Defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations. Defendant Johnson, commenting on the Company's "disappointing" first quarter performance, stated, in pertinent part, as follows:

> The first quarter was clearly very disappointing. While our February started off well, we experienced a significant deceleration in the business as we moved through March and April. Sales were affected more severely than we originally anticipated

- 9 -

**AA21**

during the Easter shift, and we did not experience the recovery that we had expected during the month of April.

We believe our performance was primarily impacted by the merchandising missteps we discussed on our last conference call. Based upon the merchandising strategies that were initiated back in the back half of last year, we did not deliver a balanced and compelling women's assortment for the first half of this year. Additionally, the retail environment remains highly competitive and promotional and our core customer continues to be pressured by difficult macroeconomic conditions.

As a result of these factors, we were significantly more promotional than anticipated on our spring assortment and clearance merchandise. By division, our men's business was up 2% comp, while our women's business was down 10% comp. During the quarter, our men's business continued to perform very well across multiple key classifications while our women's assortment underperformed. We experienced particular weakness in our women's knit tops business where we did not deliver a cohesive assortment in terms of silhouette, color and fashion.

We were encouraged, however, with our girls' positive response to certain newness in details, color and prints. We experienced strong sellthroughs in expanded classifications such as dresses and skirts.

Moving into the remainder of the year, our number one priority is to regain the balance and clarity in our assortment. We have made significant changes to the assortments starting in the back half of 2011. We are committed to returning to our fun, bright and optimistic product offering.

Additionally, we will deliver the right fashion and color palette, one that is understandable to our customer and fits her lifestyle. The girl's wardrobe is now broader than ever and we have the opportunity to offer her expanded classifications and more fashion.

31.     With regard to the Company's inventory situation, Michael Cunningham

("Cunningham"), Aeropostale's President, stated, in pertinent part, as follows:

KIMBERLY GREENBERGER, ANALYST, MORGAN STANLEY SMITH BARNEY: My question is on inventory. I'm wondering if you can talk about the 16% increase here. How did that come out relative to your initial expectation? And as you look at the end of second quarter, I would assume that you will see some cost inflation in the end of second quarter inventory levels.

So what do you think we should look for in terms of end of inventory -- sorry, end of second quarter inventory on a cost basis versus a unit basis? I think you said you were buying units down. If you could just help us understand that, that would be great.

**AA22**

MICHAEL CUNNINGHAM: Sure I can. Let me tackle the second half. We said we bought the units down in the second half. The cost impressions we've said were going to be up probably 35% in the beginning in the beginning of the second half. So at that rate, basically should be kind of flattish total cost inventory.

With regard to where we ended first quarter, I think first quarter was up 6% per square foot, which was not too unreasonable. However, given as Marc indicated some of the current business trends, especially with the reception of the spring product that Tom talked about, we are backing up in our inventory so we are being very aggressive with the markdown. And our goal is to basically take this quarter and liquidate as much as we can with the spring product to drive through and be flattish last year with any carryover inventory and open up back-to-school with fresh product.

32.     With regard to inventory and demand for the Company's products, Defendant Johnson and Cunningham stated, in pertinent part, as follows:

JANET KLOPPENBURG, ANALYST, JJK RESEARCH: Just a couple of follow-ons there. So I'm glad you understand what the problem is, Tom, and I'm just wondering if the remedies to that were -- if you had enough time to infuse the remedies to the problem with the tops into the back-to-school season? Or do you think that because of your lead times we should be more hopeful about some sort of improvement in that important category in the fourth quarter?

And also, Michael, if you could be a little bit more specific about inventories. I assume you are planning them down significantly in the back half, but I didn't hear that. So if you could give us a little more embellishment that would help. Thanks.

TOM JOHNSON: Sure, Janet. The first part clearly we are building and yes you are correct. We will be more right in the fourth quarter than we are in the third quarter, but we are certainly more right in the third quarter than we were in the first quarter. So we are making incremental change and we understand that change and we will be building towards that. Mike?

MICHAEL CUNNINGHAM: And, Janet, this is Michael. Yes we are -- and I believe we talked about this on the last quarter call, but we are planning our units down in the mid- to high single digits for Q3 and in the high single to low double digits down in units for Q4. Obviously unit cost will be up.

And with regards to the question that Kim asked, again, we bought units flat for Q2 but the cost of increase will be about 3%. So there will be a slight increase in inventory if we end clean as we anticipate.

33.     In reaction to these announcements, on May 20, 2011, the price of Aeropostale stock fell $3.04 per share, or 14.25%, to close at $18.30 per share, on extremely heavy trading volume.

- 11 -

**AA23**

34.     Then, on August 4, 2011, Aeropostale issued a press release providing a business update for the second quarter of 2011. For the quarter, the Company reported net sales of $468.2 million, a decrease of 5% from the second quarter of 2010, and expected net earnings to be in the range of $0.02 to $0.03 per share. Defendant Johnson, commenting on the second quarter results, stated, in pertinent part, as follows:

> We are very disappointed with our second quarter financial results that were clearly unacceptable. As a result of a lack of balance in our merchandise assortments, as well as continued promotional and macroeconomic challenges, we significantly increased the depth and breadth of our promotions and markdowns. Our top priority is to deliver a merchandise assortment that resonates with the teen customer and captures market share from our competitors. Additionally, based on current business conditions that are likely to continue for the remainder of the year, we are planning our inventories conservatively and focusing aggressively on cost controls. As we look to 2012 and beyond, we have great confidence in the strength of the Aeropostale and PS brands, in our ability to develop balanced merchandise assortments for our customer, and in our capability to deliver improved financial performance and growth.

35.     In reaction to the Company's announcement, on August 4, 2011, the price of Aeropostale stock fell $3.99 per share, or 24%, to close at $12.53 per share, on extremely heavy trading volume.

36.     On August 18, 2011, the Company held a conference call with analysts and investors to discuss Aeropostale's second quarter 2011 financial results. Again, Defendant Johnson described the quarter as "disappointing" due to weak trends in June and July. In that regard, Defendant Johnson stated, in pertinent part, as follows:

> We are clearly disappointed with our second-quarter results. Since we last spoke to you in May, our trends in June and July weakened, and we experienced sharply lower consumer demand. In response, we increased both the depth and breadth of our promotions and our markdowns in order to move through our spring and summer merchandise. This action resulted in significantly lower than expected sales and gross margins for the second quarter.
>
> Same-store sales for the quarter declined 14%, and our GAAP earnings for the quarter were $0.04 per diluted share. While these financial results are unexceptionable, we believe we are making progress with our merchandise

- 12 -

**AA24**

initiatives. On our last conference call, we discussed our organization's top priority -- regaining the balance and clarity of our merchandise assortment and winning back market share.

We outlined two specific areas of improvement in our women's business, color and fashion. Since that call, as many of you have commented, we have returned our color palette to represent the fun, bright and optimistic spirit that our customer wants.

We have also started to integrate more fashion into our assortment, and this initiative remains our greatest opportunity. While the overall business in women's was weak for the quarter, we did experience bright spots when we offered the girl newness and fashion that was both understandable and consistent with the heritage of the Aeropostale brand.

Moving forward, our entire product development team is working diligently to strike the appropriate balance between fashion and core basics. We will leverage our flexible operating model and speed to market, becoming even more responsive to emerging trends. Additionally we will continue to fund new and innovative ways to connect with our customer, amplifying our fashion message and create excitement in our stores.

This initiative of pursuing more fashion is a subtle modification to our formula, but can have meaningful impact to our brand projection and performance. To be clear, we remain committed to our brand positioning. Aeropostale will always be a fun, inclusive and parent-friendly brand offering our team customer the best mix of fashion and basics at compelling prices.

With regard to the Company's outlook for the third quarter and full year 2011, Defendant Miller

stated, in pertinent part, as follows:

I will now discuss our guidance outlook. With third quarter, we expect earnings per share in the range of $0.09 to $0.15 per diluted share. This guidance assumes a share count of 82 million and a tax rate of 40.5%. We expect the effective tax rate to normalize as we move through the second half of the year. While our trends have improved slightly since the second quarter, we believe it is prudent to take a cautious view of the third quarter and the remainder of the year as uncertainty surrounding the macroeconomic and competitive environment remains, and we continue to work through our merchandising initiatives.

With regard to the Company's high level of inventory, Cunningham stated, in pertinent part, as

follows:

DOROTHY LAKNER, ANALYST, CARIS & COMPANY: I wanted to ask about inventory. It seems a little high, obviously, relative to where your sales are, even if

- 13 -

**AA25**

trends have improved. So I am just wondering in terms of the carryover there and where we should expect that to be at the end of 3Q or what you are aiming at?

MICHAEL CUNNINGHAM, PRESIDENT, AEROPOSTALE, INC.: Clearly we are not satisfied with our level of inventory at the end of the second quarter. It is clearly well above our sales trend. And I think as you look at our guidance for Q3, it reflects our plans and our goals to liquidate the inventory, the carryover inventory to again try to get clean and have a fresh inventory for the holiday season.

37.     The market for Aeropostale common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Aeropostale common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Aeropostale common stock relying upon the integrity of the market price of Aeropostale common stock and market information relating to Aeropostale, and has been damaged thereby.

38.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Aeropostale common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

39.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Aeropostale's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Aeropostale and its business, prospects and operations, thus causing the Company's

- 14 -

**AA26**

common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

40. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Aeropostale, their control over, and/or receipt and/or modification of Aeropostale's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Aeropostale, participated in the fraudulent scheme alleged herein.

41. Defendants were further motivated to engage in this course of conduct in order to enable certain Company insiders, including Defendants Johnson and Miller, to collectively sell 143,401 shares of their personally-held Aeropostale common stock for gross proceeds in excess of $3.5 million. The insider shares sold during the Class Period are set forth more fully in the following chart:

| Insider | Position | Date | Shares | Price | Proceeds |
|---------|----------|------|--------|-------|----------|
| Ross Citta | Chief Accounting Officer | 03/25/11 | 1,522 | $24.23 | $36,878 |
| | | 05/25/11 | 2,753 | $18.29 | $50,352 |
| | | | 4,275 | | $87,230 |
| | | | | | |
| Julian Geiger | Director | 02/08/11 | 30,000 | $25.33 | $759,900 |
| | | | | | |

- 15 -

**AA27**

| | | | | | |
|---|---|---|---|---|---|
| Thomas Johnson | Chief Executive Officer | 02/14/11 | 8,080 | $25.81 | $208,545 |
| | | | | | |
| Mindy Meads | President and Chief Merchandising Officer | 02/14/11 | 9,042 | $25.81 | $233,374 |
| | | 02/16/11 | 10,000 | $26.57 | $265,700 |
| | | 03/25/11 | 10,935 | $24.23 | $264,955 |
| | | 03/28/11 | 32,024 | $23.90 | $765,374 |
| | | 03/30/11 | 16,875 | $24.67 | $416,306 |
| | | | 78,876 | | $1,945,709 |
| | | | | | |
| Marc Miller | Chief Financial Officer | 03/25/11 | 2,541 | $24.23 | $61,568 |
| | | 03/28/11 | 2,527 | $23.90 | $60,395 |
| | | | 5,068 | | $121,964 |
| | | | | | |
| Mary Pile | Executive Vice President | 03/25/11 | 3,173 | $24.23 | $76,882 |
| | | 03/28/11 | 3,157 | $23.90 | $75,452 |
| | | | 6,330 | | $152,334 |
| | | | | | |
| Barbara Pindar | Senior Vice President, Planning and Allocation | 03/25/11 | 2,862 | $24.23 | $69,346 |
| | | 03/28/11 | 2,826 | $23.90 | $67,541 |
| | | | 5,688 | | $136,888 |
| | | | | | |
| Edward Slezak | Senior Vice President, General Counsel and Secretary | 03/25/11 | 2,557 | $24.23 | $61,956 |
| | | 03/28/11 | 2,527 | $23.90 | $60,395 |
| | | | 5,084 | | $122,351 |
| | | | | | |
| | | **Total:** | **143,401** | | **$3,534,921** |

### Loss Causation/Economic Loss

42.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Aeropostale common stock and operated as a fraud or deceit on Class Period purchasers of Aeropostale common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Aeropostale common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Aeropostale common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

- 16 -

**AA28**

43.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of Aeropostale's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Aeropostale common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $26.64 per share on February 18, 2011.

44.     As a direct result of defendants' disclosures on May 5, 2011, May 19, 2011 and August 4, 2011, the price of Aeropostale common stock fell precipitously, falling from its closing price of $25.49 per share on May 4, 2011 to $12.53 per share on August 4, 2011 – a loss of $12.96 per share, or over 50%.  These drops removed the inflation from the price of Aeropostale common stock, causing real economic loss to investors who had purchased Aeropostale common stock during the Class Period.

45.     The over 50% decline was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Aeropostale common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Aeropostale common stock and the subsequent significant decline in the value of Aeropostale common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

46.     At all relevant times, the market for Aeropostale common stock was an efficient market for the following reasons, among others:

- 17 -

**AA29**

(a)     Aeropostale common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, Aeropostale filed periodic public reports with the SEC and the NYSE;

(c)     Aeropostale regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Aeropostale was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Aeropostale common stock promptly digested current information regarding Aeropostale from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Aeropostale common stock during the Class Period suffered similar injury through their purchase of Aeropostale common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

48.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the

- 18 -

statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aeropostale who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

51.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

52.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Aeropostale common stock. Plaintiff and the Class would not have purchased Aeropostale common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

- 19 -

53.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Aeropostale common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of Aeropostale within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Aeropostale, and their ownership of Aeropostale stock, the Individual Defendants had the power and authority to cause Aeropostale to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

**AA32**

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 11, 2011

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.

_(signature)_

MARIO ALBA JR.

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
MARSHALL DEES
200 Ashford Center North, Suite 300
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, Colorado 80203
Telephone: 303/861-1764
303/395-0393 (fax)

Attorneys for Plaintiff

**AA33**

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the complaint and authorized its filing.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| ARO | | *See attached* | |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| ARO | | *None* | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

1

**AA34**

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _7th_ day of _October_, 2011 in ___Belleville___, __KS__.
                                              City              State

(Signature) X _____

(Print Name) _J. Robert Arbuthnot_

2

**AA35**

EXHIBIT A

Arbuthnot ARO Purchases:

| Date | Shares | Price / Share | Cost |
|---|---|---|---|
| 5/10/2011 | 200 | $21.2284 | $4,245.68 |
| 5/10/2011 | 200 | $21.00 | $4,200.00 |
| 5/13/2011 | 400 | $21.4284 | $8,571.36 |
| 5/20/2011 | 400 | $18.3899 | $7,355.96 |
| 5/20/2011 | 600 | $18.26 | $10,956.00 |
| 6/1/2011 | 200 | $18.66 | $3,732.00 |
| 6/2/2011 | 200 | $18.15 | $3,630.00 |
| 6/7/2011 | 300 | $17.8084 | $5,342.52 |
| 6/15/2011 | 200 | $17.38 | $3,476.00 |



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, ) | No. 11-CV-7132 (CM)(THK) |
| ) | |
| Plaintiff, ) | <u>CLASS ACTION</u> |
| ) | |
| vs. ) | **AMENDED CLASS ACTION** |
| ) | **COMPLAINT FOR VIOLATION** |
| AEROPOSTALE, INC., THOMAS P. JOHNSON ) | **OF THE FEDERAL SECURITIES** |
| and MARC D. MILLER, ) | **LAWS** |
| ) | |
| Defendants. ) | <u>JURY TRIAL DEMANDED</u> |
| ) | |

U S DISTRICT COURT SDNY

2012 FEB 10 P 4 05

RECEIVED

**AA37**

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE ........................................................................7

III.     PARTIES .............................................................................................................7

IV.     CONFIDENTIAL WITNESSES .......................................................................8

V.     SUBSTANTIVE ALLEGATIONS ..................................................................10

     A.      BACKGROUND ....................................................................................10

         1.      Aeropostale: An Overview ...................................................10

         2.      Aeropostale's Business Model ..............................................10

         3.      The Company's Product Categories and Seasons ...................11

         4.      Aeropostale's Fiscal Calendar ..............................................12

     B.      Aeropostale's Core Operations.............................................................12

     C.      Aeropostale's Comprehensive Information Management System ........13

     D.      Weekly Executive Committee Meetings, Daily Reports, and Unit-Q
            Meetings ..............................................................................................14

         1.      Weekly Executive Committee Meetings ...............................14

         2.      Daily Flash Reports and the "Bible" .....................................15

         3.      Weekly Unit-Q Reports and Monthly Unit-Q Meetings ..........16

     E.      Aeropostale Moves Away from It's Core Offering in the Back Half of
            2010 ....................................................................................................17

     F.      Defendants Know That the Company Has Already Over-Ordered
            Inventory Under Meads' New Designs for Spring and Summer 2011.................19

     G.      Sales of the New Styles Continue to Sell Poorly Through 4Q2010 Leading
            to Increased Inventory Backlog............................................................20

     H.      Defendants Condition the Market to Believe 2010 Inventory Overhang
            Would Not Linger into 2011 .................................................................20

     I.      The Inventory Problems Worsened Throughout the First Half of 2011 and
            Defendants Knew the Severity of the Developing Crisis ......................21

**AA38**

J.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING
     STATEMENTS MADE DURING THE CLASS PERIOD ..................................24

     1.   March 10, 2011 Press Release ..................................................24

     2.   March 10, 2011 Earnings Conference Call ...............................26

     3.   May 5, 2011 Business Update ..................................................30

     4.   May 19, 2011 Press Release .....................................................32

     5.   May 19, 2011 Earnings Conference Call....................................33

K.   THE TRUTH IS FULLY REVEALED..................................................35

     1.   August 4, 2011 Business Update ..............................................35

     2.   August 18, 2011 Press Release ................................................37

     3.   August 18, 2011 Earnings Conference Call .............................38

VI.   PLAINTIFF'S INDUSTRY EXPERT ALLAN ZWERNER ..........................................40

VII.  ADDITIONAL SCIENTER ALLEGATIONS ....................................................42

VIII. LOSS CAUSATION AND ECONOMIC LOSS....................................................44

IX.   CLASS ACTION ALLEGATIONS ................................................................46

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE
      AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE
      FRAUD ON THE MARKET DOCTRINE ........................................................48

XI.   NO STATUTORY SAFE HARBOR ................................................................51

XII.  CONTROL PERSON ALLEGATIONS ................................................................52

COUNT I Claim for Violations of Section 10(b) Of The Exchange Act and Rule 10b-5(b)
     Promulgated Thereunder Against All Defendants................................................54

COUNT II Claim for Violation of Section 20(a) of the Exchange Act Against the
     Individual Defendants................................................................................58

XIII. PRAYER FOR RELIEF ................................................................................59

XIV.  JURY DEMAND................................................................................60

AA39

Lead Plaintiff, The City of Providence ("Providence" or "Plaintiff"), by its undersigned attorneys, hereby brings this Amended Complaint ("Complaint") against Aeropostale, Inc. ("Aeropostale" or the "Company"), Thomas P. Johnson and Marc D. Miller ("Defendants").  The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of Aeropostale and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, *etc.*) and will be described in the masculine in all cases in order to protect their identities); review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by Aeropostale, regulatory filings and reports, securities analysts' reports and research data, investor conference transcripts, Company advisories, press releases and other public statements issued by the Company, media reports about the Company and consultations with experts, including consultation with Allan Zwerner, an expert on the retail and wholesale industry with over 40 years of experience.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

I.      **NATURE OF THE ACTION**

1.      Plaintiff brings this action on behalf of itself and as a class action on behalf of all persons and entities who purchased the common stock of Aeropostale between March 11, 2011 and August 18, 2011 inclusive (the "Class Period") and who were damaged thereby.

2.      Aeropostale is a specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old young women through its Aeropostale stores and 7 to 12 year-old

**AA40**

children through its P.S. from Aeropostale ("P.S.") stores. Its apparel offerings include graphic t-shirts, tops, bottoms, sweaters, jeans, outerwear and accessories. Much of the merchandise features Aeropostale brand logos. As of January 29, 2011, Aeropostale operated 965 stores, and employed 4,160 full-time and 13,668 part-time employees.

3.      Aeropostale's business is highly seasonal, highlighted by back-to-school demand during the third quarter and fourth quarter holiday shopping. Sales during the first and second quarters are traditionally less robust.

4.      Aeropostale's primary focus is on merchandise designed for young women. For at least the past three years, approximately 70% of the Company's revenue was generated from the Company's Women's fashion line.

5.      Aeropostale's success, or lack thereof, depends almost entirely on the Company's ability to match the merchandise it offers with the styles young women want. When Aeropostale correctly anticipates both the style and the likely level of demand for that style, the Company does well. When the Company selects the wrong style or overestimates demand for its clothing and accessories, it performs less well.

6.      During the first half of 2010, a traditionally slow period, Aeropostale's sales were relatively strong. Aeropostale did a good job anticipating customer demand for a strong product line. In fact, the Company reported record profits for those seasonally slow quarters.

7.      A turn for the worse took place in the second half of 2010. The change coincided with the strategic decision made by the Company's former Co-CEO and Chief Merchandising Officer, Mindy Meads, to change the Women's clothing line design to one that (she hoped) appealed to a more mature audience. This change in design philosophy was implemented for the 2010 back-to-school and holiday seasons and was carried through the ordering of the 2011 spring

**AA41**

and summer lines.  The strategy backfired, with back-to-school and holiday sales in 2010 falling

far short of plan.  Ms. Meads ultimately lost her job with the Company as a result thereof.

8.      Back-to-school and holiday clothing that did not sell, even at a discount, clogged

the Company's stores' shelves long after the 2010 holiday season.

9.      The arrival of the spring 2011 line also designed by Meads for a more mature

audience exacerbated the Company's inventory problems.  Unfortunately for Aeropostale, orders

were placed for this misguided spring line (and summer line) months earlier.  The Company was

faced with the prospect of having to try to sell off the fall, winter and spring lines during the first

quarter of 2011, at drastically reduced prices.

10.     Aeropostale maintains sophisticated software systems which allow the Company

to track orders, inventory, store-wide sales, and margins on a real time basis.  So when a

particular clothing line is not selling well, or when inventory is backing up, Defendants know it

immediately and institute promotions to move that inventory.  Indeed, according to former

employees of the Company, Defendants knew by the start of the Class Period that the Company

had a severe inventory carryover problem and that the Company's traditional efforts to sell

through the inventory back log were unavailing.

11.     The sophisticated software systems allowed the Company not only to track the

performance, sale, inventory levels and margins on its merchandise, but they allowed Defendants

to forecast revenue and earnings with remarkable precision because merchandise that sold well

during the first part of a quarter could be expected to sell well throughout the quarter, while slow

moving inventory would be discounted in a predictable, quantifiable manner.  It became the

Company's practice, a few weeks into a quarter, to provide analysts with revenue and earnings

guidance for the balance of the quarter.

AA42

12.     In 2010, for example, four weeks into the fourth quarter, the Company provided earnings per share guidance of $0.94-$0.96, and subsequently reported actual earnings per share of $0.95.  In the third quarter 2010, the Company provided guidance three weeks into the quarter of $0.61-$0.63, and reported actual third quarter earnings of $0.63.  Defendants offered second quarter 2010 guidance of $0.45-$0.48 per share a few weeks into the quarter, and reported actual earnings per share of $0.46.  In other words, a few weeks into a given quarter, Defendants have the wherewithal and technology to know what to expect in the balance of the quarter, absent an unexpected and unknown change in circumstances. The market came to expect these predictable results.

13.     In keeping with this custom and practice, and with real time access to the Company's actual performance during the first half of the first quarter, on March 10, 2011, Defendants guided analysts to expect first quarter 2011 earnings of $0.35-$0.38 per share—a robust expectation only slightly below the Company's very successful first quarter 2010 actual results.  When Defendants provided this guidance, they knew that the Company still had significant carry over fall and winter line inventory clogging its shelves and in some instances, off-site storage spaces that had to be rented to house the stale fall and winter clothing lines, a spring line that was not selling well in February, a coming summer line ordered by Meads in the same style as the failed 2010 back-to-school and holiday lines, and no ability to generate anywhere near the level of revenue or generate the kind of margins needed to meet that guidance. These factors made the strong guidance knowingly false and misleading when made.  Defendants compounded their misleading guidance with false non-forward looking statements indicating that the Company had successfully addressed the inventory overhang from 2010 and was confident in its spring and summer 2011 styles.  In reality, as Allan Zwerner, an expert in the retail and

AA43

wholesale industry opined, by six weeks into the first quarter, Defendants had no reasonable basis to offer this guidance. In consideration of the real-time data Defendants had in front of them and the absence of any unexpected or unknown circumstances, the guidance "miss" of $0.15-$0.18 is too great to believe otherwise.

14. Moreover, Defendants' after-the-fact explanation for the earnings miss, that sales were strong in February but took an unexpected turn for the worse in March, is contradicted by numerous former employees of the Company, who maintain that February sales were, in reality, dismal.

15. By April, 2011, the Company was in full panic mode, with plans already in place to offer unprecedented promotions already utilized on a trial basis which, they knew, when implemented chain-wide, would decimate the Company's margins and earnings.

16. The second quarter guidance provided on May 10, 2011, also lacked any reasonable basis, as did Defendants' non-forward looking statements that the Company's inventory issues could be remedied in the second quarter. At the time the Company provided second quarter guidance, Defendants knew that the spring line and early sales of the summer 2011 line were unpopular – as they knew would be the case - and would never generate the level of revenue or earnings to meet its $0.11-$0.16 guidance. Again, Mr. Zwerner concluded that a guidance miss of $0.15 to $0.20 per share on a forecast given two to three weeks into the quarter, combined with the known deterioration in revenue and need to discount almost everything on the Company's shelves, and the absence of any unexpected or unknown change in circumstances, meant that Defendants had no reasonable basis to believe that this guidance was attainable when made.

AA44

17.     Without any unexpected or unknown developments to account for the earnings misses during the first and second quarters, and with full knowledge of the unprecedented inventory backlog, slow sales, and spring and summer lines that its core audience rejected, there was no reasonable justification for providing the misleading guidance.

18.     Throughout the Class Period, rather than disclose the true, serious nature of the problems facing the Company, Defendants systematically and fraudulently misled the investing public regarding the true state of the Company's financial condition and ability to correct the mistakes from fall and winter 2010, withholding known facts indicating that (1) Defendants over-ordered merchandise that they knew, prior to and during the Class Period, was unpopular with its core female customer base, (2) the unpopular styles had been ordered through the summer 2011 line, (3) the Company was having trouble off-loading this merchandise, even with normal promotional markdowns, (4) the Company was forced to rent extra space at malls to store its inventory overflow, (5) as the inventory crisis deepened, the Company was forced to take significant and unprecedented markdowns, including selling three shirts for the price of one, and (6) all of this would and did have a predictable adverse effect on the Company's margins and ultimately on its earnings per share during the Class Period.

19.     Partial disclosures by the Company on May 5, 2011 and May 19, 2011 concerning the Company's performance for the 1Q2011, and further corrective disclosures on August 4, 2011 and August 18, 2011 concerning the Company's performance for 2Q2011, led to Aeropostale's stock price plummeting from $23.05 at the close of business on March 11, 2011, the beginning of the Class Period, to $10.71 at the end of the Class Period—more than a 53% decline.

**AA45**

20.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock when the truth was revealed, Plaintiff and other Class members have suffered significant losses.

## II.    JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because Aeropostale's principal place of business is located in this District and the acts charged herein, including the dissemination of materially false and misleading information, occurred in this District.

24.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

25.     Court-appointed Lead Plaintiff, Providence, purchased Aeropostale common stock during the Class Period, as indicated in its Certification attached hereto as Exhibit A, and was damaged thereby.

26.     Defendant Aeropostale is a Delaware corporation with its principal executive offices located at 112 West 34th Street, New York, NY 10120. Aeropostale is a primarily mall-based, specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old

**AA46**

young women and men through its Aeropostale stores and 7 to 12 year-old children through its

P.S. from Aeropostale stores.  The Company is a vertical retailer, controlling it own proprietary

brands that it designs, sources, markets and sells in its own store environment.  Aeropostale

products can only be purchased in Aeropostale stores and online at www.aeropostale.com.

***Approximately 70% of the Company's annual net sales have been attributable to Women's***

***fashion for the past three years.***  Aeropostale trades on the NYSE under the symbol "ARO."

27.     Defendant Thomas P. Johnson ("Johnson") served as Aeropostale's Chief

Executive Officer ("CEO") since December 2010 after serving as the Company's Co-Chief

Executive Officer (along with Mindy Meads) from February 2010 to December 2010.  Prior to

serving as Co-CEO, Defendant Johnson served as Executive Vice President and Chief Operating

Officer of the Company from March 2004 to February 2010.  Defendant Johnson has also served

as a member of the Company's Board of Directors ("Board") since August 2008.

28.     Defendant Marc D. Miller ("Miller") served as Aeropostale's Chief Financial

Officer ("CFO") since December 2010.  Prior to that, Defendant Miller was the Senior Vice

President of Strategic Planning, Business Development and E-Commerce from April 2007 to

December 2010.

29.     The defendants referenced above in ¶¶27-28 are referred to herein as the

"Individual Defendants."  Aeropostale and the Individual Defendants are collectively referred to

as "Defendants."

## IV.     CONFIDENTIAL WITNESSES

30.     Plaintiff's counsel's investigation included interviews of former employees of

Aeropostale and other persons with knowledge of the matters alleged herein.  The following

CWs were knowledgeable about the allegations contained herein and provided information in

confidence to Plaintiff:

AA47

- CW1 was the former Visual Manager of Corporate Initiatives at Aeropostale. He was employed by the Company from June 2008 through July 2011. In his capacity as the Director of Visual Merchandising CW1 was knowledgeable about the inventory issues confronting the Company before and during the Class Period and routinely discussed the inventory overhang with Defendants.

- CW2 was a Director of Planning and Allocation at the Company from November 2008 through September 2011. For the majority of his tenure, he reported to Barbara Pindar, the Senior Vice President of Planning and Allocation who, along with the Individual Defendants, was a member of the Executive Team. In May 2011, CW2 began reporting to Gina Reis who was the Vice President of Merchandise Planning. According to CW2, Reis reported to Pindar. CW2 focused on Aeropostale's P.S. brand from November 2008 through May 2011. CW2 was then transferred to the "Aero brand" focusing mainly on men's wear from May 2011 through September 2011. At Aeropostale, CW2 was in charge of preparing financials for his group and was responsible for presenting products to the Executive Committee and finalizing buys.

- CW3 was an Associate Merchant in the Merchandising Department at Aeropostale from January 2010 through August 2011, responsible for ordering clothing in the long-sleeve Women's knit line. He reported directly to Caroline Pettinger, Senior Merchant.

- CW4 was an Assistant Designer at the Company from May 2008 through December 2011. During 2011, CW4 was in the Women's woven department and reported to Women's Woven Director Tamara Reynolds. CW4 was responsible for all aspects of line development in the Women's woven outerwear category.

- CW5 was an Associate Merchant at Aeropostale from July 2007 through September 2011. He reported to Christine Munnelly, Vice President of Merchandising. CW5 was responsible for overseeing Women's sweaters and dresses.

- CW6 was a Senior Planner for e-Commerce. He primarily focused on the Company's P.S. brand. He was employed by the Company from July 2010 through July 2011 and reported to Wendy Finerty. CW6 was responsible for managing the P.S. line on the Company's website.

- CW7 was a Freelance Merchandise Assistant in Aeropostale's Merchandising Department from May 2010 through January 2011. He reported to the Head of Women's Accessories.

- CW8 was a Senior Programmer/Analyst at Aeropostale from October 2010 through August 2011. He reported to Georgia Day, Project Leader and Chris

**AA48**

Liu, Vice President of Application Development.  CW8 was responsible for the upgrade and coding of Aeropostale's internal systems.

- CW9 was a Merchandiser at Aeropostale from 2007 through April 2011.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   BACKGROUND

#### 1.   Aeropostale: An Overview

31.    The Aeropostale brand was established by R.H. Macy & Co. ("Macy's") in the early 1980's, as a department store, private label initiative targeting men in their twenties. Macy's subsequently opened the first mall-based Aeropostale specialty store in 1987. Aeropostale was originally incorporated as MSS-Delaware, Inc. in September 1995, and, in February 2000, the Company changed its name to Aeropostale, Inc.  In May 2002, Aeropostale management took the Company public through an initial public offering.  As of January 29, 2011, Aeropostale operated 965 stores, and employed 4,160 full-time and 13,668 part-time employees.[1]

32.    During the Class Period, Aeropostale was a clothing and accessories retailer.  Its "Aeropostale" stores sell clothing targeting 14 to 17 year-old young women and men while its "P.S. from Aeropostale" stores sell clothing targeting 7 to 12 year-old children.[2]

#### 2.   Aeropostale's Business Model

33.    The Company's business model is premised on providing its customer with a selection of fashion at value prices in a teen-focused store environment.  Aeropostale's stores feature visual merchandising, colorful signage and popular music.  Aeropostale's strategy is to update merchandise presentation in its floor displays numerous times throughout the year.  Its

---

[1] *See* SEC Form 10-K filed on March 28, 2011 ("2010 Form 10-K") at 3, 9.
[2] *Id.* at 3.

**AA49**

apparel offering includes graphic t-shirts, tops, bottoms, sweaters, jeans, outerwear and accessories. Much of the merchandise features the brand's logos.[3]

34.     Aeropostale is a vertical retailer—the Company designs, produces, and sells its own products, without using middlemen or wholesalers. The Company sources its merchandise from vendors with production factories located in Asia and Central America.[4]

### 3.     The Company's Product Categories and Seasons

35.     Employees of Aeropostale's merchandising and design department report directly to Defendant Johnson. Employees of the planning department report directly to the Company's President, Michael Cunningham ("Cunningham"). The departments, with Johnson's and Cunningham's oversight, determine the quantities of units needed for each of the Company's product categories.[5] Aeropostale's product categories are broken down by men and women in the Aeropostale line and children in the P.S. line. The Company orders its products by season, breaking up its offerings into spring, summer, back-to-school and holiday.

36.     According to CW2, Aeropostale orders the vast majority of its merchandise from its vendors approximately nine months before the merchandise is slated to hit the stores. By December 1, 2010, 2010 back-to-school and holiday merchandise were already on the shelves and the spring and summer 2011 lines had already been ordered.[6] CW2 confirmed that prior to Meads' departure in early December 2010, the Company had "bought" almost its entire product "through fall" of 2011 based upon Meads' design choices. CW2 added that at least 90% of the merchandise that would fill Aeropostale's shelves through the summer 2011 had been ordered by Meads.

---

[3] *Id.*

[4] *Id.* at 7.

[5] *Id.*

[6] *See* 3Q2010 Earnings Conference Call held on December 1, 2010 at 6.

AA50

### 4. Aeropostale's Fiscal Calendar

37.     The Company's fiscal year and fourth quarter end on the last Saturday in January. As relevant for the Class Period, the Company's fourth quarter and fiscal year 2010 ended on January 29, 2011 ("4Q2010"),[7] the first quarter of 2011 ended on April 30, 2011 ("1Q2011")[8] and the second quarter of 2011 ended on July 30, 2011 ("2Q2011").[9]

### B. Aeropostale's Core Operations

38.     Aeropostale's Women's fashion division was the admitted core of the Company's business.  For the past three years, revenues derived from Aeropostale's Women's fashion division consistently represented approximately ***70% of the Company's annual net sales***.  The Women's division was so critical to the Company's success that Defendants closely monitored all aspects of this line, including daily review of sales and inventory levels.

39.     The Company frequently noted the contribution of its Women's fashion division to overall sales in numerous public filings.  For example:

- In the Company's 4Q2010 Earnings Conference Call on March 10, 2011, Defendant Johnson noted that the women's and men's mix has historically been a 70-30 split, respectively. *Id.* at 12.

- In the Company's 2010 Form 10-K the Company stated that "[w]omen's" represented 69%, 70%, and 71% of the Company's sales for the fiscal years ended January 29, 2011, January 30, 2010, and January 31, 2009, respectively.

- In the Company's 2009 Form 10-K the Company twice noted that Women's fashion represented 70%, 71%, and 72% of sales for fiscal years 2009, 2008, and 2007, respectively.

40.     Aeropostale's quarterly reports covering quarters ended prior to and during the Class Period further touted the significance of the Company's Women's fashion division.  For example:

---

[7] *See* 2010 Form 10-K at 1.

[8] *See* SEC Form 10-Q filed on June 3, 2011, at 1.

[9] *See* SEC Form 10-Q filed on Sept. 7, 2011, at 1.

**AA51**

- In the Company's Form 10-Q filed with the SEC on December 8, 2010, Aeropostale stated that Women's fashion represented 68% and 70% of net sales for the 13 weeks ended October 30, 2010 and October 31, 2009, respectively, as well as 69% and 70% of net sales for the 39 weeks ended October 30, 2010, and October 31, 2009, respectively.

- In the Company's Form 10-Q filed during the Class Period on June 3, 2011 the Company noted that the percentage of net sales attributable to Women's fashion for the 13 weeks ended April 30, 2011, and May 1, 2010, was 68% and 71%, respectively.

41. Analysts also cited the importance of Aeropostale's Women's fashion division. For example, analyst Evren Kopelman of Wells Fargo Securities repeatedly noted that a majority of the Company's sales were derived from the Women's fashion division. *See* Evren Kopelman, Equity Research, Aeropostale, Inc., Jan. 7, 2011, at 1 (noting that Women's fashion represented "70% of sales"); Evren Kopelman, Equity Research, Aeropostale, Inc., Mar. 11, 2011, at 1 (same); Evren Kopelman, Equity Research, Aeropostale, Inc., May 9, 2011, at 1 (same); Evren Kopelman, Equity Research, Aeropostale, Inc., May 20, 2011, at 1 (same); Evren Kopelman, Equity Research, Aeropostale, Inc., Aug. 19, 2011, at 1 (same).

42. Aeropostale's statements made prior to and during the Class Period, the statements of former employees, and contemporaneous analyst reports leave no question that (1) the Women's department was the core of the Company's operations, (2) the Defendants were fully aware of the issues concerning the Company's excessive women's inventory issues (as described more fully herein), and (3) Defendants accessed reports on a daily, weekly, and monthly basis that showed the Company's Women's department was in a massive decline both leading into and continuing through the Class Period.

**C.    Aeropostale's Comprehensive Information Management System**

43. As set forth in the Company's Form 10-K for the year ended January 29, 2011, and as confirmed by CW8, the Company uses a sophisticated management information system

**AA52**

called "Island Pacific" which provides a full range of retail financial and merchandising applications.  Island Pacific performs various functions relating to point-of-sale, inventory management, supply chain, planning and replenishment as well as financial reporting.  Island Pacific is the leading supplier of merchandising, store operations and retail point of sale solutions for multi-store specialty retail chains.[10]

44.     Since 2008, the Company has also been implementing, in phases, new planning and allocation systems.  During 2010, the Company completed implementation of a data warehouse system to enhance its business intelligence reporting capabilities.[11]  This enabled the Company further real-time insight into its inventory position at the store level.  The system also allows the Company to monitor sales of each style and color.  Aeropostale's corporate headquarters direct the merchandise assortments, merchandise pricing, store layout, inventory management, and in-store visuals for all of the Company's stores.

45.     Collectively, the various information systems in place at Aeropostale during the Class Period allowed management to track, *inter alia,* inventory levels, sales data, pricing, and margins, all in real time.   Access to this data allowed Defendants to see which merchandise lines were moving, which lines required added inducements, where and to what extent inventory was backing up, and the profitability of the various merchandise lines.

**D.      Weekly Executive Committee Meetings, Daily Reports, and Unit-Q Meetings**

**1.      Weekly Executive Committee Meetings**

46.     According to CW1 and CW2, as a matter of course and throughout the Class Period, the Company held weekly Executive Committee meetings every Monday in its boardroom at Aeropostale's corporate headquarters in New York.  According to CW1 and CW9,

---

[10] *See* www.islandpacific.com.
[11] 2010 Form 10-K at 8.

**AA53**

the boardroom was a conference room located directly outside of Defendant Johnson's office. CW1 attended these meeting throughout the Class Period and stated that the Individual Defendants regularly attended. CW1 recalled a specific meeting in or about February 2011 during which the "very large" inventory "carryover" problem was discussed. CW1 also recalled a meeting in or about April 2011 attended by Defendants Johnson and Miller where they acknowledged that the heavily discounted merchandise was still not selling.

### 2. Daily Flash Reports and the "Bible"

47. According to CW5 and CW8, the Company updated its "flash" report every day. CW5 confirmed that the "flash" was a spreadsheet broken down by daily units sold, sales, comps, dollars made, inventory and other important sales data figures.

48. According to CW8, each transaction from a cash register or point of sale ("POS") was recorded by the Island Pacific software. The system would take a "polling" from "every single store" each night. The polling would then produce an inventory and sales report. CW8 confirmed that that the polling occurred "every day." The daily polling information, including an inventory and sales report, would appear on "internal flash reports."

49. CW 8 stated that the "flash" was accessible on the Island Pacific system, and that the Individual Defendants had access to and utilized the Island Pacific system, including the "flash" reports. CW5 confirmed that more senior level personnel as well as the executive team had access to Company-wide data on the daily Flash reporting system. According to CW2, the flash report listed "Aero Comp Sales and Gross Margin" by department and compared sales and margins year over year. CW2 also explained that the flash report was broken down by product category (women's, men's, *etc.*) and within each product category was broken down by type of product (*i.e.*, graphic tees, sweaters, dresses, pants). Thus, by looking at a flash report,

**AA54**

Defendants could see on a daily basis how each kind of unit was currently performing as to sales and margins and compare that to the year before.

50.     CW8 stated that Island Pacific also had an inventory application.  CW8 explained that the inventory in this snapshot was divided by "styles" and "sku's." CW8 recalled that the executive team had access to certain files that no others at the Company would be able to view.

51.     In addition, CW8 stated that the Individual Defendants received a daily report known as the "Bible."  CW8 described the "Bible" as providing the Individual Defendants with a "snapshot" of the Company's entire business, including inventory.  CW8 confirmed that the Bible was also accessible on the Island Pacific System.

### 3.     Weekly Unit-Q Reports and Monthly Unit-Q Meetings

52.     In addition, according to CW2, the Company held monthly "Unit Q" meetings including the Company's senior executives, department heads and product line directors. Defendants Johnson and Miller attended the monthly Unit Q meetings before and during the Class Period.  Inventory, production issues, and sales were discussed at these meetings.  CW2 prepared reports on storage, performance and sell-throughs using the Company's Microstrategy Reporting tool for the meetings.

53.     CW2 explained that the executive team, including the Individual Defendants, would look at these "Unit-Q" reports.  CW2 described the Unit-Q report as an excel-based spreadsheet prepared on legal sized paper that compared the 52 weeks of the year, listing them top to bottom.  The comparative metrics "that went across the top" included weekly sell throughs, average unit retail ("AUR"), weekly units being sold, dollars and projections prepared by department directors.  CW2 would print out the Unit Q report weekly to give to his supervisors, Reis and Pindar.  During his time at the "Aero" line, CW2 would give his Unit Q reports to Reis who was "religious" about going through them.  Reis reported to Pindar who

**AA55**

reported to Cunningham.  CW2 recalled that beginning in late 2010 and throughout the Class

Period, the AUR—or amount that each unit sold for—was down for every type product,

including the women's department.  This was reflected in the Unit Q reports.

54.     According to CW2, the monthly Unit-Q reports were discussed internally at

Monthly Unit-Q meetings which were held by product line at the department level.  CW2

attended for his product lines and confirmed that the Women's division had its own Unit-Q

meeting.  These meetings were held during the second or third week of every month and they

occurred monthly throughout the Class Period.  CW2 advised that inventory, production issues,

sales, and other Company metrics were discussed at these meetings.  CW2 recalled that Johnson,

Cunningham and Pindar regularly attended his Unit-Q meetings during the Class Period, and

would have been at the Women's department meetings as well.  In addition to these executives,

the planner, the Senior Vice President, and Executive Vice President, among others, attended the

Unit-Q meetings.

55.     CW2 explained that during the Unit-Q meetings, the department discussed

forecasting and how the month was going to perform with the executives.  The attendees looked

a quarter out and if it was close to the end of the year, they would begin forecasting for the

following year.  CW2 also met seasonally with Defendant Johnson and Cunningham, when he

presented products to them and finalized orders for the upcoming seasons.

**E.      Aeropostale Moves Away from It's Core Offering in the Back Half of 2010**

56.     Under the direction of former Co-CEO and Chief Merchandising Officer Mindy

Meads, the Company adopted new styles in its Women's line for the back-to-school and holiday

2010 seasons.  Meads ordered clothing with a muted color palate and mature designs.  This

clothing was a marked departure from the more "wholesome" styles and bright colors that the

17

**AA56**

Company had typically sold to its core female client base. This change was received poorly by Aeropostale's customers and the Company had trouble selling the new style of merchandise.

57. CW1 stated that poor sales in the Company's Women's fashion line in 4Q2010, leading to a huge inventory glut, resulted from Meads having gone "too far into fashion" with the "preppy products and the fleece products." These products did not appeal to the Company's teen girl constituent.

58. Half way into 4Q2010, on December 1, 2010, the Company announced that Meads was resigning. In truth, according to CW1, Meads was actually *fired* from the Company because her decision to change from the Company's traditional "core offering" designs to a more mature style was a failure. CW2 confirmed that the poorly received line of products that Meads ordered for the second half of 2010 resulted in a tremendous excess women's inventory leading into 2011. According to CW2 the "internal dialogue" at the Company was that Meads was being blamed for the "bad product" that had not been selling. CW5 agreed, stating that Meads had left the Company because her leadership role was "not working out." According to CW5, Meads envisioned taking the brand in a different direction and met a lot of opposition among the executive board—Meads wanted Aeropostale to "push the fashion envelope." In shaking up the administration, the Company promoted Defendant Johnson to CEO and Defendant Miller to CFO.

59. CW2 explained that on the heels of Meads' departure, Julian Geiger, who was Chairman of the Board at the time, was forced to step back in because Defendant Johnson had no experience in the product side of the business--he was more of a real estate person. This comports with CW7's recollection that after Mindy Meads left the Company, the Merchandising Department was under a lot of scrutiny. Each product line had to present its products to the

AA57

Board and Julian Geiger. According to CW7, this had not been the typical procedure at the Company. This product line review occurred some time between December 2010 and January 2011. Apparently, the Board wanted to make sure that the products for the fall 2011 line were "sell-worthy" after Meads' departure. As explained below, it was already too late to reverse course for the already ordered spring and summer 2011 lines—a fact known internally by Defendants.

### F. Defendants Know That the Company Has Already Over-Ordered Inventory Under Meads' New Designs for Spring and Summer 2011

60. CW3 was responsible for ordering merchandise for the Company. CW3 said that in 2010 he made ordering recommendations that were overridden by the executive team and he was forced to order inventory well beyond what he calculated as necessary. He further explained that the ultimate "open to buy," or amount of inventory that should be ordered, was dictated by the executive team including Pindar, Christine Munnelly (former Vice President of Merchandising ), Todd Blumenthal (Chief Marketing Officer at Aeropostale-who took over for Meads after she was fired), Meads and Defendant Johnson.

61. According to CW1 and CW2, the inventory ordered in 2010 consisted of the new designs approved by Meads. According to CW2, he personally was "very tight" in ordering his inventory for the P.S. brand, but that the Women's division was not conservative at all. Defendants were aware of this over-ordering of the Women's line because the heads of planning and merchandising reported directly to Defendant Johnson. In addition, Defendants tracked ordering and inventory. According to CW1, CW2, CW4, and CW5 and CW8, the content and make-up of the inventory (including style type) was reviewed by Defendants through various reporting methods including, among other things, the Flash reports, Unit-Q reports, the Bible, and sales reports.

AA58

**G. Sales of the New Styles Continue to Sell Poorly Through 4Q2010 Leading to Increased Inventory Backlog**

62. CW2 explained that the build up of inventory which started in 3Q2010 and worsened in 4Q2010, led to excess inventory going into 2011. CW2 advised the Women's department especially had "tremendous amounts of inventory." He explained that the Women's line would leave "a million units on the shelf"—which was a large amount of inventory.

63. According to CW2, it was clear in December 2010, that the Women's line was "really, really struggling" and that the comps[12] for the Women's line were down 20-30%. CW2 explained that while the downward trend began at the "end of back to school," the Company was able to "eek out" respectable 2010 yearly results mostly because of the Company's successes in 1Q2010 and 2Q2010 rather than the last two quarters. Meanwhile, the inventory back-up from the poorly selling Women's line in the fourth quarter continued to increase. Despite the Company's efforts to discount its slowly moving merchandise in 4Q2010, the more mature styles just were not selling. This led to an increasing inventory back-up. CW1 confirmed this stating that the inventory was very high at the end of 4Q2010. CW9 also confirmed that the inventory carryover problem was apparent in January towards the end of 4Q2010.

**H. Defendants Condition the Market to Believe 2010 Inventory Overhang Would Not Linger into 2011**

64. On February 3, 2011, the Company reported its January 2011 sales results. At a time when Defendants knew that its inventory levels were increasing and that its promotional efforts were ineffective to halt that rise in inventory, the Company suggested in this

---

[12] "Comps" or "Same Store Sales" is one of the most important metrics in retail sales analysis. Comps compare sales at stores that have been open for a year or more. This statistic allows investors to determine what portion of new sales has come from sales growth and what portion from the opening of new stores. This analysis is important because, although new stores are good, a saturation point – where future sales growth is determined by same store sales increases – eventually occurs. Same-store-sales data reveals how a store, or a number of stores, fares on a period-to-period basis.

**AA59**

announcement and in a conference call that same day that Aeropostale was making "progress" selling through its fourth quarter holiday product.

65.     Analysts accepted the Company's statements.  For example, on February 4, 2011, analyst Dorothy Lakner of Caris & Company stated: "ARO shares have traded up both on December and now January sales results as *fears that promotional activity would crush its results did not prove true.*" (emphasis added).

### I.     The Inventory Problems Worsened Throughout the First Half of 2011 and Defendants Knew the Severity of the Developing Crisis

66.     According to CW1, in or about February 2011, he was present at an Executive Committee meeting where the severely increasing inventory problem was discussed.  CW1 attended the weekly Executive Committee meetings until his departure in July 2011.  According to CW1, the inventory problem was quantified and grouped on reports by "category," such as denim, knit, sleepwear for women, fleece (sweat suits, hoodies, *etc*.) and also in terms of dollar amounts.

67.     CW1 stated that initially, in order to deal with the 2010 inventory carryover, the unsold merchandise was moved to the back of the stores.  However, as the inventory problem grew the stores ran out of space and the Company was forced to rent storage space in the malls to house the large amounts of unsold inventory.  Therefore, to the public, there did not appear to be that much aging inventory on the sales floor.

68.     According to CW2, throughout February 2011 the Company's sales continued to decline and its inventory continued to increase.  CW2 advised that February 2011 sales were poor and there was a "downward trend" throughout the end of 2010 into 2011--February was no different.  CW4 said that it was well known internally that sales were down throughout the first quarter of 2011, which included February.

**AA60**

69.     CW2 went on to say that the planners at Aeropostale knew that they needed to burn through the inventory glut at whatever price they could sell it, despite the effects this would have on the Company's margins.  He confirmed that he and other planners were making decisions about promotions without regard to margins.  The Company became more concerned about selling the excess inventory.  CW2 said that other planners would "chase product" to "sell-through units."  CW2 defined a "chase" as a continuous markdown to deal with the Company's excess inventory.  He confirmed that this was happening throughout the Company and it was an epidemic during the Class Period.

70.     CW2 also confirmed that before and during the Class Period, "business was not good," and had been "falling off" which led to "a ton of inventory" sitting around that the Company would have "to get disposition of" somehow.  CW2 recalled that in the middle of the 1Q2011, the Women's department began testing a never before used promotion called the "Big 2."  With this promotion, a customer could "buy one get two free," instead of the previously used "buy one get one free" promotion.  Towards the end of 1Q2011 and by early 2Q2011, the Company "really started pushing" the Big 2 promotion in its Women's department.  According to CW2 this had a drastic effect on AUR and margins because the Company was selling three shirts for the price of one.

71.     CW1 confirmed CW2's account and stated that the Company tried to deal with the excess inventory problem by reducing the prices on many of their products.  However, even at these new reduced pricing levels, the products still were not selling.  CW9 also confirmed that even after the merchandise price reductions in the beginning of the 2011 year, merchandise was still not selling and that inventory levels were still a problem when he left the Company in April 2011.  CW1 stated that during an April 2011 meeting, which included CW1 and Defendants

**AA61**

Johnson and Miller, there was an acknowledgement that the excess inventory was not being purchased, even at the heavily discounted prices.

72.     CW2 also stated that during the Class Period, "level 2" graphics t-shirts were being priced the same as "level 1" t-shirts in order to promote sales.  According to CW2, level 1 is a basic t-shirt whereas level 2 has a lot of "bells and whistles" (embroidery, embellishment, etc.).  Starting in May 2011, the Company began to charge the same price for both t-shirt levels, driving margins on the level 2 t-shirts down.  CW2 confirmed that the reason margins were affected was because level 2 products cost more to produce and were being sold at the same price point as level 1 t-shirts.

73.     CW3 explained that inventory was a problem that kept getting worse. Aeropostale kept "lowering their prices but not lowering inventory."  This culminated in an inventory glut leading into 2011.  CW3 was baffled by the decision to continue stocking up on inventory while lowering prices, given the poor selling environment.

74.     CW3 advised that he and the other merchants attended a weekly meeting led by Tom Carberry (former Director of Merchandising) and Caroline Pettinger (Senior Merchant). Inventory, sales and projections were discussed at these weekly meetings.  Pettinger and Carberry would then report to the executive team.  CW3 said the "inventory crisis" was discussed at "every" weekly meeting.

75.     CW3 also mentioned that a spreadsheet was distributed at the end of every month that detailed inventory levels.  This spreadsheet would break inventory into "carry-over," "leftover" and "overall" inventory.  CW3 said that the inventory problems were not a secret internally at the Company and "everyone knew they were in an inventory crisis."

23

**AA62**

76.     CW5 was very familiar with Aeropostale's disappointing sales in 2011.  CW5, who worked in women's sweaters and dresses, knew about the problems because he would access the Company's daily reporting spreadsheets known as the "flash."  CW5 had access to his department and women's overall Flash reports.  According to CW5, these flash reports showed that all of 2011 sales figures were dismal.

77.     CW4, who worked in the Women's wovens department, also reviewed weekly sales reports which made it clear that Aeropostale was not reaching its sales goals during the Class Period.  The sales reports were provided to all the managers and executives, including Defendant Johnson.

78.     CW6 was familiar with the issues related to excess inventory and the forced markdowns that occurred during the Class Period.  CW6 confirmed the statements of other former employees of the Company who said that Aeropostale was challenged to move its inventory.  CW6 explained that inventory at Aeropostale was ordered six to nine months prior to the clothing being on the shelves in their stores.  Due to this lead time, it was impossible to rectify an excess inventory problem in one or two quarters.

### J.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

#### 1.  March 10, 2011 Press Release

79.     On March 10, 2011, Aeropostale issued a press release announcing the results of the Company's 2010 fourth quarter which ended on January 29, 2011 ("4Q2010 Press Release").  Defendant Miller signed the press release.  Defendant Johnson, commenting on the results, stated as follows:

> In 2010 the Aeropostale brand continued to build momentum and popularity, we opened our flagship Times Square store, and we continued the roll-out of our children's concept 'P.S. from Aeropostale.'  While we are proud of our many accomplishments,

24

**AA63**

our performance in the back-half was below our expectations. The
teen retail environment was highly promotional and we believe
that we did not execute to our full potential. Moving into 2011, we
recognize our opportunities and are more determined than ever to
show the power of the Aeropostale brand.

The Company's 4Q2010 Press Release also provided guidance for Aeropostale's 1Q2011:

For the first quarter of fiscal 2011, the Company *expects earnings
in the range of $0.35 to $0.38 per share*, compared to earnings of
$0.48 per share last year.

\* \* \*

Mr. Johnson, continued, "*Our outlook for the first quarter reflects
the impact from clearing through holiday inventories*, and our
outlook for the full year reflects industry wide inflationary
pressures. As we look forward into 2011, we recognize that the
entire sector faces near term challenges. We are, however, focused
on leveraging our flexible promotional business model to navigate
through the current environment and delivering on our initiatives
to position ourselves for future growth."

(emphasis added).

80.    In providing investors with this guidance, Defendants intentionally understated

the sales and inventory problems that the Company was experiencing while advising investors

that they anticipated 1Q2011 to be only slightly weaker than the very strong quarter the

Company experienced in 1Q2010. More significantly, Defendants led the market to believe that

by March 10, 2010, six weeks into the first quarter, they had sufficiently cleared through the

4Q2010 holiday inventory overhang.

81.    The statements made in the March 10, 2011 press release were materially false

and misleading at the time made because Defendants had no reasonable basis for the guidance

provided and were aware of undisclosed facts which seriously undermined the validity of the

statements made. Defendants knew the outlook for the first quarter *did not reflect the reality* of

the severe excess inventory carryover.

**AA64**

82.     Specifically, by March 10, 2011, Defendants knew but failed to disclose to investors the following facts:

(a)     Aeropostale was having trouble selling the 2010 holiday and 2011 spring merchandise ordered by Meads such that the unappealing merchandise could not be sold, even at marked down prices, and ended up sitting in storage rooms at the malls where Aeropostale's stores were located;

(b)     Defendants would have to lower prices even further in order to sell the excess inventory, which would adversely affect the Company's margins and earnings ***more substantially than they advised and the guidance indicated***;

(c)     The inventory problems at the Company were so severe that they would not be able to clear through excess inventory until at least the second half of 2011; and

(d)     Meads had already made purchases for the spring and summer 2011 lines that Defendants knew did not appeal to its customers.

### 2.     March 10, 2011 Earnings Conference Call

83.     Following issuance of the press release on March 10, 2011, Defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations ("4Q2010 Conference Call").  The Individual Defendants participated in the call.

84.     During the call, Defendant Miller reiterated the Company's 1Q2011 guidance:

> I will now discuss our guidance outlook.  ***For the first quarter we expect earnings per share in the range of $0.35 to $0.38 per diluted share, which reflects the impact of the aforementioned markdown liquidation.***  This compares to record earnings per share of $0.48 last year.

(emphasis added).

**AA65**

85. This statement was false and misleading for the same reasons articulated in ¶¶81-82.

86. With regard to the Company's outlook for 2011, Defendant Johnson stated, in pertinent part, as follows:

> ***Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give the customers what they want.*** At the same time, Aeropostale, along with the rest of the industry, is facing inflationary pressures. We are working diligently to mitigate the cost increases by leveraging our vendor relationships, raising ticket prices strategically, offering our customers creative promotions and being more conservative with our initial buys.

(emphasis added).

87. This statement was false and misleading because it gave the market the false sense that despite the problems the Company was facing, the Company had already "taken" the steps necessary to (1) give the customers designs that they wanted in the first quarter of 2011 and (2) rectify the inventory overhang problems. This was untrue. The Company had already ordered its spring and summer 2011 lines utilizing Meads' unpopular design style—a style Defendants knew customers did not like or buy. Additionally, (1) the Company's massive inventory problem was only going to get worse as the spring and summer 2011 lines purchased by Meads arrived in the Company's stores, (2) the backed up holiday inventory was not selling despite promotions, (3) Defendants had moved the excess holiday inventory into storage spaces at malls, (4) the lack of sell through would require the Company to be substantially more promotional in 1Q2011 and 2Q2011, and (5) this excessive promotion would massively affect the Company's margins and earnings.

88. With regard to the Company's inventory, Defendant Miller stated, in pertinent part, as follows:

27

**AA66**

> *So we feel like we are appropriately attacking the inventory problem.* Our goal, as always, is to end the quarter as cleanly as possible from an inventory standpoint.

(emphasis added).

89.     This statement was false and misleading because it led the market to believe that the inventory problem was under control and would be resolved by the end of 1Q2011. In reality, the Defendants knew but failed to disclose that the inventory problem was much worse and would not be resolved until at the earliest the end of 2Q2011. *See also supra* ¶87.

90.     With regard to the spring assortment Defendant Johnson said:

> **We feel very good about the product going forward**…So far for spring we have had some categories doing exceptionally well…. But we have also been **very excited about some of the fashion components of what we're delivering for spring**. And the pricing that we have been able to get [out] of some of our fashion.

(emphasis added).

91.     This statement was false and misleading because Defendants gave the market the false sense that the spring assortment was somehow different from the fall and winter offerings and would do well. Six weeks into the quarter, Defendants *already knew,* based on the daily sales data they had access to and reviewed, that the spring assortment was not selling well. In addition, Defendants knew that the Women's spring line had been designed by Meads in the same styles as the failed 2010 back-to-school and holiday lines.

92.     During the Conference Call, Defendants were asked a *direct question* about the state of the inventory at the end of 1Q2011. Anna Andreeva, an analyst at JPMorgan asked: "And it sounds like your inventories are in good shape now; where should we expect inventories at the end of 1Q?" Cunningham and Defendant Miller responded. Neither dispelled the analyst's impression that "inventories are in good shape now," nor did they disclose the reality that inventory levels would not be in good shape at the end of the first quarter. Instead,

**AA67**

Defendant Miller gave an evasive answer about margin pressure in 1Q2011, but never disclosed the known inventory crisis or the fact that the inventory overhang would continue through 1Q2011.

93.    Defendants' statements and omissions were false and misleading because Defendants had an obligation to respond truthfully to the analyst and the market.  Defendants already knew that inventories were not in good shape.  In fact, inventories, which consisted of the unpopular styles were backing up and would continue to do so.

94.    In response to the guidance and the accompanying false and misleading statements and omissions from the 4Q2010 Conference Call, analysts understood Defendants' statements to mean that the inventory overhang problem was all but over.  On March 11, 2011, Linda Tsai of MKM Partners, stated in an analyst report: "First, 1Q11 guidance includes the impact from having to sell through excess holiday inventory as inventory ended up 9% per square foot at the end of 4Q.  The inventory has largely been sold through now (up 4% currently) *and so this issue is behind the company"* (emphasis added).

95.    On March 10, 2011 Robin Murchison of SunTrust Robinson Humphreys stated in an analyst report, "[W]e were surprised by the higher level of inventory carry-over to 1Q but at this point *it appears to be worked through* at some cost to 1Q earnings (emphasis added)."

96.    Defendants' decision to provide guidance of $0.35-$0.38 for 1Q2011 was considered credible by analysts in large part because the Company had a proven track record of providing accurate guidance.  In each of the three quarters leading up to the first quarter of 2011, the Company provided analysts with guidance a few weeks into the quarter and in each instance, the actual results for the quarter were within the range provided.  For example, four weeks into the fourth quarter of 2010, the Company provided earnings per share guidance of $0.94-$0.96,

AA68

and subsequently reported actual earnings per share of $0.95. In 3Q2010, the Company provided guidance three weeks into the quarter of $0.61-$0.63, and reported actual third quarter earnings of $0.63. Defendants offered second quarter 2010 guidance of $0.45-$0.48 per share a few weeks into the quarter, and reported actual earnings per share of $0.46. Defendants demonstrated to analysts that Aeropostale had the wherewithal and technology to know what to expect in the balance of the quarter, *absent any unexpected and unknown change in circumstances*. The market came to expect these predictable results.

### 3. May 5, 2011 Business Update

97.     Prior to the market open, on May 5, 2011, in a partial revelation of the truth about the severe and continuing inventory problem and the problems with the spring 2011 line, Aeropostale issued a press release announcing its preliminary first quarter financial results. Defendant Miller signed the Press Release. For the quarter, the Company reported that same store sales had decreased 7% compared to a same store sales increase of 8% the year before. The release also stated "[B]ased on lower than expected sales and margins for the quarter," the Company expected earnings of approximately $0.20 per diluted share – well below the Company's previously issued guidance of $0.35-$0.38 per share and $0.28 cents lower than EPS for 1Q2010. Defendant Johnson, commenting on the results, stated, in pertinent part, as follows:

> Clearly we are not satisfied with our sales and margin performance for the first quarter. **We were more promotional than anticipated on our spring assortment and clearance merchandise.** Additionally, our core customers continue to be pressured by challenging macroeconomic conditions while, at the same time, the teen retail sector remains intensely promotional. As we move forward through the year, our entire management team is keenly focused on our key initiatives: regaining the balance and clarity of our merchandise assortment, managing our cost structure, and leveraging our strong financial position. We remain very confident in our business model, in the ability and determination of our organization, and in the strength and positioning of our brand.

AA69

(emphasis added).

98.     While this release partially revealed the scope of the inventory overhang on the ongoing disappointing spring 2011 sales, and its effect on margins and earnings, this statement still was false and misleading because Defendants gave the false impression that they did not anticipate and were surprised by how promotional the Company would have to be to clear through their product.  Defendants already knew, and discussed internally, the massive inventory problem and had visibility into the poor sales of carryover inventory at normal discount prices. Significantly, when Defendants made these statements on May 5, 2011, they already knew that even bigger, unprecedented promotions, such as "buy one get two free" had already hit the shelves, to address the still staggering problem the Company had with stale inventory.  Indeed, Defendants would have to continue lowering prices even further in order to sell the excess inventory, which would continue to adversely affect their margins *more substantially than they advised*.

99.     Indeed, CW2 recalled being "really shocked" by the lowered 1Q2011 EPS number announced in early May given the Company's visibility back in March when they provided guidance. CW2 said "I don't know how you can go to the street" with the guidance given the internal knowledge of the sales environment at Aeropostale.  CW2 explained that the 1Q2011 guidance was unrealistic and unattainable given the way AURs were down. According to CW2, during the Class Period, "there was not a single week where AUR was higher than 2010." CW2 explained that the Women's business was "really, really soft" and that would have a material impact on the Company because "missy drives the bus" at Aeropostale.

100.    In reaction to this announcement, the price of Aeropostale stock fell $4.20 per share, or 16.5%, to close at $21.29 per share, on heavy trading volume (approximately 14 million

31

AA70

shares when average daily volume during the Class Period averaged approximately 2.8 million shares).

### 4. May 19, 2011 Press Release

101.     After the market closed on May 19, 2011, Aeropostale issued a press release announcing its actual first quarter financial results and second quarter financial guidance ("1Q2011 Press Release"). Defendant Miller signed the Press Release. The Company confirmed the preliminary 1Q2011 financial performance it had provided in its May 5, 2011 business update of diluted net earnings per share of $0.20 per share, and a same store sales decrease of 7% compared to a same store sale increase of 8% the year before. With regard to the Company's outlook for the second quarter, Defendants stated, as follows:

> **For the second quarter of fiscal 2011, the Company expects earnings in the range of $0.11 to $0.16 per share.**
>
> ***
>
> Thomas P. Johnson, Chief Executive Officer, commented, "**Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories** to position ourselves appropriately for the important back to school selling season. While we are disappointed with our current performance, we are confident that our entire organization is focused on the right initiatives to regain market share. Our goals for the remainder of the year remain very clear - regain balance and clarity in our merchandise assortments, mitigate industry wide cost increases, and manage our cost structure conservatively and carefully."

(emphasis added).

102.     While the 1Q2011 Press Release partially revealed the true nature of the Company's inventory problem and poor 2011 spring line sales and its impact on the Company's financial performance, it was materially false and misleading at the time made because Defendants had no reasonable basis for the 2Q2011 guidance of earnings of $0.11 - $0.16 and

32

**AA71**

were aware of undisclosed facts tending to seriously undermine the validity of that guidance. Specifically:

        (a)     The spring and summer 2011 line purchased by Meads, which had been selling poorly up until that point, would continue to sell poorly, and would add to the inventory backlog;

        (b)     The unappealing merchandise could not be sold, even at marked down prices, and ended up sitting in storage rooms at the malls where Aeropostale's store were located;

        (c)     Because the merchandise had not been selling well, Defendants had made the decision in mid-April to begin drastically marking down their merchandise in May with promotions such as "buy one get two free";

        (d)     These promotions would adversely affect the Company's margins and earnings *more substantially than they advised*.

103.    In addition, the outlook for the second quarter did not reflect the reality of the impact of clearing through spring inventories. Defendants would not be able to clear though all of the inventory overhang from 1Q2011 and the first six weeks of 2Q2011 in the weeks that remained in 2Q2011. Defendants also failed to disclose that the same poorly selected merchandise would add to the problem with the summer 2011 line on the Company's shelves.

104.    CW2 was surprised at the 2Q2011 guidance as well, especially considering that AURs were down even more in the second quarter.

     **5.**     **May 19, 2011 Earnings Conference Call**

105.    Following the Company's first quarter press release, after the market closed on May 19, 2011, Defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations ("1Q2011 Conference Call"). Both of the

**AA72**

Individual Defendants were present on the call.  Defendant Johnson, commenting on the

Company's "disappointing" first quarter performance, stated, in pertinent part, as follows:

> The first quarter was clearly very disappointing.  ***While our
> February started off well***, we experienced a significant
> deceleration in the business as we moved through March and
> April.  Sales were affected more severely than we originally
> anticipated during the Easter shift, and we did not experience the
> recovery that we had expected during the month of April.

(emphasis added).

106.    This statement was false and misleading because February did not "start off well."

In fact, according to CWs 2 and 4, February sales were just as low as March and April sales.

Moreover, Defendants made this false and misleading statement about February sales and the

subsequent deceleration to create the (false) impression that the Company missed its guidance

because of an unexpected downward turn in events that was unknown at the time the guidance

was given.  Defendants knew that the excuse they gave for the poor performance was not true.

107.    In closing, Defendant Johnson stated:

> Thank you again, everyone, for your support.  We know that
> coming off of a tough quarter like this it's never a great position to
> be in.  **I think that the positive outlook that we have is
> grounded in the fact that we know that the mistakes that we
> made and that we have taken steps to rectify those and to get
> this brand back on course**.  And we have the team to do that.  So
> I'm confident in our ability to be back on track.

(emphasis added).

108.    This statement is false and misleading because it gives the market the false sense

that the Company's previously announced promotional campaign would be sufficient to rectify

the inventory overhang and that there is a positive outlook for 2Q2011, when in reality,

Defendants knew that the Company (1) was still facing a massive inventory problem of

unpopular spring and summer 2011 product and an inventory overhang from 1Q2011, (2) the

**AA73**

inventory was not selling despite promotions and markdowns, (3) the lack of sell throughs would require the Company to substantially increase its promotions, and (4) this excessive promotion would massively affect the Company's margins and earnings in 2Q2011.

109.    In reaction to the 1Q2011 Press Release and Earnings Conference Call, on May 20, 2011, the price of Aeropostale stock fell $3.04 per share, or 14.25%, to close at $18.30 per share, on extremely heavy trading volume (approximately 16.5 million shares where Class Period volume averaged approximately 2.8 million shares).

110.    In response to the guidance and the accompanying false and misleading statements, analysts understood Defendants' statements to mean that while there was an inventory overhang, it was not unmanageable. Analysts believed Defendants when they said they expected to clear out inventory by the end of the 2Q2011. Eric Beder of Brean, Murray, Carret & Co issued an analyst report on May 20, 2011 where he stated: "management will aggressively clear out goods to enter the back-to-school period clean and ready for the season." On May 20, 2011, Pamela Quintiliano from Oppenheimer stated "we believe aggressive markdowns will result in clean BTS [back-to-school] inventories." This couldn't be farther from the truth.

### K.    THE TRUTH IS FULLY REVEALED

#### 1.    August 4, 2011 Business Update

111.    Before the market opened on August 4, 2011, Defendants shocked investors when Aeropostale issued a press release, signed by Defendant Miller, providing a business update for the second quarter of 2011. For the quarter, the Company preliminarily reported a same stores sales decrease of 14% compared to a same store sales increase of 4% the year prior, and expected net earnings to be in the range of **$0.02 to $0.03 per share**. This included a one-time pre-tax benefit of $0.06 per share, resulting from the favorable resolution of a dispute with a vendor.

AA74

Therefore, the non-adjusted EPS based on net sales, without considering this pre-tax benefit, was *negative*, in **the range of -$0.04 to -$0.03 –** a difference of **$0.15 to $0.19 per share** from what the Company had guided several weeks into the quarter and a huge drop from the Company's $0.46 EPS in the second quarter of 2010.

112.    Defendant Johnson, commenting on the second quarter results, stated, in pertinent part, as follows:

> **We are very disappointed with our second quarter financial results that were clearly unacceptable.** As a result of a lack of balance in our merchandise assortments, as well as continued promotional and macroeconomic challenges, **we significantly increased the depth and breadth of our promotions and markdowns.** Our top priority is to deliver a merchandise assortment that resonates with the teen customer and captures market share from our competitors. Additionally, based on current business conditions that are likely to continue for the remainder of the year, we are planning our inventories conservatively and focusing aggressively on cost controls. As we look to 2012 and beyond, we have great confidence in the strength of the Aeropostale and PS brands, in our ability to develop balanced merchandise assortments for our customer, and in our capability to deliver improved financial performance and growth.

(emphasis added).

113.    Thus investors began to learn the truth—that the Company's inventory overhang led to significantly increased promotions and mark downs well above normal levels, such that the Company's 2Q2011 results would be significantly below what investors had been led to believe by Defendants on May 19, 2011.

114.    In reaction to the Company's announcement, on August 4, 2011, the price of Aeropostale stock fell $3.99 per share, or 24%, to close at $12.53 per share, on extremely heavy trading volume (approximately 14 million shares where Class Period volume averaged 2.4 million shares).

**AA75**

115. Investors and analysts were shocked by the news. For example, Brian S. Sozzi from Wall Street Strategies issued an analyst report on August 4, 2011 stating: "Eek, gadzooks, and golly gee the July sales announcement from Aeropostale (ARO) was an utter disaster. The company's poorly positioned assortments required stronger markdowns to clear than expected." Evren Kopelman, of Wells Fargo issued an analyst report that same day stating: "[W]e think there was not too much progress made on lowering inventory levels to get them more in-line with sales trends."

### 2. August 18, 2011 Press Release

116. After the market closed on August 18, 2011, Aeropostale issued a press release announcing its actual second quarter financial results ("2Q2011 Press Release"). Defendant Miller signed the Press Release. The Company announced the actual 2Q2011 earnings per share of $0.04, which included a non-recurring pre-tax benefit of $0.06 per diluted share—so that the actual adjusted diluted net earnings per share for the second quarter was -$0.02 per diluted share-*-down $0.48 per share* compared to the same period the year before. The Company also reported a same stores sales decrease of 14% compared to a same store sales increase of 4% the year prior. With regard to the Company's outlook for the third quarter, Defendants stated, as follows:

> Our outlook for the third quarter reflects challenging sales and margin trends, as well as an uncertain macroeconomic environment. While we are very disappointed with our current performance, **we are working diligently to integrate the right balance of fashion into our assortment.** Additionally, we will find new ways to connect with our customer, and amplify our fashion message. I am very confident that the strategies we have in place and the tenacity of our organization will position us for future growth and success.

(emphasis added).

**AA76**

117.    Defendant Johnson admitted that, contrary to what Defendants led the market believe, the Company was still recovering from the merchandising gaffes committed the year prior beginning in 3Q2010.  Even at the end of 2Q2011, the Company was *still* trying to "integrate the right balance of fashion" into its clothing assortment.

### 3.    August 18, 2011 Earnings Conference Call

118.    On August 18, 2011, the Company held a conference call with analysts and investors to discuss Aeropostale's actual second quarter 2011 financial results ("2Q2011 Conference Call").  The Individual Defendants participated on the call.

119.    Defendant Johnson echoed the business update issued on August 4, 2011, and admitted that larger than disclosed markdowns had occurred on both the spring and summer merchandise:

> [W]e increased both the **depth and the breadth of our promotions and our markdowns in order to move through our spring and summer merchandise.**  This action resulted in significantly lower than expected sales and gross margins for the second quarter.

(emphasis added).

120.    In addition, Defendants admitted that their inventory levels were still very high. The Company still had to clear through the excess inventory from spring and summer. Cunningham stated:

> Clearly we are not satisfied with our level of inventory at the end of the second quarter. It is clearly well above our sales trend.

121.    Defendants also admitted that for the back-to-school season, they were finally returning to the color palate customers were used to, admitting that the styles offered for the back-to-school and holiday 2010 seasons and spring and summer 2011 seasons had consisted of the muted, mature styles— an unsuccessful departure from their "core offering":

**AA77**

Since that call [on May 19, 2011], **we have returned** our color palate to represent the fun, bright and optimistic spirit that our customer wants…

[W]e do feel that **we have returned to that color palette that our customers are accustomed to and expect from us**. And, from a fashion perspective, we feel very good about the progress we have made because the fashion this **back-to-school 2 in particular set and going forward is more relevant to our teen customer**….

And the change we have made I think that you guys see, and it is really in the overall project of the brand today, and it is **back to… our core**.

(emphasis added).

122. Moreover, Defendant Johnson admitted that the Executive Team must have known about the problems with the inventory because they tracked pricing, product and sales on a daily basis:

We keep a close eye on mostly that reaction to is not so much the actual price of the competitor, but it is really based upon how our product categories are turning. So if we see a particular product category or item that is not turning fast enough, we will change the price. And some of that is due to the competitive pressures, and some of that is due to obviously the product itself. **So we do that on a daily basis, and we react to pricing accordingly.**

(emphasis added).

123. This admission was reinforced by Cunningham:

We have invested heavily in the data warehouse internally to be able to capture, **analyze and report in real time, as well as as often as we need the data to understand the business in every possible way**.

(emphasis added).

124. Thus investors finally learn the full truth: (1) that the Company had strayed from its core offering, (2) that the Company had ordered these unpopular styles through summer 2011 and just now was able to return to its core offering, (3) that its core female customers did like the

**AA78**

styles offered leading to excess inventory, (4) that the inventory overhang led to significantly increased promotions and mark downs well above normal levels, and (5) that as a result the Company's margins suffered severely.

125.    Analysts finally understood the complete picture.  Dorothy Lakner from Caris & Company issued an analyst report stating: "**ARO failed to deliver a strong womens assortment in 1H11 [first half 2011], leading to heavy clearance and increased promotional activity that took a big toll on margins.** ARO got some traction from better colors in its early BTS [back-to-school] assortments…. Inventory ended…clearly way higher than the rate of gain on sales. So again this quarter, ARO will have to heavily promote current inventory again in order to make room for the more fashion correct product planned for BTS… (emphasis added).

126.    In reaction to the Company's announcement, on August 19, 2011, the price of Aeropostale stock fell $1.78 per share, or 14% on heavy trading volume (approximately 8.5 million shares where Class Period volume averaged 1-3 million shares).

## VI.    PLAINTIFF'S INDUSTRY EXPERT ALLAN ZWERNER

127.    Lead Plaintiff consulted with Allan Zwerner, an expert in the retail and wholesale industry.  Mr. Zwerner has over 40 years of experience working in the retail industry.  He has served as an executive at public retail and wholesale companies including serving as the President of Tommy Hilfiger's wholesale division and as a Senior Vice President at Macy's.  Mr. Zwerner also served as an adjunct professor at Columbia University, where he taught a class on the retail apparel industry.

128.    Mr. Zwerner reviewed publicly available news articles, confidential witness reports, and SEC filings, and relied on his many years of experience in forming his opinion.

129.    In Mr. Zwerner's opinion: (1) the Defendants had no reasonable basis on March 10, 2011 to believe that the Company could meet the guidance they issued for 1Q2011, and (2)

**AA79**

the Defendants had no reasonable basis on May 19, 2011 to believe that the Company could meet the guidance they issued for 2Q2011.

130.    Specifically, the Individual Defendants had access to daily sell through data in the flash report and the "Bible," monthly Unit Q reports, and discussed sell throughs at the monthly Unit Q meetings before and throughout the Class Period. An increase in inventory is indicative of a lack of sell-through. Sell through data, therefore, gave the Defendants a clear indication of whether inventory was being liquidated in a timely manner. According to CWs 1, 2, 3, 4, 6 and 9 sell throughs did not get better during the Class Period (and going back to 3Q2010 and 4Q2010). This would have been reflected in all the reports that Defendants reviewed.

131.    When Defendants saw slow sell throughs on inventory that had already been marked down (*i.e.*, holiday inventory in 1Q2011, spring inventory in 2Q2011), they knew further, drastic markdowns to inventory were needed and inevitable. This would have a severe affect on and impact EPS negatively. In addition, the extra storage space the Company rented at the malls to store the excess inventory was another cost factor that would drive margin and EPS lower.

132.    Compounding the problem in Mr. Zwerner's opinion was that the spring and summer lines ordered by Meads could also be expected to sell poorly, adding more inventory to the backlog.

133.    According to Mr. Zwerner, going into 1Q2011 (and when they issued guidance *six weeks into 1Q211 on March 10, 2011*) the guidance numbers were unreasonable and unattainable. In Mr. Zwerner's opinion, the CW testimony that sales were down throughout the first quarter of 2011 combined with the guidance miss of $0.15 to $0.18 per share was too large for the Defendants not to have known about 6 weeks into the quarter.

AA80

134.     According to Mr. Zwerner, going into 2Q2011 (and when they issued guidance *several weeks into 2Q2011 on May 19, 2011*) the guidance numbers were unreasonable and unattainable.  In Mr. Zwerner's opinion, the CW testimony that sales continued to be down throughout 1Q2011 and into 2Q2011—through the spring line and early sales of the summer 2011 line, combined with the guidance miss of $0.15-$0.20 per share was too large for the Defendants not to have known about when they issued guidance.

135.     The massive markdowns ("buy 1 get 2 free") began towards the end of 1Q2010.  According to Mr. Zwerner, these types of markdowns take time to plan because retailers need to order signage and get the sales floor ready.  Management would have known about these promotions at least two weeks beforehand--by mid-April.  Because Defendants must have known about the hit that margins would take by mid-April, Mr. Zwerner believes for this additional reason, Defendants' 2Q2011 guidance issued on May 19, 2011 lacked a reasonable basis when made.

## VII.     ADDITIONAL SCIENTER ALLEGATIONS

136.     As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aeropostale, their control over, and/or receipt and/or modification of Aeropostale's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to non-public information concerning Aeropostale, participated in the wrongful scheme alleged herein.

42

**AA81**

137.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme and illegal course of conduct: (i) deceived the investing public regarding Aeropostale's business, operations, and management and the intrinsic value of Aeropostale common stock; (ii) enabled Defendants to artificially inflate the price of Aeropostale common stock; and (iii) caused Plaintiff and other members of the Class to purchase Aeropostale common stock at artificially inflated prices.

138.    The Individual Defendants received contemporaneous daily reports showing the severity of the Company's inventory overhang problems and that normal promotions would not rectify the problems. Defendants had access to the daily "flash report" detailing the sales made and aged inventory and the "Bible" which was a daily "snapshot" of the Company's entire business, including a snapshot of the Company's inventory divided by "styles" & "sku's," as part of their responsibilities for, inter alia, making projections and budgeting.

139.    The Executive Committee, including both Individual Defendants and heads of the Company's business lines, had weekly Executive Committee meetings.  The meetings were held on Mondays in the Boardroom at the Company's headquarters in New York.  Based on CW statements, during the Class Period, these meetings included discussions of sales trends and how bad the inventory situation had become.  In or about February 2011, the severity of the inventory crisis was discussed at the Executive Committee meetings.  By the end of the 1Q2011 Defendants had begun to test their "buy one get two free" promotion.  In April 2011, Defendants discussed that the excess inventory was not being purchased, even at the reduced promotion prices.  By the end of 1Q2011 and early 2Q2011, Big 2 "buy one get two free" promotion was in full swing.  Indeed, Defendants knew before they issued 2Q2011 guidance that they were already severely marking down product for the Big 2 promotions.

**AA82**

140. *Defendants admit that they looked at inventory and pricing on a daily basis* and that they had systems in place to access and analyze information "in real time…to understand the business in every possible way." With this analysis in hand Defendants internally discussed the Company's poor sales, dire inventory situation in 1Q2011, and the difficulty they faced in offloading their stale product *at least a month* before issuing guidance for 1Q2011. In addition, before issuing guidance for 2Q2011, Defendants had already started "substantial" markdowns, including an unprecedented "buy one get two free" promotion that would lead to margins shrinking and a negative EPS for 2Q2011. Yet Defendants continued to make contradictory public statements on March 10, 2011, May 5, 2011 and May 19, 2011.

141. Defendant Johnson also participated in Unit-Q meetings with Department Heads and Department Directors. At the Unit-Q meetings, Johnson discussed with others weekly sell through, weekly units, dollars and projections by product line.

## VIII. LOSS CAUSATION AND ECONOMIC LOSS

142. Defendants' wrongful conduct, as alleged herein, directly and proximately caused damages to Plaintiff and the Class.

143. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Aeropostale's common stock by misrepresenting, or failing to disclose, among other things, the true and ongoing impact of the Company's massive inventory glut; and that various internal indicia indicated to Defendants that the Company would not—and could not—meet Defendants' publicly issued guidance for 1Q2011 and 2Q2011.

144. Partial disclosures issued on May 5, 2011 and May 19, 2011 informed the market that while the Company had problems with overhang inventory from holiday 2010 sales (that had not been previously disclosed), (1) these issues were under control and mostly behind the

**AA83**

Company, and (2) the Company's prospective guidance adequately took this into consideration. Thus, Defendants continued to deceive the market.

145.   Defendants' additional corrective disclosures, issued on August 4, 2011 and August 18, 2011, informed investors, belatedly, what Defendants knew all along: that its earnings guidance was too high and that the problems it experienced during the Class Period with excess inventory made it impossible for the Company to come close to the projected results. As a direct result of these disclosures, the price of Aeropostale common stock dropped precipitously. These disclosures also revealed the truth regarding the other false and misleading statements complained of herein.

146.   The dramatic decline in Aeropostale's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' misrepresentations being revealed to investors and to the market. The timing and magnitude of Aeropostale's stock price decline negates any inference that the losses suffered by Plaintiff and the other Class members was caused by changed market conditions and/or Company-specific facts unrelated to Defendants' wrongful conduct. Indeed, at the end of the Class Period, while Aeropostale's share price fell over 45% as a result of Defendants' scheme and conduct, the Standard & Poor's 500 securities index was relatively stable.

147.   During the Class Period, as a result of Defendants' material misrepresentations and omissions in the of inflated guidance among other misstatements of present fact, Aeropostale's stock traded at a high of $26.30 per share. However, after Aeropostale revealed the truth of its financial condition, the stock dropped precipitously to *approximately 60%* of its Class Period high.

AA84

IX.   **CLASS ACTION ALLEGATIONS**

148.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Aeropostale common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the Company's officers, directors, employees, successors, and assigns, and any person, entity, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the immediate families of the Individual Defendants.

149.   This action is properly maintainable as a class action.

150.   The Class is so numerous that joinder of all members is impracticable. Throughout the Class Period, Aeropostale stock traded on NYSE, a national securities exchange. During the Class Period, there were approximately 81 million shares of issued and outstanding Aeropostale common stock.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that the proposed Class consists of at least hundreds or thousands of members scattered throughout the United States.  Record owners and other members of the Class may be identified from records maintained by Aeropostale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

151.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

152.   Plaintiff is committed to prosecuting this action and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests

**AA85**

antagonistic to or in conflict with those of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

153.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including, among others:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, financial condition, inventory, operations, internal controls, prospects and management of Aeropostale;

(c)   whether the Individual Defendants caused Aeropostale to issue materially false and misleading statements during the Class Period and/or omitted material facts necessary to make statements made not misleading;

(d)   whether Defendants acted knowingly or recklessly in issuing materially false and misleading statements and/or omitting material facts necessary to make statements made not misleading;

(e)   whether the price of Aeropostale's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

(f)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

154.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications

AA86

with respect to individual members of the Class which would, as a practical matter, be

dispositive of the interests of the other members not parties to the adjudications or substantially

impair or impede their ability to protect their interests.

155.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

156.     Additionally, Plaintiff will rely, in part, upon the presumption of reliance

established by the fraud-on-the-market doctrine in that: Defendants made public

misrepresentations or failed to disclose material facts in order to make the statements made not

misleading during the Class Period; the omissions and misrepresentations were material;

Aeropostale common stock is traded in an efficient market as the Company traded on the NYSE,

and was covered by analysts.

157.     Based on the foregoing, this action is properly maintainable as a class action.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE *AFFILIATED UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

158.     Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United

States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are

primarily predicated upon omissions of material fact which there was a duty to disclose in order

to make statements previously made not misleading.

159.     Plaintiff is alternatively entitled to a presumption of reliance because, as more

fully alleged above, the Defendants made material misstatements and failed to disclose material

**AA87**

information regarding Aeropostale's revenue guidance and known problems, *not just risks*, regarding the impact of the inventory problem on margins and earnings.

160.     Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for Aeropostale's common stock was an efficient market for the following reasons, among others:

(a)     Aeropostale's stock met the requirements for listing on, and was listed and actively traded on, the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Aeropostale filed periodic public reports with the SEC and the NYSE;

(c)     Aeropostale regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Aeropostale was followed by securities analysts employed by major brokerage firms (and others) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.  Some of these analysts include:

(i)     Adrienne Tennant, Simeon Siegel, Janney Montgomery Scott;

(ii)     Betty Chen, Connie Wong, Wedbush Securities;

(iii)     Brian S. Sozzi, Wall Street Strategies;

(iv)     Brian J. Tunick, Anna A. Andreeva, Simeon A. Siegel, Lindsey Bell, J.P. Morgan Securities LLC;

**AA88**

| (v) | Christine Chen, Needham & Company; |
|---|---|
| (vi) | Dana Telsey, Telsey Advisory Group; |
| (vii) | Datamonitor; |
| (viii) | David J. Glick, Jonathan Hart, The Buckingham Research Group; |
| (ix) | Disclosure Insight; |
| (x) | Dorothy Lakner, Caris & Company; |
| (xi) | Edward Yruma, Charu Sharm, KeyBanc Capital Markets Inc.; |
| (xii) | Eric Beder, Jennifer Sung, Brean Murray, Carret & Co.; |
| (xiii) | Evren Kopelman, Maren Kasper, Wells Fargo Securities; |
| (xiv) | Globaldata Howard Tubin, Jayson Schmitt, RBC Capital Markets, LLC; |
| (xv) | ICD Research; |
| (xvi) | Janet Kloppenburg, JJK Research; |
| (xvii) | Jeff Black, Kimberly C. Greenberger, Citigroup; |
| (xviii) | Jeffrey P. Klinefelter, Sean P. Naughton, Jennifer Yung, Piper Jaffray & Co.; |
| (xix) | Jim Chartier, Monness, Crespi, Hardt; and |
| (xx) | John Kernan, Laura Champine, Rob Simone, Tom Nikic, Cowen and Co. |

161.    As a result of the foregoing, the market for Aeropostale common stock promptly digested current information regarding Aeropostale from all publicly available sources and reflected such information in Aeropostale common stock prices.  Under these circumstances, all purchasers of Aeropostale common stock during the Class Period suffered similar injury through their purchase of Aeropostale common stock at artificially inflated prices and a presumption of reliance applies.

AA89

## XI.   NO STATUTORY SAFE HARBOR

162.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. First, many of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and/or historic fact regarding Aeropostale's sales and inventory and state of its operations as a result of the inventory overhang.  For example:

(a)     Defendant Johnson's statement made in the 4Q2010 Press Release: "Our outlook for the first quarter reflects the impact from clearing through holiday inventories." ¶¶79-80.

(b)     Defendant Johnson's statement made during the 4Q2010 Conference Call: "Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give customers what they want." ¶¶86-87.

(c)     Defendant Johnson's statement made during the 4Q2010 Conference Call: "So we feel like we are appropriately attacking the inventory problem." ¶¶88-89.

(d)     Defendant Johnson's statement made during the 4Q2010 Conference Call: "We feel really good about the product going forward…we have also been very excited about some of the fashion components of what we're delivering for spring." ¶90-91.

(e)     Defendant Johnson's statement made during the 1Q2011 Earnings Conference call: "While our February started off well, we experienced a significant deceleration in the business as we moved through March and April." ¶¶10-106.

(f)     Defendant Johnson's statement made during the 1Q2011 Conference Call: "I think the positive outlook we have is grounded in the fact that we know that the mistakes that we made and that we have taken steps to rectify those and get this brand on course." ¶¶107-108.

AA90

163.    To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.

164.    To the extent there were any forward-looking statements that were identified as such at the time made, such statements were knowingly false when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  For example, all of Defendants' Class Period statements providing guidance were not accompanied by meaningful cautionary language because the Defendants knew that the "risk" factors they warned of had already come to pass at the time they made these statements.

## XII.    CONTROL PERSON ALLEGATIONS

165.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Aeropostale's business.

166.    The Individual Defendants because of their positions of control and authority as executives and senior officers and/or directors of the Company, had access to the adverse, undisclosed information about Aeropostale's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith.

52

**AA91**

167.     Both of the Individual Defendants, by virtue of his high-level position with the Company, directly participated in the management of the Company, and was directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Sales of the Company's core products, Women's apparel, and the Company's ability to manage its inventory, were fundamental, core aspects of Aeropostale's business and subjects that these Individual Defendants followed, tracked, and were aware of at all times.

168.     The Individual Defendants, as senior officers, executives and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, investor presentations and other public statements pertaining to the Company during the Class Period.  As senior officers, executives and/or directors of the Company, the Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

169.     As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act, and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and

AA92

business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

170. The Individual Defendants are each liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Aeropostale's common stock during the Class Period, which included the dissemination of materially false and misleading statements regarding the state of its operations and its financial guidance and concealment or omission of material adverse facts. The scheme: (i) deceived the investing public regarding Aeropostale's operations and business, and the true value of Aeropostale's common stock; and (ii) caused Plaintiff and other members of the Class to purchase Aeropostale's common stock at artificially inflated prices, which fell as the truth concerning Aeropostale ultimately became known.

171. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Aeropostale, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## COUNT I

### Claim for Violations of Section 10(b) Of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

172. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against Aeropostale and the Individual Defendants.

173. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

AA93

public regarding Aeropostale's business, operations, management and the intrinsic value of Aeropostale's common stock; and (ii) cause Plaintiff and other members of the Class to purchase Aeropostale's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

174.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Aeropostale's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

175.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal adverse material information about Aeropostale's earning potential, as specified herein.

176.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Aeropostale's  value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Aeropostale and its business operations in the light of the circumstances under which they were made, not misleading, as set

AA94

forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Aeropostale's common stock during the Class Period.

177. Each Defendants' primary liability arises from the following facts, among others set forth above: (i) they were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each Defendant enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

178. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Aeropostale's operating condition from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misstatements and omissions of the Company's business and operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and

AA95

omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

179.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Aeropostale's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Aeropostale's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by them during the Class Period, Plaintiff and the other members of the Class acquired Aeropostale's common stock during the Class Period at artificially high prices and were damaged when the value of their common stock declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

180.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Aeropostale's business and operations, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Aeropostale common stock or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

181.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

AA96

## COUNT II

### Claim for Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

182.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.  This claim is asserted against the Individual

Defendants.

183.    During the Class Period, the Individual Defendants participated in the operation

and management of Aeropostale, and conducted and participated, directly and indirectly, in the

conduct of Aeropostale's business affairs.  Because of their senior positions, they knew the

adverse non-public information about Aeropostale's misstatements of financial guidance and the

Company's operations.

184.    As officers and/or directors of a publicly owned company, these Defendants had a

duty to disseminate accurate and truthful information with respect to Aeropostale's financial

condition and results of operations, and to promptly correct any public statements issued by

Aeropostale that had become materially false or misleading.

185.    Because of their positions of control and authority as senior officers, the

Individual Defendants were able to, and did, control the contents of the various reports, press

releases, and public filings, as well as presentations to securities analysts, money and portfolio

managers, and institutional investors, which Aeropostale disseminated in the marketplace during

the Class Period.  They were provided with copies of the Company's reports and press releases

alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Throughout the Class

Period, the Individual Defendants exercised their power and authority to cause Aeropostale to

engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were

**AA97**

"controlling persons" of Aeropostale within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aeropostale common stock.

186.   Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

187.   Each of the Individual Defendants, therefore, acted as a controlling person of Aeropostale.  By reason of their senior management positions and/or being directors of Aeropostale, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Aeropostale to engage in the unlawful acts and conduct complained of herein.  Each Individual Defendant exercised control over the general operations of Aeropostale and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

188.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aeropostale.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Certifying this case as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as class representative and its counsel as class counsel;

B.   Declaring that the Defendants violated §10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder;

AA98

C.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

D.    Awarding Plaintiff and the Class appropriate compensatory damages;

E.    Awarding Plaintiff and the other members of the Class the costs, expenses, and disbursements of this action, including attorneys' and experts' fees and, if applicable, prejudgment and post judgment interest; and

F.    Awarding Plaintiff and the Class such other relief as this Court deems just, equitable, and proper.

## XIV.  **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated: New York, New York
       February 10, 2012

LABATON SUCHAROW LLP

Jonathan Gardner
Mark S. Goldman
Carol C. Villegas
140 Broadway
New York, NY 10005
Telephone:  212-907-0700
Facsimile:  212-818-0477
jgardner@labaton.com
mgoldmand@labaton.com
cvillegas@labaton.com

*Attorneys for Lead Plaintiff The City of Providence*

**AA99**

Daniel E. Bacine
Lisa M. Lamb
**BARRACK, RODOS & BACINE**
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, Pennsylvania  19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
dbacine@barrack.com
llamb@barrack.com

*Additional Counsel*

AA100

# EXHIBIT A

AA101

<u>CERTIFICATION</u>

I, Jeffrey Padwa, City Solicitor for the City of Providence, Rhode Island, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of City of Providence and/or the Board of Investment Commissioners ("Providence"). I have reviewed a complaint filed against Aeropostale, Inc. ("Aeropostale") alleging violations of the federal securities laws;

2.      Providence did not purchase securities of Aeropostale at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Providence is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.      Providence's transactions in Aeropostale during the Class Period are reflected in Exhibit A, attached hereto;

5.      Providence has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years;

6.      Beyond its pro rata share of any recovery, Providence will not accept payment for serving as a lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 1st day of December , 2011.

_____
Jeffrey Padwa
*City Solicitor, City of Providence, R.I.*

**AA102**

EXHIBIT A

TRANSACTIONS IN
AEROPOSTALE, INC.

| Trans Type | Trade Date | Settle Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|---|
| Purchase | 06/07/11 | 06/10/11 | 2,490.00 | $17.47 | ($43,498.31) |
| Purchase | 06/07/11 | 06/10/11 | 4,065.00 | $17.47 | ($71,034.25) |
| Purchase | 06/08/11 | 06/13/11 | 4,980.00 | $17.34 | ($86,354.20) |
| Purchase | 06/08/11 | 06/13/11 | 6,330.00 | $17.38 | ($109,983.75) |
| Sale | 07/08/11 | 07/13/11 | -5,120.00 | $18.12 | $92,776.96 |

**AA103**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) | No. 11-CV-7132 (CM)(THK) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I, Carol C. Villegas, hereby certify that on February 10, 2012, I caused a copy of the

Amended Class Action Complaint For Violation of the Federal Securities Laws to be served

upon the following counsel for defendants by U.S Mail:

Joseph S. Allerhand
Stephen Alan Radin
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, NY 10153
Tel. (212) 310-8000
Fax: (212) 833-3148
Email: joseph.allerhand@weil.com
Email: stephen.radin@weil.com

*Attorneys for Defendants Aeropostale, Inc., Thomas P. Johnson, and Marc D. Miller*

_____
Carol C. Villegas

**AA104**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

THE CITY OF PROVIDENCE, Individually and
on Behalf of All Others Similarly Situated,

                    Plaintiff,                              No. 11 Civ. 7132 (CM) (THK)

        -against-

AEROPOSTALE, INC., THOMAS P. JOHNSON
and MARC D. MILLER,

                    Defendants.
————————————————————————x

**DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

McMahon, District Judge:

    This is a securities fraud class action. Lead Plaintiff, The City of Providence

("Providence" or "Plaintiff"), asserts a single claim under section 10(b) of the Securities

Exchange Act (the "Exchange Act") against Aeropostale, Inc. ("Aeropostale") and two of its

officers (collectively, "Defendants"). It also asserts a related "controlling person" claim under

section 20(a) of the Exchange Act against the individual defendants. Plaintiff brings these

claims on behalf of all persons who purchased the common stock of Aeropostale between March

11, 2011, and August 18, 2011, inclusive (the "putative class period"), and were damaged

thereby.

    Defendants move to dismiss the Amended Complaint pursuant to the safe harbor

provisions and heightened pleading standards of the Private Securities Litigation Reform Act of

1995 (the "PSLRA"). The motion is DENIED.

**AA105**

# BACKGROUND

## I. The Parties

Providence purchased Aeropostale common stock during the putative class period and alleges that it was damaged thereby.

Defendant Aeropostale is a Delaware corporation with its principal executive offices located in New York, New York.

Defendant Thomas P. Johnson ("Johnson") has served as Aeropostale's Chief Executive Officer ("CEO") since December 2010. Prior to that, from February 2010 to December 2010, he served as the company's "co-CEO" along with Mindy Meads. From March 2004 through February 2010, he served as Executive Vice President and Chief Operating Officer. He has also been a member of the company's Board of Directors since August 2008.

Defendant Marc D. Miller ("Miller") has served as Aeropostale's Chief Financial Officer ("CFO") since December 2010. Prior to that, from April 2007 to December 2010, he served as the Senior Vice President of Strategic Planning, Business Development and E-Commerce.

## II. Jurisdiction

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

## III. Allegations in the Amended Complaint

Plaintiff alleges that Defendants made materially false and misleading statements in March and May of 2011, painting a much rosier picture of Aeropostale's expected performance for the first and second fiscal quarters of 2011 than they had reason to believe. When the "truth" about the company's actual performance was finally revealed at the close of each quarter, the value of the company's stock dropped significantly.

2

**AA106**

The company's problems began in the second half of 2010, when Mindy Meads, the co-CEO (alongside Defendant Johnson) and Chief Merchandising Officer for Aeropostale, decided to change the design of the women's fashion line to one that (she hoped) would appeal to an older customer. The new styles featured a muted color palate and "mature" designs – in contrast to the bright colors and more "wholesome" styles that had previously formed the "core offering" for the teen women's line.

The "mature" designs first appeared in Aeropostale's 2010 back-to-school and holiday merchandise. As it turned out, the new approach did not appeal to Aeropostale's target audience. The new styles sold poorly, leading to a large amount of excess inventory.

On December 1, 2010, about halfway through the fourth quarter of 2010 ("4Q2010"), Aeropostale announced Meads' resignation; according to the accounts of several employees, she was fired because her design change was a failure.

But Aeropostale's problems with the new designs were not over. Because the company orders most of its merchandise nine months in advance, the spring and summer lines for 2011 had already been ordered. At least 90% of the merchandise ordered through the summer of 2011 was based on Meads' unpopular design choices.

The new styles continued to sell poorly through the beginning of the first quarter of 2011 ("1Q2011"). Aeropostale uses a particular metric, known as "comps" or "same store sales," to track the sales of a particular store or a number of stores on a period-to-period basis. The purpose of the statistic is to allow investors to determine which portion of new sales has come from actual sales growth, as opposed to the opening of new stores. As early as December 2010, same store sales were down 20-30 % over the prior year. According to an employee from the merchandise planning department, sales in February of 2011 were "poor."

3

**AA107**

Inventory had started to build up in the last two quarters of 2010. Initially, the excess merchandise was moved to the backs of the stores; eventually, Aeropostale had to rent storage space in malls to house all the excess inventory.

Aeropostale began discounting slow-moving merchandise and offering various promotions. According to an employee in the merchandise planning department, the planners at Aeropostale knew that they needed to "burn through the inventory glut" at whatever price they could sell it, despite the effect this would have on the company's margins. This employee confirmed that he and other planners were making decisions about promotions without regard to margins.

In the beginning of 2011, the company began "chasing product" – continuously marking down the prices in order to move the merchandise – across all product lines. At the beginning of the first quarter of 2011, the women's department started testing a new "buy one, get two free" promotion in the women's department. In May, the "Big 2" promotion, as it was called, was implemented widely at Aeropostale stores. Also in May, the company offered steep discounts on some of its t-shirts, selling more expensive t-shirts for the same price as a cheaper t-shirt. According to a former employee, the discounts and extreme promotions had a significant impact on the margins for those products.

Plaintiff argues that Defendants were aware of how poorly the women's line was doing on a near real-time basis because of a "sophisticated management information system" that Aeropostale used to track inventory levels, sales data, pricing, and margins (all in real time). Plaintiff alleges that the information system, "Island Pacific," allowed Defendants to see which merchandise lines were moving, which lines required added inducements, where and to what extent inventory was backing up, and how profitable the various merchandise lines were.

AA108

Former Aeropostale employees (who are identified as "confidential witnesses" or "CWs") provided Plaintiff with information regarding the content of the various analytical reports, covering sales and inventory data, that Defendants would have reviewed, and also with accounts of regular meetings that Defendants attended where the severity of the sales and inventory problems was discussed. According to these CWs, the company held weekly "Executive Committee" meetings, which the individual defendants regularly attended. One CW recalled a specific meeting in February 2011 during which the "very large" inventory "carryover" problem was discussed. At that meeting, the inventory problem was quantified and grouped on reports by "category," such as denim, knit, sleepwear for women, fleece (sweat suits, hoodies, etc.) as well as in terms of dollar amounts. At another meeting in April 2011, Defendants Johnson and Miller acknowledged that the heavily discounted merchandise was still not selling.

Defendants also had access to daily "flash" reports, which consisted of a spreadsheet reporting inventory and sales on a daily basis. Flash reports included a breakdown by product category (*e.g.*, women's, men's), tracking comp sales and gross margin by department and comparing sales and margins year over year. The individual defendants also received a daily report known as the "Bible," a snapshot of the company's entire business, including inventory.

The individual defendants attended monthly "Unit Q" meetings, which were held for each department separately, and where inventory, production issues, and sales were discussed. According to an employee in merchandise planning who focused on the men's department, the individual defendants would review "Unit Q" reports, which included weekly "sell throughs," average unit retail (the amount that each unit sold for, or "AUR"), weekly units being sold, and dollars and projections prepared by department directors. At the Unit Q meetings, the members

5

**AA109**

of the particular division at Aeropostale would meet with the executives to discuss forecasting and how the month was going to perform. The attendees "looked a quarter out," and if it was close to the end of the year, they would begin forecasting for the following year. This employee recalled that the AUR was down for every type of product, including the women's department, throughout the putative class period. Although this employee did not attend the women's division Unit Q meeting, he stated that Defendant Johnson regularly attended his Unit Q meeting and would have the women's department meetings as well.

The individual defendants were allegedly aware that the merchandise in the women's line had been ordered in the "mature" designs for the following two quarters because they tracked ordering and inventory. According to various former Aeropostale employees, the content and make-up of the inventory (including style type) was reviewed by them through various reporting methods, including, among other things, the flash reports, Unit Q reports, the Bible, and sales reports. Defendant Johnson in particular would have been aware of any significant merchandising decisions because the heads of planning and merchandise reported directly to him.

### A. March 10, 2011 Press Release

Aeropostale issued a press release on March 10, 2011, which announced the results of the fourth quarter of 2010 (ending on January 29, 2011) and gave guidance for the first quarter of 2011 (ending on April 30, 2011) ("4Q2010 Press Release"). Defendant Miller signed the press release. The individual defendants also gave public comments on the press release, including in an earnings conference call with analysts and investors held on the same day.

The Amended Complaint identifies the statements below made in association with the press release as false and misleading.

6

**AA110**

(1)      For the first quarter of fiscal 2011, the Company *expects earnings in the range of $0.35 to $0.38 per share*, compared to earnings of $0.48 per share last year.  (4Q2010 Press Release.)

(2)      *Our outlook for the first quarter reflects the impact from clearing through holiday inventories*, and our outlook for the full year reflects industry wide inflationary pressures.  As we look forward into 2011, we recognize that the entire sector faces near term challenges.  We are, however, focused on leveraging our flexible promotional business model to navigate through the current environment and delivering on our initiatives to position ourselves for future growth.  (Defendant Johnson's comments on the 4Q2010 Press Release.)

(3)      I will now discuss our guidance outlook.  *For the first quarter we expect earnings per share in the range of $0.35 to $0.38 per diluted share, which reflects the impact of the aforementioned markdown liquidation.*  This compares to record earnings per share of $0.48 last year.  (Defendant Miller on the earnings conference call.)

(4)      *Moving into 2011, we recognized our merchandise opportunities and we have taken the necessary steps to give the customers what they want.*  At the same time, Aeropostale, along with the rest of the industry, is facing inflationary pressures.  We are working diligently to mitigate the cost increases by leveraging our vendor relationships, raising ticket prices strategically, offering our customers creative promotions and being more conservative with our initial buys.  (Defendant Johnson on the earnings conference call.)

(5)      *So we feel like we are appropriately attacking the inventory problem.*  Our goal, as always, is to end the quarter as cleanly as possible from an inventory standpoint.  (Defendant Miller on the earnings conference call.)

(6)      *We feel very good about the product going forward* . . . So far for spring we have had some categories doing exceptionally well . . . But we have also been *very excited about some of the fashion components of what we're delivering for spring.*  And the pricing that we have been able to get [out] of some of our fashion.  (Defendant Johnson on the earnings conference call.)

Additionally, Providence alleges that the individual defendants made a material omission in their response to a direct question from an analyst.  The analyst asked, "And it sounds like your inventories are in good shape now; where should we expect inventories at the end of 1Q?"  According to the Amended Complaint, the company's President, Michael Cunningham

7

**AA111**

("Cunningham"), and Defendant Miller responded.  Defendant Miller gave an "evasive" answer about margin pressure in 1Q2011, but neither Cunningham nor Defendant Miller disclosed the "known inventory crisis" or the fact that the inventory overhang would continue through the end of the first quarter and beyond.

Providence alleges that all these statements were false and misleading at the time they were made for a number of reasons.

First, the earnings guidance understated the sales and inventory problems, providing guidance that suggested only a slight diminution in performance year to year.

Second, the statements led the market to believe that Aeropostale had "sufficiently" cleared through the holiday inventory when it had not – as evidenced by the fact that excess inventory had to be moved into storage spaces at malls and that the holiday inventory was not selling despite promotions.

Third, the statements failed to disclose that the sales and inventory problems would only get worse through the first and second quarters of 2011 because the poorly-selling "mature" styles had already been ordered through the spring and summer of 2011, and to sell that merchandise, Aeropostale would have to offer more substantial promotions – which would "massively" affect the company's margins and earnings.

### B.  May 5, 2011 Business Update

Aeropostale issued a press release announcing its "preliminary" first quarter financial results on May 5, 2011 (the quarter ended on April 30, 2011).  Defendant Miller signed the press release, and Defendant Johnson commented on the results.

In the press release, the company reported that "same store sales" had decreased 7% – in contrast to a same store sales increase of 8% the year before.  The release also revised the

AA112

company's expected earnings for the first quarter of 2011 to approximately $0.20 per diluted

share (down from $0.35-$0.38 in the 4Q2010 Press Release), "based on lower than expected

sales and margins for the quarter."

Plaintiff identifies the following statements as false and misleading:

(7)     Clearly we are not satisfied with our sales and margin performance for the first
        quarter. *We were more promotional than anticipated on our spring assortment and
        clearance merchandise.* Additionally, our core customers continue to be pressured
        by challenging macroeconomic conditions while, at the same time, the teen retail
        sector remains intensely promotional. As we move forward through the year, our
        entire management team is keenly focused on our key initiatives: regaining the
        balance and clarity of our merchandise assortment, managing our cost structure, and
        leveraging our strong financial position. We remain very confident in our business
        model, in the ability and determination of our organization, and in the strength and
        positioning of our brand. (Defendant Johnson's comments on the press release.)

Plaintiff alleges that these statements were false and misleading at the time they were

made because they gave the false impression that Defendants did not anticipate having low sales

and poor margins during the first quarter and were surprised by how promotional Aeropostale

would have to be to be clear through its product – when in fact they had long known that they had

poorly-selling merchandise on hand. Defendants already knew, and discussed internally, the

massive inventory problem and had visibility into the poor sales of carryover inventory at normal

discount prices. Additionally, at the time the statements were made, large, unprecedented

promotions such as "buy one, get two free" had already "hit the shelves."

After this announcement, the price of Aeropostale stock fell $4.20 per share, or 16.5%, to

close at $21.29 per share, on heavy trading volume (approximately 14 million shares when

average daily volume during the putative class period was approximately 2.8 million).

AA113

### C.  May 19, 2011 Press Release

Aeropostale issued a third press release on May 19, 2011, which included its actual first quarter financial results and gave second quarter ("2Q2011") financial guidance ("1Q2011 Press Release").  Defendant Miller signed the press release.  The individual defendants commented on the release, including on an earnings conference call with analysts and investors held on the same day.

The company confirmed the preliminary 1Q2011 financial performance it had provided in the May 5, 2011 business update.

Plaintiff identifies the following statements made in association with the press release as false and misleading:

(8)  ***For the second quarter of fiscal 2011, the Company expects earnings in the range of $0.11 to $0.16 per share.***  (1Q2011 Press Release.)

(9)  ***Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories*** to position ourselves appropriately for the important back to school selling season.  While we are disappointed with our current performance, we are confident that our entire organization is focused on the right initiatives to regain market share.  Our goals for the remainder of the year remain very clear -- regain balance and clarity in our merchandise assortments, mitigate industry wide cost increases, and manage our cost structure conservatively and carefully.  (Defendant Johnson's comments on 1Q2011 Press Release.)

(10)  The first quarter was clearly very disappointing.  ***While our February started off well***, we experienced a significant deceleration in the business as we moved through March and April.  Sales were affected more severely than we originally anticipated during the Easter shift, and we did not experience the recovery that we had expected during the month of April.  (Defendant Johnson on the earnings conference call.)

(11)  Thank you again, everyone, for your support.  We know that coming off of a tough quarter like this it's never a great position to be in.  ***I think that the positive outlook that we have is grounded in the fact that we know that the mistakes that we made and that we have taken steps to rectify those and to get this brand back on course.***

**AA114**

And we have the team to do that. So I'm confident in our ability to be back on track. (Defendant Johnson on the earnings conference call.)

Plaintiff alleges that these statements were materially false and misleading for many of the same reasons outlined above, including that the earnings guidance understated the sales and inventory problems; that the spring and summer lines were selling poorly and would continue to sell poorly; that markdowns and promotions were not helping to sell the merchandise; that Aeropostale would therefore not be able to clear through all of the inventory by the end of the second quarter; and that the markdowns and promotions would adversely affect the company's margins and earnings more substantially than Defendants advised. Also as noted above, promotions like the "buy one, get two free" promotion were already being implemented.

Additionally, according to two former employees, sales in February were just as low as sales in March and April. It was well known internally that sales were down throughout the entire first quarter.

### D. August 4, 2011 Business Update

Defendants issued a press release on August 4, 2011, which provided a business update for the second quarter (the quarter ended on July 31, 2011). The press release was signed by Defendant Miller.

For the quarter, Aeropostale preliminarily reported a same store sales decrease of 14% in contrast to a same store sales increase of 4% the year prior. It also reported preliminary earnings per share for the second quarter in the range of $0.02 to $0.03 per share (down from the guidance of $0.11-$0.16 given in the 1Q2011 Press Release.) However, this included a one-time pre-tax benefit of $0.06 per share, resulting from the favorable resolution of a dispute with a vendor. According to the Amended Complaint, the non-adjusted earnings per share based on net sales, without taking into consideration the pre-tax benefit, was negative, in the range of -$0.04 to -

AA115

$0.03, and the actual adjusted diluted net earnings per share for the second quarter was -$0.02 per diluted share.

After the announcement, on August 4, 2011, the price of Aeropostale stock fell $3.99 per share, or 24%, to close at $12.53 per share, on extremely heavy trading volume (approximately 14 million shares where the putative class period volume averaged 2.4 million shares).

### E. *August 18, 2011 Press Release*

Aeropostale issued a press release on August 18, 2011 announcing its actual second quarter financial results ("2Q2011 Press Release"). Defendant Miller signed the press release.

The company announced the actual 2Q2011 earnings per share of $0.04. Due to the aforementioned pre-tax benefit, according to the Amended Complaint, the actual adjusted diluted net earnings per share for the second quarter was -$0.02 per diluted share. The company also confirmed the earlier guidance in the August 4, 2011 business update regarding the same store sales decrease of 14%.

At that time, Defendants finally told the public that the "muted" color styles had been ordered up until the fall of 2011; that Aeropostale had been forced to engage in excessive markdowns and promotions in order to sell the spring and summer merchandise; and that the company was now returning to the "color palette" of its "core offering." Defendant Johnson also commented that Aeropostale tracks pricing closely, "on a daily basis," so that the company can react quickly to change the price of products when they are not selling fast enough. Cunningham confirmed this, stating, "We have invested heavily in the data warehouse internally to be able to capture, analyze and report in real time, as well as as [*sic*] often as we need the data to understand the business in every possible way."

12

**AA116**

On August 19, 2011, the price of Aeropostale stock fell another $1.78 per share, or 14% on heavy trading volume (approximately 8.5 million shares where the putative class period volume averaged 1-3 million shares).

### F. Plaintiff's Industry Expert

The Amended Complaint also contains opinion evidence from an expert in the retail and wholesale industry, Allan Zwerner. Zwerner reviewed publicly available news articles, confidential witness reports, and SEC filings to form his opinion. In Zwerner's view, Defendants had no reasonable basis to believe that Aeropostale could meet the guidance they issued on March 10, 2011 and May 19, 2011, for the first and second quarters of 2011, respectively. The confidential witness testimony that sales continued to be down throughout the first and second quarters of 2011, combined with the guidance "miss" of $0.15 - $0.18 per share for the first quarter and $0.15 - $0.20 per share for the second quarter, demonstrated that the "miss" was too large for Defendants not to have known about when they issued the guidance.

Zwerner also concluded that all of the various reporting available to Defendants, which included daily sell-through data, would have given Defendants a clear indication of whether inventory was being liquidated in a timely manner. Because large markdowns like the "buy one, get two free" promotion take time to plan, Zwerner found that management would have known about such promotions at least two weeks before they were implemented. In the case of the "buy one, get two free" promotion that was implemented in the end of the first and beginning of the second quarter of 2011 (around April or May), Defendants would have known about the promotion by mid-April. In Zwerner's opinion, this provided an additional reason to conclude that the second quarter guidance issued on May 19, 2011 lacked a reasonable basis when made.

AA117

# DISCUSSION

## I. Standard for Determining the Motion

Even under the PSLRA, which establishes heightened pleading requirements for securities fraud claims, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all reasonable inferences are drawn in favor of the pleader. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted).

The gloss imposed by the PSLRA involves what allegations can be deemed "well-pleaded." In addition to the long-standing requirements of Fed. R. Civ. P. 9(b), which requires the plaintiffs to state "the circumstances constituting fraud . . . with particularity," the PSLRA requires them to "state with particularity all facts on which [information and belief that defendants have violated Rule 10(b)(5)] is formed." 15 U.S.C. § 78u-4(b)(1). The Second Circuit has ruled that the word "all" as used in the PSLRA means that plaintiffs must plead "sufficient" facts to support a reasonable belief as to the misleading nature of defendants' statements or omissions. *Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000). The PSLRA also requires the plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

14

**AA118**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996).  In this case, because the Amended Complaint quotes and relies upon statements made in the press releases and the two investor calls, the Court may properly consider the complete referenced press releases, the full transcripts of those calls, and the Aeropostale Form 10-Ks referenced and incorporated in those calls in connection with the Rule 12(b)(6) motion, without converting it to one for summary judgment. *See Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 232 n.3 (S.D.N.Y. 2009).

## II.  Section 10(b) and Section 20(a) of the Securities and Exchange Act

Plaintiff brings claims under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78a *et seq.*  To state a claim under section 10(b), and the accompanying regulation Rule 10b-5, the plaintiff must allege that Defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  Section 20(a) of the Exchange Act establishes joint and several liability (subject to a good faith exception) for every person who, directly or indirectly, controls any person liable under any provision of the Act.  15 U.S.C. § 78t(a).

The PSLRA establishes a statutory safe harbor for forward-looking statements.  Under the safe harbor, a defendant will not be liable for a forward-looking statement if (1) the statement

15

**AA119**

is "identified as a forward-looking statement, and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," (2) the statement is immaterial, or (3) if "the plaintiff fails to prove that the forward-looking statement . . . was . . . made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c).

"The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis in original).

Defendants argue that the statements identified in the Amended Complaint as materially misleading were in fact not misleading; that these statements are all forward-looking and fall within the PSLRA safe harbor; and that even if these arguments fail, the Amended Complaint does not allege scienter.

## III.  The Amended Complaint Alleges Material Misstatements and Omissions With Sufficient Particularity

The Amended Complaint specifies each statement alleged to have been misleading, outlines separately the reasons why each statement is misleading, and where applicable, states with particularity all facts on which "information or belief" is formed.  *See* 15 U.S.C. 78u-4(b)(1); (Compl. ¶¶ 79-110.)  This is not a complaint that can be dismissed for failure to plead fraud with particularity; Defendants do not contend otherwise.

Defendants, however, argue that Providence has failed to allege *material* misstatements or omissions because, in light of the "total mix" of information available to the investing public –

AA120

including public disclosures made at the same time as the alleged misstatements and publicly
available information regarding sales and promotions at Aeropostale stores – the alleged
misstatements or omissions (i) were not misleading and (ii) were forward-looking statements
accompanied by meaningful cautionary language.  To the extent the Court might find that some
of the statements were not forward-looking, Defendants claim they are a combination of non-
actionable statements, such as expressions of puffery or corporate optimism, or of belief or
opinion, which are non-actionable unless the speaker does not genuinely or reasonably believe
the statement at the time it was made.

 In every respect, Defendants are wrong.

 Section 10(b) requires a plaintiff claiming securities fraud to allege, *inter alia*, a material
misstatement or omission in a public disclosure.  *See* 15 U.S.C. § 78(j).  The meaning of
materiality in the context of securities litigation is long settled – the key to the inquiry is whether
there is a "substantial likelihood" that the alleged misstatement or omission would be deemed
significant by a reasonable investor in light of the "total mix" of information available at such
time about the investment.  *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988) (*quoting TSC
Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).

 As a general matter, "an omission is actionable under the securities laws only when the
corporation is subject to a duty to disclose the omitted facts."  *In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259, 267 (2d Cir. 1993) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988) and
*Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)).  "A corporation is not required to
disclose a material fact merely because a reasonable investor would very much like to know that
fact."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *Time
Warner*, 9 F.3d at 267) (internal alteration marks omitted).  Nevertheless, a duty to disclose

AA121

"arises when disclosure is necessary to make prior statements not misleading." *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 525 (S.D.N.Y. 2009) (quoting *Time Warner*, 9 F.3d at 268). A plaintiff in that instance need only demonstrate the materiality of the omitted facts and need not separately address the misleading nature of the statements that were actually made. *See Time Warner*, 9 F.3d at 267-68. "If a reasonable investor would so regard the omitted fact as material, it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564 (S.D.N.Y. 2011) (quoting *Time Warner*, 9 F.3d at 267-68) (internal alteration marks omitted).

Plaintiff here has alleged that Defendants omitted to disclose material facts without which the statements that were made were materially misleading. On several occasions, for example, Defendants disclosed that they were taking steps to get their problems behind them by being "promotional" with 4Q2010 and 1Q2011 inventory (*e.g.*, "Our outlook for the first quarter reflects the impact from clearing through holiday inventories" (statement 2), "So we feel like we are appropriately attacking the inventory problem" (statement 5), "Our outlook for the second quarter reflects our plans to aggressively clear through spring inventories" (statement 9), "we have taken steps to rectify [our mistakes] and to get this brand back on course" (statement 11)). They made such statements as late as May 19, 2011, when Defendants announced that the problem was "primarily impacted by missteps . . . in the back half of last year."

But facts are alleged in the Amended Complaint – facts that I must presume are true – that, if proved, demonstrate that Defendants knew that this was not a problem limited to inventory overhang for 4Q2010, or even 1Q2011, at the time those statements were made. Even assuming that Defendants could not be certain early in 2011 that the merchandise ordered for the

AA122

spring and summer of 2011 would not sell just because holiday sales (or lack of sales) were weak (although they were certain enough about the failure of Meads' strategy to fire her and reverse course on teen apparel), they had the ability to track sales on a daily basis, and so could undoubtedly surmise relatively early in the spring selling season (February through April) that the spring line was going to be no more successful than the winter line had been. And from those results, it is not at all illogical to infer that the summer was highly likely to be problematic as well. The supposedly "forward-looking" statements, fairly read, imply that the company's lower earnings are the product of a temporary inventory problem (in the case of some statements, a 4Q2010 inventory problem) that would be resolved imminently – without disclosing that the company anticipated that the problem might well extend into succeeding quarters (as it did) because the merchandise that had proved unpopular had been pre-ordered and would continue to be stocked until fall of 2011, when a different "look" arrived at stores.

The May 19 statement quoted above, fairly read, does not suggest to a rational investor that the "problems . . . in the back half of last year" included merchandise orders for merchandise that would not even hit the stores until the second quarter of *this* year. A rational investor would want to know that the merchandising misstep that led to the firing of a merchandise director and a sudden and precipitous downturn in same store sales – all of which did indeed occur "in the back half of last year" – was going to have considerable impact on the profitability during the first two quarters of this year. For that reason alone, Plaintiff has exceeded the materiality threshold, and by a considerable margin.

The safe harbor also offers Defendants no protection. Under the first prong of the safe harbor, a defendant will not be liable for a forward-looking statement if the statement is "identified as a forward-looking statement, and accompanied by meaningful cautionary

AA123

statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). Defendants assert that all of the alleged misstatements are "forward-looking" and accompanied by "meaningful cautionary statements."

But the safe harbor does not apply to material omissions. *See, e.g.*, *In re Complete Mgmt. Inc. Sec. Litig*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001); *In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y.1999). Nor does it apply to statements of current or historical fact. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("[S]tatements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking statements falling within the PSLRA's safe harbor."). Defendants' failure to disclose that the unpopular designs – the source of the poor sales and inventory problems in the "back half of last year" – had been ordered through summer of 2011 is unprotected by the safe harbor, regardless of whether the statements thereby rendered misleading were forward-looking. *See Complete Mgmt.*, 153 F. Supp. at 340.

The forward-looking statements are also not protected by the first prong of the safe harbor because they are not accompanied by "meaningful cautionary statements" that are sufficiently specific to address the material omission. *See Slayton*, 604 F.3d 758, 769-72 (2d Cir. 2010). Vague or boilerplate disclaimers do not suffice as cautionary statements. *See id.*; *Schottenfeld Qualified Associates, L.P. v. Workstream, Inc.*, No. 05 Civ. 7092 (CLB), 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006). To be meaningful, cautionary statements must be "substantive and tailored to the specific future projections, estimates or opinions which the plaintiffs challenge." *Slayton*, 604 F.3d at 772 (quoting *Inst. Investors Group v. Avaya, Inc.*, 564

20

**AA124**

F.3d 242, 256 (3d Cir. 2009)); *see also In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ.

3111 (RWS), 2005 WL 225288, at *18 (S.D.N.Y. Feb. 1, 2005).

In this case, there is no question that the forward-looking statements made on the

conference calls and in the press releases were specifically identified as "forward-looking" and

were accompanied by cautionary language,[1] so the only issue is whether those statements were

sufficient to warrant protection under the PSLRA.

Defendants point to cautionary language concerning "consumer spending patterns,"

"fashion preferences and trends," and "the effectiveness of our inventory management" as

effectively cautioning investors of the risks identified by Plaintiff – the merchandising missteps,

inventory build-up, and increased promotional activities (*i.e.*, sales and markdowns to reduce

inventory). However, Plaintiff argues that these factors were not "meaningful" or "sufficiently

specific" because Aeropostale did not disclose that the risk factors were not merely hypothetical

(*i.e.*, they "could" happen), but were in fact happening – indeed, had already happened – that is,

Aeropostale did not reveal that, at that time, Meads' designs were ordered through the summer of

2011 and that the poor performance would necessarily continue through then.

Nor can many of the alleged misstatements be fairly characterized simply as "forward-

looking." The PSLRA gives several definitions of a forward-looking statement, including "a

statement containing a projection of . . . income (including income loss), earnings (including

earnings loss) per share, . . . or other financial items"; "statement of the plans and objections of

management for future operations, including plans or objectives relating to the products or

---

[1] Plaintiff contends that the oral statements, made on conference calls with investors, were not sufficiently identified by Defendants' statement at the beginning of the calls that "certain statements and responses to questions may contain forward-looking statements such as forecasts of financial performance" and directing the participants to the risks as described in Aeropostale's Form 10-K. Under the PSLRA, oral forward-looking statements require an accompanying statement "that the particular oral statement is a forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i). But courts have held that a statement like Defendants' at the beginning of a conference call is sufficient to identify the oral forward-looking statements, and I find that to be the case here. *See, e.g., Biovail*, 615 F. Supp. 2d at 232-33.

21

AA125

services of the issuer"; and "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1)(A)-(C).

But statements that the company had "taken the necessary steps to give the customers what they want" (statement 4), was "appropriately attacking the inventory problem" (statement 5), and that Defendants "know the mistakes that we made and . . . have taken steps to rectify those" (statement 11) are not "forward-looking." They are statements about present or historical fact, whose "accuracy can be determined at the time they were made." *Vivendi Universal*, 765 F. Supp. 2d at 569. Statements that Aeropostale had taken the "necessary steps" to rectify the problems are another excellent example of a statement that, while technically true, is materially misleading (or could well be) without disclosing that the "necessary steps" did not involve undoing already-planned orders for spring and summer merchandise, and so would not lead to better results until 3Q of 2011.

Moreover, "mixed" statements that have both a forward-looking aspect and a representation of present or historical fact are not protected with respect to the latter. *See, e.g.*, *Schottenfeld*, No. 05 Civ. 7092 (CLB), 2006 WL 4472318, at *3; *Regeneron Pharms.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *13. Viewed in isolation, Aeropostale's earnings projections fall within the definition of a forward-looking statement under the PSLRA as "statements containing a projection of . . . earnings [] per share." 15 U.S.C. § 78u-5(i)(1)(A)-(C). But these statements are accompanied by statements that the projections and "outlook" incorporate the effect of clearing through the inventory, sometimes even within the same sentence (*see* statements 1, 2, 3, 8, and 9). Such statements imply that the earnings projections accurately reflect the sales and inventory problems that Defendants were aware of at the time the statements were made, demonstrating that the statements are not solely forward-looking, but

AA126

instead incorporate a present fact "whose accuracy could be determined at the time the statements were made." *Vivendi Universal,* 765 F. Supp. 2d at 569.

Appreciating that these statements are not properly characterized as mere forward-looking projections makes their misleading nature, and the materiality of the omissions regarding Meads' designs in the company's earnings guidance, all the more apparent.  Plaintiff does not need to rely on the falsity of Aeropostale's financial projections in order to show that they fail to disclose facts that impacted the reliability of those statements. *See, e.g., Oxford,* 187 F.R.D. at 141.  Plaintiff's position is analogous to that of the plaintiffs in *Oxford,* where the court explained, "[P]laintiffs point out that they are not relying on the falsity of Oxford's financial projections and estimates, but rather the defendants' failure to disclose historical and existing material facts about Oxford's computer problems and the impact of those problems on the reliability of the financial statements." *Id.*  As in *Oxford,* "The safe harbor and bespeaks caution doctrines do not apply to these omissions." *Id.*  Moreover the same-day sales data – assuming (as I must) that it showed nothing was getting better – meant that any pretense that these statements were "predictions" that might or might not work lost all force at some point (what that point is we need not decide now).  Aeropostale knew what the problem was.  By the summer, well after the holiday "inventory glut" had passed, sales were so poor that they were a negative number, and only an accounting gambit could get the earnings onto the positive side of the ledger.

Finally, it speaks volumes that the ultimate corrective statement – the one that was finally made on August 18, 2011 – was the only one to disclose the true scope of a problem that had been identified months earlier.  As it became more and more certain that Aeropostale customers were not going to accept Meads' design concept, there undoubtedly came a point at which

**AA127**

investors were entitled to know that the merchandising misstep committed in the fall of 2010 would ripple through Aeropostale's earnings for virtually an entire year. They certainly could not be told that the misstep had occurred last year and nothing more; only by knowing for how long Aeropostale's inventory would be "infected" with unpopular "mature" designs and colors could investors make rational decisions about purchasing and/or selling the company's stock.

I agree with Plaintiff that these allegations, if proven, would take the forward-looking disclosures out of the PSLRA's safe harbor. "[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (quoting *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99 Civ. 12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001)). Even assuming that Defendants sufficiently identified the correct risk factors for the public, the disclosures failed to warn investors that the risks were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences. That is what makes the forward-looking disclosures misleading (if they are misleading – an issue that must abide discovery). As Judge Pollack presciently noted some years ago, in the context of the judicially-created "bespeaks caution" doctrine (analogous to and a predecessor of the PSLRA's safe harbor provision): "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit." *In re Prudential Securities Inc. Ltd. Partnerships Litigation*, 930 F.Supp. 68, 72 (S.D.N.Y.1996); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Of course, if the evidence reveals that Plaintiff's allegations about the existence of unfavorable events are unfounded, the safe harbor provision may yet absolve Defendants of

liability for any forward-looking statement, identified as such, that was accompanied by meaningful cautionary language. *Asher v. Baxter International Inc.*, 377 F.3d 727, 735 (7th Cir. 2004). This will, however, depend on facts that remain to be developed.

The alleged misstatements are also misleading to the extent that they led the market to believe Aeropostale had sufficiently cleared through its holiday inventory as of March 10, 2011; "February started off well" in terms of performance; or Aeropostale was "more promotional" in the first and second quarters of 2011 "than anticipated." Defendands argue that many of the statements amount to "puffery" or "expressions of corporate optimism," or belief or opinion, and are not actionable misrepresentations on those grounds (*e.g.*, "We feel very good about the product going forward" and "we have also been very excited about some of the fashion components . . . for spring").

A plaintiff may not rely on statements that constitute puffery or ordinary expressions of corporate optimism which are "too general to cause a reasonable investor to rely upon them." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also Rombach*, 355 F.3d at 174. Statements of belief or opinion are also not actionable unless they are both objectively false and disbelieved by the speaker at the time the statements were made. *Sanofi-Aventis*, 774 F. Supp. 2d at 567; *see also Time Warner*, 9 F.3d at 267.

But the rosy predictions that might otherwise be puffery are rendered problematic for the very same material omissions outlined above. *See Time Warner*, 9 F.3d at 267. Moreover, statements of belief or opinion are actionable upon a showing of knowing falsity and the fair implication of the holding discussed in the preceding page is that Aeropostale's executives,

25

**AA129**

including the individual defendants, well knew that their half-true expressions of optimism were both overly rosy and highly unlikely.

## IV.  The Amended Complaint Raises a Strong Inference of Scienter

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  In *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court interpreted this provision of the PSLRA to require a court to consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24.  Under this rubric, a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id* at 324.  The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324 (citation and internal quotation marks omitted).  In determining whether a strong inference exists, the court must consider "whether *all* of the facts alleged, taken collectively, . . . [and] not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 551 U.S. at 322-23 (emphasis in original).

The requisite state of mind in a Rule 10b-5 action is "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Second Circuit, a strong inference of scienter can be established in two ways:  by alleging particularized facts that show that defendants had both motive and opportunity to commit the fraud, or by alleging particularized facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *ATSI Commc'ns, Inc. v. Wolfson*, 493 F.3d 87, 99 (2d Cir. 2007).  In either case, the court must be convinced that the inference of scienter is "at least as compelling" as any

AA130

competing inferences. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

As indicated above, Defendants urge the Court to adopt a finding that the alleged misstatements are all forward-looking, and so would be subject to the higher standard of "actual knowledge" for scienter under the second prong of the PSLRA. *See* 15 U.S.C. § 78u-5(c); *Slayton*, 604 F.3d at 773 ("[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity.") (quoting *Avaya, Inc.*, 564 F.3d at 274). I have declined to find that the misleading nature of the statements rests on the forward-looking aspects of the statements; instead, it is the omissions that make the alleged misstatements materially misleading. The standard that applies to material omissions is "conscious misbehavior or recklessness." *See, e.g.*, *ATSI*, 493 F.3d at 99.

A generalized desire to maintain a company's stock price or to sustain "the appearance of corporate profitability" does not constitute sufficient evidence of motive to support a securities fraud claim. *Chill v. Gen Elec. Co.*, 101 F.3d 263, 268 & n.5 (2d Cir. 1996). Plaintiff does not plead or argue that Defendants personally profited by selling Aeropostale stock while the price was artificially inflated – though, ironically, Defendants admitted in their responsive papers that they had previously made elections to sell stock during the putative class period to satisfy their tax liability, thereby giving them a personal motive to keep the stock price inflated that would satisfy the "motive" prong of scienter analysis. *See ECA*, 553 F.3d at 198 ("[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit.") (citations and internal quotation marks omitted).

27

**AA131**

But Plaintiff definitely pleads particularized facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. "[W]here the plaintiffs cannot make a motive showing, . . . their circumstantial evidence of fraud must be correspondingly greater." *Slayton*, 604 F.3d at 776; *see also Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). The inquiry regarding scienter is necessarily case-specific, and the conclusion rests on a practical judgment about whether, taking all of the allegations collectively, it is at least as likely that Defendants acted with scienter. *See Tellabs*, 551 U.S. at 322-23; *Avaya Inc.*, 564 F.3d at 269.

In order to demonstrate "conscious misbehavior or recklessness," Plaintiff alleges that Defendants knew or had access to information suggesting that their public statements were not accurate. Defendants argue that Plaintiff has failed to both plead its facts with sufficient particularity and to raise a strong inference of scienter.

It is well settled that plaintiffs can plead conscious misbehavior or recklessness by alleging that defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311; *see also In re AIG*, 741 F. Supp. 2d at 532-33; *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309 (2d Cir. 2000). With respect to sales data and reports, pleadings are sufficiently specific where the plaintiffs have alleged who prepared the reports, how frequently they were prepared, who reviewed them, and the issues discussed in the reports. *See New Orleans Emps. Ret. Sys. V. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. Dec. 29, 2011); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-73 (2d Cir. 2001) (allegations with respect to company-generated

28

**AA132**

statistics held sufficient where plaintiffs specified "who prepared internal company reports, how frequently the reports were prepared and who reviewed them").

In this case, Plaintiff has pleaded such facts with sufficient particularity. Plaintiff has pleaded facts tending to show that Defendants knew they had made a huge merchandising mistake – indeed, they fired the merchandising director whose fashion sense was so disastrously wrong and set about correcting it. It pleads facts tending to show that Defendants knew that her poor decisions were not limited to Aeropostale holiday results, but would have longer term consequences. Defendants could see that sales, not just of the holiday inventory, but of spring inventory, were poor and getting poorer. They could see it on a daily basis. Consumer distaste for Meads' lines was not hypothetical and it was not confined to the holiday season – it was real and demonstrable and ongoing. These issues were discussed at meetings as early as February 2011, as well as at monthly Unit Q meetings.

Plaintiff, moreover, has pleaded facts tending to show Defendants knew the kind of impact these failures would have on the company's overall performance – the women's fashion division was recognized as the "core" of Aeropostale's business and constituted approximately 70% of the company's annual net sales.

I decline to accept Defendants' invitation to overlook the law in this circuit regarding confidential sources, as articulated in *Novak*, in favor of the Seventh Circuit's decision in *Higginbotham v. Baxter Int'l*, 495 F.3d 753 (7th Cir. 2007). *See Higginbotham*, 495 F.3d at 756-57.; *see Novak*, 216 F.3d at 313-14. If the confidential employees turn out to have given Plaintiff's counsel false information, or have axes to grind that renders implausible their testimony about what Defendants knew and when they knew it, so be it – but that is an issue for

29

**AA133**

*trial*, not on a motion to dismiss. Here, sufficient facts are disclosed to allow, at the pleading stage, an inference of scienter.

The CWs included the director of visual merchandising, who was responsible for inventory issues and routinely discussed the inventory overhang with Defendants (CW1); a director of planning and allocation primarily focused on the P.S. from Aeropostale brand, responsible for preparing financials for his group and presenting products to the Executive Committee (CW2); an associate merchant in the merchandising department, responsible for ordering clothing in the long-sleeve women's knit line (CW3); an assistant designer, responsible for fashion line development in women's woven outerwear (CW4); an associate merchant, responsible for women's sweaters and dresses (CW5); a senior planner for e-commerce primarily focused on the P.S. from Aeropostale brand, responible for managing the P.S. line on the company's website (CW6); a freelance merchandise assistant in the merchandising department, who worked in women's accessories (CW7); a senior programmer/analyst, responsible for the upgrade and coding of Aeropostale's internal systems (CW8); and a merchandiser at the company (CW9).

Their evidence gives rise to the following findings.

- The women's line changed direction during the second half of 2010, with the introduction of Meads' new "mature" designs and muted color palette. Defendants knew about the change, and Meads was fired in December 2010 as a result of the designs' failure.

- As of December 2010, the women's department had ordered almost all of the merchandise in Meads' unpopular styles through spring and summer of 2011. Since inventory at Aeropostale is ordered six to nine months before the clothing hits the shelves, it is impossible to rectify an excess inventory problem in one or two quarters.

30

**AA134**

- The "inventory crisis" began in the second half of 2010 and intensified in early 2011 and throughout the putative class period.  Aggressive markdowns and promotions were not proving successful at clearing the inventory, and Aeropostale had to rent additional storage space to house the excess inventory.

- Aeropostale employed aggressive and unprecedented discounts and promotions during the putative class period, which severely affected Aeropostale's margins throughout the putative class period.

- Defendants had access to, reviewed, and discussed flash reports, Unit Q reports, the Bible, and sales reports, which contained detailed information regarding sales, inventory, and other performance metrics on a "real time basis."  Daily flash reports showed that all of the 2011 sales figures were "dismal," and weekly sales reports made it clear that Aeropostale was not reaching its sales goals during the putative class period.

- The inventory crisis was discussed at weekly Executive Committee meetings, as early as February 2011.  At a meeting in April 2011, Defendants acknowledged that the "heavily discounted merchandise was still not selling."

From this, one can infer that Defendants, having access to all this information and watching the downward trend, omitted to disclose all the information necessary to make their statements true and did so either recklessly or consciously – more likely the latter.

And those inferences are "at least as" compelling as any non-fraudulent inference.  This is a case where, assuming the pleaded facts to be true, it is hard to come up with a non-fraudulent inference.  In view of the daily sales data available to Defendants, and the ongoing nature of the problem as the weeks and months passed with no visible improvement (indeed, with a deterioration) in the company's prospects for consumer acceptance of Meads' styles and colors – in a business segment that accounted for 70% of the company's revenue – it is difficult to infer that Defendants really and reasonably thought that the company's problem would not persist until all of Meads' influence on Aeropostale's teen fashions had dissipated.  The inference that Defendants failed to apprise the market that "last year's problem" could not be fully corrected

**AA135**

until halfway through "this year," even though they knew otherwise, is highly compelling on this record.

The opposing inference of non-fraudulent intent is that Defendants were aware that the "mature" designs were not selling, and that they had problems with excess inventory as a result. But they reasonably believed that the problems would not persist throughout the first and second quarters, and that the effect on financial performance would not be "as bad" as it proved to be. This inference is supported by Defendants "early" disclosures – several weeks before their financial reporting on the quarter at issue was due under SEC regulations – that the actual earnings per share results would be much lower than the projected earnings given at the beginning of the quarter. It is also supported by the fact that Defendants significantly lowered the expected earnings per share for the second quarter (from $0.35-$0.38 in the first quarter, to $0.11-$0.16 in the second quarter, and compared to $0.46 earnings per share in the second quarter of the previous year), presumably after they saw how poorly the designs ended up selling through the spring.

"Later disclosures that timely raise questions about the reliability of financial information . . . lend weight to an inference that contemporaneous financial statements were made in good faith." *Slayton*, 604 F.3d at 777 (quoting *Matrix Capital Management Fund, LP v. Bearing Point, Inc.*, 576 F.3d 172, 187 (4th Cir. 2009)). But in this case, the facts as alleged by Plaintiff do not indicate that these disclosures made by Defendant were "timely;" in fact, they suggest the opposite. And the lowered "earnings per share" guidance for the second quarter also supports an inference that Defendants, recognizing that actual earnings would eventually be disclosed, merely understated the severity of the problems as a way to avoid revealing the full extent of the problem – the poor designs purchased through the summer of 2011 – until the fall. At that time,

AA136

Aeropostale could comfortably report that the problems arising from the "merchandising missteps" were over.

Defendants argue vigorously that the "real time" data available to Defendants was not a "magic black box" that could perfectly predict performance for the quarter. But that need not be the case in order for Plaintiff to raise a strong inference of scienter. In assessing whether Plaintiff has met its burden to raise such an inference – one that is *at least as* compelling as any opposing inference – I must consider whether all of the facts, taken collectively, meet that standard, and not scrutinize any one fact in isolation. *See Tellabs*, 551 U.S. at 322-23. I am, of course, not privy to what the actual data revealed, aside from the reports of the confidential witnesses that appear in the Amended Complaint. But I find that here, the *access* to real time data, at a minimum, bolsters Plaintiff's allegation that Defendants were aware of the severity of the "inventory crisis," as recounted by the confidential witnesses (in addition to and separate from the witnesses' reports that Defendants attended various meetings and were aware of the inventory problems). And the bevy of information provided by those witnesses suggests that the crisis was severe and that it would not abate for the next two quarters, because of the material fact, omitted from Defendants' statements, that the poorly-received "mature" designs had been purchased through the summer of 2011.

We are only at the pleading stage, and discovery may well undermine the seeming strength of Plaintiff's position. But precisely because we are at the pleading stage, where – even under the PSLRA – we have to assume the truth of well-pleaded facts, it would be inappropriate to grant the motion to dismiss.[2]

---

[2] The Court did not consider any of the "expert testimony" that was included – inappropriately, in the Court's view – in the pleading.

AA137

**V. The Amended Complaint Sufficiently Alleges Section 20(a) Liability**

 Because Plaintiff has sufficiently pled a primary violation that the individual defendants controlled Aeropostale and acted with conscious misbehavior or recklessness, Plaintiff's control person claims against Defendants Johnson and Miller are actionable. *See* 15 U.S.C. § 78(t); *In re AIG*, 741 F. Supp. 2d at 534-36.

**CONCLUSION**

 For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint is denied. The Clerk of the Court is directed to remove the motion at Docket No. 23 from the Court's list of pending motions.

 Plaintiff has 30 days to move for class certification. Meanwhile, merits discovery will commence; it will not be stayed, since whether a class is certified or not we will be litigating the merits. *All* merits discovery, including expert discovery, must be complete by September 30, 2013. Plaintiff's expert report is due June 7, 2013; if Defendants retain an expert the report is due August 23, 2013. These dates *will not be extended.* Class discovery must proceed simultaneously.

March 25, 2013

                  _____
                       U.S.D.J.

BY ECF TO ALL COUNSEL

34

**AA138**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

THE CITY OF PROVIDENCE, Individually and     :
on Behalf of All Others Similarly Situated,         No. 11 Civ. 7132 (CM) (THK)

                         :

                 Plaintiff,

                         :

       vs.

                         :

AEROPOSTALE, INC., THOMAS P. JOHNSON
and MARC D. MILLER,                 :

                Defendants.       :

-------------------------------------------------------------------x


## ANSWER AND AFFIRMATIVE DEFENSES
## TO THE AMENDED CLASS ACTION COMPLAINT


           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, NY 10153
           (212) 310-8000 (Telephone)
           (212) 310-8007 (Fax)

           *Attorneys for Defendants Aéropostale, Inc.,*
           *Thomas P. Johnson and Marc D. Miller*


Of Counsel:

    Joseph S. Allerhand
    Stephen A. Radin
    Caroline H. Zalka


April 8, 2013

Defendants Aéropostale, Inc., Thomas P. Johnson, and Marc D. Miller ("Defendants"), through their undersigned attorneys, respectfully submit this Answer to the Amended Class Action Complaint, dated February 10, 2012 (the "Complaint").

With respect to the Complaint in its entirety, Defendants deny that they engaged in any wrongful, illegal or improper conduct, made any false or misleading statements or omissions, or caused or are responsible in any way for any injuries or damages purportedly suffered by Plaintiff or any members of the putative class. Except as otherwise expressly stated, Defendants deny every allegation contained in each paragraph of the Complaint, including all headings and subheadings; specifically deny any liability to Plaintiff or any members of the putative class that it purports to represent; and deny that any of the claims asserted against Defendants may properly be maintained as a class action. Defendants deny any characterization of excerpts from and references to documents and third-party publications in the Complaint and further deny that any limited quotations accurately state the contents of the full documents. Defendants respectfully refer the Court to the original source or document for an accurate and complete statement of all the terms thereof. Defendants reserve the right to challenge the authenticity of all sources and documents referred to or purportedly quoted from in the Complaint, and to assert that any of the sources or documents referred to or purportedly quoted from by Plaintiff in the Complaint are covered by the attorney-client privilege, the work product doctrine, and/or otherwise applicable privileges. Whenever a paragraph of this Answer states that no response to an allegation is required, to the extent a response is required, Defendants deny the allegation. This statement is incorporated into each of the specific responses below as if stated fully therein.

US_ACTIVE:\44234837\1\11727.0003

**AA140**

As to the specific paragraphs of the Complaint, Defendants respond based upon knowledge with respect to themselves and their own acts, and upon information and belief with respect to all other matters, as follows:

1.     Deny the allegations of Paragraph 1, except admit that Plaintiff purports to represent certain purchasers of Aéropostale common stock and bring a putative class action as described in Paragraph 1.

2.     Deny the allegations of Paragraph 2, except admit that Aéropostale is a specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old young women and men through its Aéropostale stores and 4 to 12 year-old children through its P.S. from Aéropostale stores. Admit that Aéropostale offers a focused collection of apparel including graphic t-shirts, tops, bottoms, sweaters, jeans, outerwear, and accessories that usually incorporate the Aéropostale and P.S. from Aéropostale logo. Admit that as of January 29, 2011, Aéropostale operated 965 Aéropostale stores and employed 4,160 full-time and 13,668 part-time employees.

3.     Deny the allegations of Paragraph 3, except admit that Aéropostale's business is highly seasonal, and historically Aéropostale has realized a significant portion of its sales in the second half of the fiscal year, attributable to the impact of the back-to-school selling season in the third quarter and the holiday selling season in the fourth quarter.

4.     Deny the allegations of Paragraph 4, except admit that Aéropostale principally targets 14 to 17 year-old young women and men through its Aéropostale stores and 4 to 12 year-old children through its P.S. from Aéropostale stores. Further admit that net sales attributable to the Women's category comprised 66% of net sales for the fiscal year ended January 28, 2012 ("fiscal year 2011"); 69% of net sales for the fiscal year ended January 29,

US_ACTIVE:\44234837\1\11727.0003

**AA141**

2011 ("fiscal year 2010"); and 70% of net sales for the fiscal year ended January 30, 2010 ("fiscal year 2009").

5.      Deny the allegations of Paragraph 5.

6.      Deny the allegations of Paragraph 6, except admit that on June 4, 2010, Aéropostale filed a Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2010, and on September 8, 2010, Aéropostale filed a Quarterly Report on Form 10-Q for the quarterly period ended July 31, 2010 and refer to those documents for a complete and accurate description of the matters described in Paragraph 6.

7.      Deny the allegations of Paragraph 7, except admit that on December 1, 2010, Aéropostale issued a press release announcing that Ms. Meads would be departing from the Company and refer to that press release for its content.

8.      Deny the allegations of Paragraph 8.

9.      Deny the allegations of Paragraph 9.

10.     Deny the allegations of Paragraph 10, except admit that Aéropostale employs a range of retail, financial, and merchandising applications, and utilizes industry-specific software systems to provide various functions related to point-of-sale, inventory management, logistics and sourcing, planning and replenishment, and financial reporting. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of Paragraph 10 concerning statements purportedly made by unidentified former employees to Plaintiff or its counsel.

11.     Deny the allegations of Paragraph 11, except admit that during the purported Class Period, Aéropostale employed a range of retail, financial, and merchandising applications and utilized industry-specific software systems to provide various functions related

4

**AA142**

to point-of-sale, inventory management, logistics and sourcing, planning and replenishment, and financial reporting. Refer to Aéropostale's press releases issued during the purported Class Period for a complete and accurate description of the matters described in the last sentence of Paragraph 11.

12. Deny the allegations of Paragraph 12, except admit that Aéropostale issued press releases on May 20, 2010 and August 5, 2010 providing earnings guidance for the quarterly period ending July 31, 2010, issued press releases on August 19, 2010, and November 4, 2010 providing earnings guidance for the quarterly period ending October 30, 2010, and issued press releases on December 1, 2010, January 6, 2011, and February 3, 2011 providing earnings guidance for the quarterly period ending January 29, 2011, and refer to those press releases for their content. Further admit that Aéropostale issued press releases on August 19, 2010, December 1, 2010, and March 10, 2011 disclosing earnings for the quarterly periods ended July 31, 2010, October 30, 2010, and January 29, 2011, respectively, and refer to those press releases for their content. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the final sentence of Paragraph 12.

13. Deny the allegations of Paragraph 13, except admit that Aéropostale issued a press release on March 10, 2011 providing earnings guidance of $0.35 to $0.38 per diluted share for the quarterly period ending April 30, 2011. State that because the Court determined that the incorporation of Mr. Zwerner's purported testimony in the Complaint was inappropriate, no response to the allegations in the penultimate sentence of Paragraph 13 is required. Further state that to the extent Paragraph 13 contains legal conclusions, no response is required.

**AA143**

14.     Deny the allegations of Paragraph 14, except deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 14 concerning statements purportedly made by unidentified former employees to Plaintiff or its counsel.

15.     Deny the allegations of Paragraph 15.

16.     Deny the allegations of Paragraph 16, and state that because the Court determined that the incorporation of Mr. Zwerner's purported testimony in the Complaint was inappropriate, no response to the allegations in the final sentence of Paragraph 16 is required. Further state that to the extent Paragraph 16 contains legal conclusions, no response is required.

17.     Deny the allegations of Paragraph 17.

18.     Deny the allegations of Paragraph 18.

19.     Deny the allegations of Paragraph 19, except admit that the common stock of Aéropostale ("Aéropostale stock") closed at $23.05 per share on March 11, 2011. State that to the extent Paragraph 19 contains legal conclusions, no response is required.

20.     Deny the allegations of Paragraph 20, and state that to the extent Paragraph 20 contains legal conclusions, no response is required.

21.     Admit that Plaintiff purports to seek relief under the statutory provisions and rule referenced, and deny any liability to Plaintiff or any members of the putative class it purports to represent.

22.     Admit the allegations of Paragraph 22.

23.     Deny the allegations of Paragraph 23, except admit that Aéropostale maintains its principal executive offices in New York, New York.

US_ACTIVE:\44234837\1\11727.0003

**AA144**

24.     State that the allegations of Paragraph 24 are legal conclusions, and therefore no response is required.

25.     Deny any liability to Plaintiff or any members of the putative class it purports to represent, and deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 25. Refer to the attachment to the Complaint cited in Paragraph 25 for its content.

26.     Deny the allegations of Paragraph 26, except admit that Aéropostale is incorporated under the laws of the state of Delaware and maintains its principal executive offices at 112 West 34th Street, New York, NY 10120. Admit that Aéropostale is a primarily mall-based, specialty retailer of casual apparel and accessories, principally targeting 14 to 17 year-old young women and men through its Aéropostale stores and 4 to 12 year-old children through its P.S. from Aéropostale stores. Admit that Aéropostale maintains control over its proprietary brands by designing, sourcing, marketing and selling all of its own merchandise, other than in licensed stores. Admit that Aéropostale products can only be purchased in Aéropostale stores and online at www.aeropostale.com and P.S. from Aéropostale products can be purchased in P.S. from Aéropostale stores, in certain Aéropostale stores, and online at www.ps4u.com and www.aeropostale.com. Admit that Aéropostale stock is traded on the New York Stock Exchange under the symbol "ARO." Admit that net sales attributable to the Women's category comprised 66% of net sales for fiscal year 2011; 69% of net sales for fiscal year 2010; and 70% of net sales for fiscal year 2009.

27.     Admit that Mr. Johnson was promoted to Chief Executive Officer in December 2010, after service as Co-Chief Executive Officer from February 2010 to December 2010 and as Executive Vice President and Chief Operating Officer from March 2004 to February

7

**AA145**

2010. Admit that Mr. Johnson has served as a director of Aéropostale since August 2008. Further

admit that Ms. Meads served as Co-Chief Executive Officer from February 2010 until December

2010.

28.     Admit that Mr. Miller was promoted to Senior Vice President and Chief

Financial Officer in December 2010, after service as Senior Vice President of Strategic Planning,

Business Development and E-Commerce from April 2007 to December 2010.

29.     State that the allegations of Paragraph 29 are not factual allegations, and

therefore no response is required.

30.     Deny knowledge or information sufficient to form a belief as to the truth

or falsity of statements purportedly made by unidentified confidential witnesses ("CWs") to

Plaintiff or its counsel.

31.     Admit the allegations of Paragraph 31, except admit that on March 28,

2011, Aéropostale filed an Annual Report on Form 10-K for fiscal year 2010 ("2010 Form 10-

K") cited in the footnote to Paragraph 31 and refer to that document for its content.

32.     Deny the allegations of Paragraph 32, except admit that during the

purported Class Period, Aéropostale was a specialty retailer of casual apparel and accessories,

principally targeting 14 to 17 year-old young women and men through its Aéropostale stores and

4 to 12 year-old children through its P.S. from Aéropostale stores. Further admit that on March

28, 2011, Aéropostale filed its 2010 Form 10-K cited in the footnote to Paragraph 32 and refer to

that document for its content.

33.     Deny the allegations of Paragraph 33, except admit that Aéropostale

provides customers with a focused selection of high quality fashion and fashion basics at

compelling values in an innovative and exciting store environment. Admit that Aéropostale

8

**AA146**

stores use visual merchandising, colorful in-store signage, and popular music. Admit that

Aéropostale offers a collection of apparel including graphic t-shirts, tops, bottoms, sweaters,

jeans, outerwear, and accessories that usually incorporate the Aéropostale and P.S. from

Aéropostale logo. Further admit that on March 28, 2011, Aéropostale filed its 2010 Form 10-K

cited in the footnote to Paragraph 33 and refer to that document for its content.

      34.    Deny the allegations of Paragraph 34, except admit that Aéropostale

maintains control over its proprietary brands by designing, sourcing, marketing, and selling all of

its own merchandise. Further admit that on March 28, 2011, Aéropostale filed its 2010 Form 10-

K cited in the footnote to Paragraph 34 and refer to that document for its content.

      35.    Deny the allegations of Paragraph 35, except admit that during the

purported Class Period, the head of the Merchandising department and the head of the Design

department directly reported to Mr. Johnson and the head of the Planning & Allocation

department directly reported to Mr. Cunningham. Admit that the merchandising organization,

together with the planning organization, determine the quantities of units needed for each

product category. Further admit that on March 28, 2011, Aéropostale filed its 2010 Form 10-K

cited in the footnote to Paragraph 35 and refer to that document for its content.

      36.    Deny the allegations of Paragraph 36, except admit that on December 1,

2010, Aéropostale hosted its Third Quarter 2010 Earnings Call cited in the footnote to Paragraph

36 and refer to the transcript of that call for its content. Deny knowledge or information

sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to

Plaintiff or its counsel.

      37.    Deny the allegations of Paragraph 37, except admit that Aéropostale's

fiscal year 2010 ended on January 29, 2011, the first quarterly period for fiscal year 2011 ended

**AA147**

April 30, 2011, and the second quarterly period for fiscal year 2011 ended July 30, 2011. Further

admit that on March 28, 2011, Aéropostale filed its 2010 Form 10-K, on June 3, 2011,

Aéropostale filed a Quarterly Report on Form 10-Q for the quarterly period ended April 30, 2011

(the "1Q 2011 Form 10-Q"), and on September 7, 2011, Aéropostale filed a Quarterly Report on

Form 10-Q for the quarterly period ended July 30, 2011 cited in the footnotes to Paragraph 37

and refer to those documents for their content.

38.     Deny the allegations of Paragraph 38, except admit that net sales

attributable to the Women's category comprised 66% of net sales for fiscal year 2011; 69% of

net sales for fiscal year 2010; and 70% of net sales for fiscal year 2009. Admit that during the

purported Class Period, Aéropostale employed a range of retail, financial, and merchandising

applications and utilized industry-specific software systems that monitored, among other things,

certain data concerning sales and inventory on a daily basis, and that Messrs. Johnson and Miller

had access to certain of these systems during the purported Class Period.

39.     Deny the allegations of Paragraph 39, except admit that on March 10,

2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that

call for its content. Further admit that on March 29, 2010, Aéropostale filed an Annual Report on

Form 10-K for fiscal year 2009, and on March 28, 2011, Aéropostale filed its 2010 Form 10-K,

and refer to those documents for their content.

40.     Deny the allegations of Paragraph 40, except admit that on December 8,

2010, Aéropostale filed a Quarterly Report on Form 10-Q for the quarterly period ended October

30, 2010, and on June 3, 2011, Aéropostale filed its 1Q 2011 Form 10-Q, and refer to those

documents for their content.

10

**AA148**

41.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 41 and refer to the cited analyst reports for their content.

42.    Deny the allegations of Paragraph 42, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein.

43.    Deny the allegations of Paragraph 43, except admit that on March 28, 2011, Aéropostale filed its 2010 Form 10-K and refer to that document for its content. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 43 concerning statements purportedly made by CW8 to Plaintiff or its counsel, and deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second and third sentences of Paragraph 43 and refer to the source cited in the footnote to Paragraph 43, www.islandpacific.com, for its content.

44.    Deny the allegations of Paragraph 44, except admit that during fiscal year 2008, Aéropostale commenced a phased implementation of new planning and allocation systems. Admit that during fiscal year 2010, Aéropostale completed implementation of a data warehouse system designed to enhance Aéropostale's business intelligence reporting capabilities. Admit that Aéropostale employs a range of retail, financial, and merchandising applications and utilizes industry-specific software systems that monitor, among other things, sales of each style and color of Aéropostale merchandise. Admit that Aéropostale's corporate headquarters directs the merchandise assortments, merchandise pricing, store layout, inventory management, and in-store visuals for all stores, other than in licensed stores. Further admit that on March 28, 2011, Aéropostale filed its 2010 Form 10-K cited in the footnote to Paragraph 44 and refer to that document for its content.

11

**AA149**

45.     Deny the allegations of Paragraph 45, except admit that during the purported Class Period, Aéropostale employed a range of retail, financial and merchandising applications and utilized industry-specific software systems that monitored on various periodic schedules, among other things, data concerning inventory, sales, and pricing, and that Messrs. Johnson and Miller had access to certain of these systems during the purported Class Period.

46.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1, CW2, or CW9 to Plaintiff or its counsel.

47.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW5 or CW8 to Plaintiff or its counsel.

48.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW8 to Plaintiff or its counsel.

49.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2, CW5, or CW8 to Plaintiff or its counsel.

50.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW8 to Plaintiff or its counsel.

51.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW8 to Plaintiff or its counsel.

52.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

53.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

54.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

**AA150**

55.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

56.     Deny the allegations of Paragraph 56, except admit that Aéropostale continuously evolves its merchandise assortment to resonate with its customer base, and admit that as part of its overall order of merchandise for the back-to-school and holiday seasons in 2010, Aéropostale ordered certain select styles of merchandise for the Women's category that could be considered to fall within a "muted" color palate or could be considered a "mature" fashion style.

57.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1 to Plaintiff or its counsel.

58.     Deny the allegations of Paragraph 58, except admit that on December 1, 2010, Aéropostale issued a press release announcing that Ms. Meads would be departing from the Company and that Mr. Johnson would assume the position of Chief Executive Officer, and refer to that press release for its content. Admit that on December 21, 2010, Aéropostale issued a press release announcing the appointment of Mr. Miller to the position of Chief Financial Officer, and refer to that press release for its content. Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1, CW2, or CW5 to Plaintiff or its counsel.

59.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 or CW7 to Plaintiff or its counsel, and repeat and reallege their answers to all subsequent Paragraphs of the Complaint as if fully set forth herein.

**AA151**

60.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW3 to Plaintiff or its counsel.

61.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1, CW2, CW4, CW5, or CW8 to Plaintiff or its counsel.

62.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

63.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1, CW2, or CW9 to Plaintiff or its counsel.

64.     Deny the allegations of Paragraph 64, except admit that on February 3, 2011, Aéropostale issued a press release and refer to that press release for its content.

65.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 65 and refer to the cited analyst report for its content.

66.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1 to Plaintiff or its counsel.

67.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1 to Plaintiff or its counsel.

68.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 or CW4 to Plaintiff or its counsel.

69.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

70.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

AA152

71.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW1 or CW9 to Plaintiff or its counsel.

72.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

73.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW3 to Plaintiff or its counsel.

74.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW3 to Plaintiff or its counsel.

75.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW3 to Plaintiff or its counsel.

76.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW5 to Plaintiff or its counsel.

77.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW4 to Plaintiff or its counsel.

78.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW6 or unidentified former employees to Plaintiff or its counsel.

79.     Admit that Aéropostale issued a press release on March 10, 2011 and refer to that press release for its content and its signatories.

80.     Deny the allegations of Paragraph 80, and state that to the extent Paragraph 80 contains legal conclusions, no response is required.

81.     Deny the allegations of Paragraph 81, and state that to the extent Paragraph 81 contains legal conclusions, no response is required.

**AA153**

82.     Deny the allegations of Paragraph 82.

83.     Admit that on March 10, 2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that call for its content and its participants.

84.     Deny the allegations of Paragraph 84, except admit that on March 10, 2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that call for its content.

85.     Deny the allegations of Paragraph 85, and repeat and reallege their answers to Paragraphs 81-82 of the Complaint as if fully set forth herein. State that to the extent Paragraph 85 contains legal conclusions, no response is required.

86.     Deny the allegations of Paragraph 86, except admit that on March 10, 2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that call for its content.

87.     Deny the allegations of Paragraph 87, and state that to the extent Paragraph 87 contains legal conclusions, no response is required.

88.     Deny the allegations of Paragraph 88, except admit that on March 10, 2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that call for its content.

89.     Deny the allegations of Paragraph 89, and repeat and reallege their answer to Paragraph 87 of the Complaint as if fully set forth herein. State that to the extent Paragraph 89 contains legal conclusions, no response is required.

90.     Deny the allegations of Paragraph 90, except admit that on March 10, 2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that call for its content.

US_ACTIVE:\44234837\1\11727.0003

**AA154**

91.     Deny the allegations of Paragraph 91, and state that to the extent Paragraph 91 contains legal conclusions, no response is required.

92.     Deny the allegations of Paragraph 92, except admit that on March 10, 2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that call for its content.

93.     Deny the allegations of Paragraph 93, and state that to the extent Paragraph 93 contains legal conclusions, no response is required.

94.     Deny the allegations of Paragraph 94, except admit that on March 10, 2011, Aéropostale hosted its Fourth Quarter 2010 Earnings Call and refer to the transcript of that call for its content. Deny knowledge or information sufficient to form a belief as to the truth or falsity of analysts' purported understanding, and refer to the cited analyst report for its content. State that to the extent Paragraph 94 contains legal conclusions, no response is required.

95.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 95 and refer to the cited analyst report for its content.

96.     Deny the allegations of Paragraph 96, except admit that Aéropostale issued press releases on May 20, 2010 and August 5, 2010 providing earnings guidance for the quarterly period ending July 31, 2010, issued press releases on August 19, 2010, and November 4, 2010 providing earnings guidance for the quarterly period ending October 30, 2010, and issued press releases on December 1, 2010, January 6, 2011, and February 3, 2011 providing earnings guidance for the quarterly period ending January 29, 2011, and refer to those press releases for their content. Further admit that Aéropostale issued press releases on August 19, 2010, December 1, 2010, and March 10, 2011 disclosing earnings for the quarterly periods ended July 31, 2010, October 30, 2010, and January 29, 2011, respectively, and refer to those press

17

AA155

releases for their content. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of Paragraph 96.

97. Deny the allegations of Paragraph 97, except admit that Aéropostale issued a press release on May 5, 2011 and refer to that press release for its content and its signatories. State that to the extent Paragraph 97 contains legal conclusions, no response is required.

98. Deny the allegations of Paragraph 98, and state that to the extent Paragraph 98 contains legal conclusions, no response is required.

99. Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

100. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 100, except admit that on May 5, 2011, Aéropostale stock closed at $21.29 per share.

101. Deny the allegations of Paragraph 101, except admit that Aéropostale issued a press release on May 19, 2011 and refer to that press release for its content and its signatories.

102. Deny the allegations of Paragraph 102.

103. Deny the allegations of Paragraph 103.

104. Deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 to Plaintiff or its counsel.

105. Deny the allegations of Paragraph 105, except admit that on May 19, 2011, Aéropostale hosted its First Quarter 2011 Earnings Call and refer to the transcript of that call for its content and its participants.

US_ACTIVE:\44234837\1\11727.0003

**AA156**

106.    Deny the allegations of Paragraph 106, except deny knowledge or information sufficient to form a belief as to the truth or falsity of statements purportedly made by CW2 or CW4 to Plaintiff or its counsel.

107.    Deny the allegations of Paragraph 107, except admit that on May 19, 2011, Aéropostale hosted its First Quarter 2011 Earnings Call and refer to the transcript of that call for its content.

108.    Deny the allegations of Paragraph 108.

109.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 109, except admit that on May 19, 2011, Aéropostale stock closed at $21.34 per share and on May 20, 2011, Aéropostale stock closed at $18.30 per share.

110.    Deny the allegations of Paragraph 110, except deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 110 concerning analysts' purported understanding, and refer to the cited analyst reports for their content.

111.    Deny the allegations of Paragraph 111, except admit that Aéropostale issued a press release on August 4, 2011 and refer to that press release for its content and its signatories.

112.    Deny the allegations of Paragraph 112, except admit that Aéropostale issued a press release on August 4, 2011 and refer to that press release for its content.

113.    Deny the allegations of Paragraph 113.

114.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 114, except admit that on August 3, 2011, Aéropostale

**AA157**

stock closed at $16.52 per share and on August 4, 2011, Aéropostale stock closed at $12.53 per share.

115.    Deny the allegations of Paragraph 115, except deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 115 concerning analyst reports and refer to the cited analyst reports for their content.

116.    Deny the allegations of Paragraph 116, except admit that Aéropostale issued a press release on August 18, 2011 and refer to that press release for its content and its signatories.

117.    Deny the allegations of Paragraph 117, except admit that Aéropostale issued a press release on August 18, 2011 and refer to that press release for its content.

118.    Admit that on August 18, 2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of that call for its content and its participants.

119.    Deny the allegations of Paragraph 119, except admit that on August 18, 2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of that call for its content.

120.    Deny the allegations of Paragraph 120, except admit that on August 18, 2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of that call for its content.

121.    Deny the allegations of Paragraph 121, except admit that on August 18, 2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of that call for its content.

**AA158**

122.     Deny the allegations of Paragraph 122, except admit that on August 18, 2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of that call for its content.

123.     Deny the allegations of Paragraph 123, except admit that on August 18, 2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of that call for its content.

124.     Deny the allegations of Paragraph 124.

125.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 125, and refer to the cited analyst reports for their content.

126.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 126, except admit that on August 18, 2011, Aéropostale stock closed at $12.49 per share, and that on August 19, 2011 Aéropostale stock closed at $10.71 per share.

127.     State that because the Court determined that the incorporation of Mr. Zwerner's purported testimony in the Complaint was inappropriate, no response is required.

128.     State that because the Court determined that the incorporation of Mr. Zwerner's purported testimony in the Complaint was inappropriate, no response is required.

129.     State that because the Court determined that the incorporation of Mr. Zwerner's purported testimony in the Complaint was inappropriate, no response is required.

130.     Deny the allegations of Paragraph 130, except admit that during the purported Class Period, daily flash reports of data concerning sales were generated and that Messrs. Johnson and Miller had access to those flash reports. Admit that "Unit-Q meetings"

**AA159**

generally occurred on a monthly basis during the purported Class Period and that inventory

levels were generally discussed at those meetings. Deny knowledge or information sufficient to

form a belief as to the truth or falsity of statements purportedly made by CW1, CW2, CW3,

CW4, CW6, or CW9 to Plaintiff or its counsel.

       131.    Deny the allegations of Paragraph 131.

       132.    State that because the Court determined that the incorporation of Mr.

Zwerner's purported testimony in the Complaint was inappropriate, no response is required.

       133.    State that because the Court determined that the incorporation of Mr.

Zwerner's purported testimony in the Complaint was inappropriate, no response is required.

       134.    State that because the Court determined that the incorporation of Mr.

Zwerner's purported testimony in the Complaint was inappropriate, no response is required.

       135.    Deny the allegations in the first sentence of Paragraph 135. Otherwise

state that because the Court determined that the incorporation of Mr. Zwerner's purported

testimony in the Complaint was inappropriate, no response is required.

       136.    Deny the allegations of Paragraph 136, and repeat and reallege their

answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the

extent Paragraph 136 contains legal conclusions, no response is required.

       137.    Deny the allegations of Paragraph 137, and repeat and reallege their

answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the

extent Paragraph 137 contains legal conclusions, no response is required.

       138.    Deny the allegations of Paragraph 138, except admit that during the

purported Class Period, daily flash reports of data concerning sales were generated and that

Messrs. Johnson and Miller had access to those flash reports.

**AA160**

139.     Deny the allegations of Paragraph 139, except admit that during the
purported Class Period, the members of the Executive Committee of Aéropostale included,
among others, Messrs. Johnson and Miller and relevant business leaders. Admit that during the
purported Class Period, the Executive Committee generally conducted meetings on Monday in
the Boardroom of Aéropostale's principal executive offices in New York, New York. Deny
knowledge or information sufficient to form a belief as to the truth or falsity of statements
purportedly made by unidentified CWs to Plaintiff or its counsel.

140.     Deny the allegations of Paragraph 140, except admit that on August 18,
2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of
that call for its content, including the content quoted in the first and third sentences of Paragraph
140.

141.     Admit that during the purported Class Period, "Unit-Q meetings"
generally occurred on a monthly basis and that Mr. Johnson and relevant business leaders
generally participated in Unit Q meetings. Admit that data concerning sell-through, weekly units,
and projections was generally an agenda item for discussion during the Unit-Q meetings.

142.     Deny the allegations of Paragraph 142, and state that to the extent
Paragraph 142 contains legal conclusions, no response is required.

143.     Deny the allegations of Paragraph 143, and repeat and reallege their
answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the
extent Paragraph 143 contains legal conclusions, no response is required.

144.     Deny the allegations of Paragraph 144, except admit that Aéropostale
issued press releases on May 5, 2011 and May 19, 2011 and refer to those press releases for their
content. Admit that on May 19, 2011, Aéropostale hosted its First Quarter 2011 Earnings Call

US_ACTIVE:\44234837\1\11727.0003

**AA161**

and refer to the transcript of that call for its content. Further state that to the extent Paragraph 144 contains legal conclusions, no response is required.

145.   Deny the allegations of Paragraph 145, except admit that Aéropostale issued press releases on August 4, 2011 and August 18, 2011 and refer to those press releases for their content. Admit that on August 18, 2011, Aéropostale hosted its Second Quarter 2011 Earnings Call and refer to the transcript of that call for its content. Further state that to the extent Paragraph 145 contains legal conclusions, no response is required. Repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein.

146.   Deny the allegations of Paragraph 146, and state that to the extent Paragraph 146 contains legal conclusions, no response is required

147.   Deny the allegations of Paragraph 147, except admit that on April 20, 2011, Aéropostale stock reached an intra-day high of $26.30 per share, and closed at $12.49 per share on August 18, 2011.

148.   Deny the allegations of Paragraph 148, except admit that Plaintiff purports to represent certain purchasers of Aéropostale common stock and bring a putative class action as described in Paragraph 148. State that to the extent Paragraph 148 contains legal conclusions, no response is required.

149.   Deny the allegations of Paragraph 149, and state that to the extent Paragraph 149 contains legal conclusions, no response is required.

150.   Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 150, except admit that Aéropostale stock traded on the New York Stock Exchange during the purported Class Period and that there were more than 80 million shares outstanding during the purported Class Period. Admit that Aéropostale or its agent

24

**AA162**

may have a list of beneficial owners of Aéropostale common stock of record during the purported Class Period. State that to the extent Paragraph 150 contains legal conclusions, no response is required.

151.    Deny the allegations of Paragraph 151, except state that to the extent Paragraph 151 contains legal conclusions, no response is required, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein.

152.    Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 152, and state that to the extent Paragraph 152 contains legal conclusions, no response is required.

153.    Deny the allegations of Paragraph 153, and state that to the extent Paragraph 153 contains legal conclusions, no response is required.

154.    Deny the allegations of Paragraph 154, and state that to the extent Paragraph 154 contains legal conclusions, no response is required.

155.    Deny the allegations of Paragraph 155, and state that to the extent Paragraph 155 contains legal conclusions, no response is required.

156.    Deny the allegations of Paragraph 156, and state that to the extent Paragraph 156 contains legal conclusions, no response is required.

157.    Deny the allegations of Paragraph 157, and state that to the extent Paragraph 157 contains legal conclusions, no response is required.

158.    Deny the allegations of Paragraph 158, and state that to the extent Paragraph 158 contains legal conclusions, no response is required.

159.    Deny the allegations of Paragraph 159, and state that to the extent Paragraph 159 contains legal conclusions, no response is required.

**AA163**

160.    Deny the allegations of Paragraph 160, and state that to the extent Paragraph 160 contains legal conclusions, no response is required.

161.    Deny the allegations of Paragraph 161, except deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 161. State that to the extent Paragraph 161 contains legal conclusions, no response is required.

162.    Deny the allegations of Paragraph 162, except admit that Aéropostale issued a press release on March 10, 2011, and hosted its Fourth Quarter 2010 Earnings Call on March 20, 2011, and its First Quarter 2011 Earnings Call on May 19, 2011, and refer to that press release and the transcript of those calls for their content. Repeat and reallege their answers to every other Paragraph of the Complaint, including Paragraphs 79-80, 86-91, 105-08 specifically, as if fully set forth herein. State that to the extent Paragraph 162 contains legal conclusions, no response is required.

163.    Deny the allegations of Paragraph 163, and state that to the extent Paragraph 163 contains legal conclusions, no response is required.

164.    Deny the allegations of Paragraph 164, and state that to the extent Paragraph 164 contains legal conclusions, no response is required.

165.    Deny the allegations of Paragraph 165, and state that to the extent Paragraph 165 contains legal conclusions, no response is required. Repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein.

166.    Deny the allegations of Paragraph 166, and state that to the extent Paragraph 166 contains legal conclusions, no response is required.

AA164

167.    Deny the allegations of Paragraph 167, except admit that during the purported Class Period, Mr. Johnson served as Chief Executive Office and Mr. Miller served as Senior Vice President and Chief Financial Officer, and Messrs. Johnson and Miller participated in the management and operations of Aéropostale. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first clause of the second sentence of Paragraph 167 concerning unidentified public statements and communications. Repeat and reallege their answers to each Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 167 contains legal conclusions, no response is required.

168.    Deny the allegations of Paragraph 168, except admit that each periodic report containing financial statements filed by Aéropostale with the Securities and Exchange Commission ("SEC") during the purported Class Period was accompanied by a signed written statement from Messrs. Johnson and Miller pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241, 18 U.S.C. § 1350. Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences of Paragraph 168 concerning unidentified SEC filings, press releases, investor presentations, documents, and statements. Repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 168 contains legal conclusions, no response is required.

169.    Deny the allegations of Paragraph 169, and state that to the extent Paragraph 169 contains legal conclusions, no response is required.

170.    Deny the allegations of Paragraph 170, and state that to the extent Paragraph 170 contains legal conclusions, no response is required.

**AA165**

171.     Deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 171 concerning unidentified statements, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 171 contains legal conclusions, no response is required.

172.     Repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein, and state that to the extent Paragraph 172 contains legal conclusions, no response is required.

173.     Deny the allegations of Paragraph 173, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 173 contains legal conclusions, no response is required.

174.     Deny the allegations of Paragraph 174, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 174 contains legal conclusions, no response is required.

175.     Deny the allegations of Paragraph 175, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 175 contains legal conclusions, no response is required.

176.     Deny the allegations of Paragraph 176, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 176 contains legal conclusions, no response is required.

177.     Deny the allegations of Paragraph 177, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 177 contains legal conclusions, no response is required.

US_ACTIVE:\44234837\1\11727.0003

**AA166**

178.     Deny the allegations of Paragraph 178, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 178 contains legal conclusions, no response is required.

179.     Deny the allegations of Paragraph 179, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 179 contains legal conclusions, no response is required.

180.     Deny the allegations of Paragraph 180, and state that to the extent Paragraph 180 contains legal conclusions, no response is required.

181.     Deny the allegations of Paragraph 181, and state that to the extent Paragraph 181 contains legal conclusions, no response is required.

182.     Repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein, and state that to the extent Paragraph 182 contains legal conclusions, no response is required.

183.     Deny the allegations of Paragraph 183, except admit that during the purported Class Period, Mr. Johnson served as Chief Executive Office and Mr. Miller served as Senior Vice President and Chief Financial Officer, and Messrs. Johnson and Miller participated in the management and operations of Aéropostale.

184.     Deny the allegations of Paragraph 184, and state that to the extent Paragraph 184 contains legal conclusions, no response is required.

185.     Deny the allegations of Paragraph 185, except deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 185 concerning unidentified reports, press releases, public filings, presentations, and statements, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set

**AA167**

forth herein. Further state that to the extent Paragraph 185 contains legal conclusions, no response is required.

      186.    Deny the allegations of Paragraph 186, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 186 contains legal conclusions, no response is required.

      187.    Deny the allegations of Paragraph 187, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein. State that to the extent Paragraph 187 contains legal conclusions, no response is required.

      188.    Deny the allegations of Paragraph 188, and repeat and reallege their answers to every other Paragraph of the Complaint as if fully set forth herein.

No answer is required in response to the statements in Plaintiff's Prayer for Relief or Jury Demand. To the extent a response to those statements is deemed necessary, Defendants deny them and request that the Court deny all relief requested by Plaintiff and dismiss the Complaint with prejudice and order such further relief as the Court deems just and proper.

## DEFENSES AND AFFIRMATIVE DEFENSES

Without assuming the burden of proof or persuasion where such burden properly rests with Plaintiff and the members of the putative class, and without waiving and hereby expressly reserving the right to assert any defenses at such time and to such extent as discovery and factual developments establish a basis therefore, Defendants hereby assert the following defenses to the claims asserted in the Complaint:

## FIRST DEFENSE

The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

**AA168**

**SECOND DEFENSE**

Any and all actions taken by Defendants were, at all times, lawful, proper, and consistent with their duties and obligations, and Defendants did not otherwise have any obligation or duty to take any other action or make any other disclosure.

**THIRD DEFENSE**

Plaintiff's claims, and those of the putative class, are barred, in whole or in part, because Defendants did not make any false or misleading statements of material fact or omit to state any material facts and Defendants are not otherwise responsible in law or fact for any alleged false or misleading statements or omissions of material fact made, or manipulative or deceptive devices employed, by any other defendant or any non-party to this action.

**FOURTH DEFENSE**

Defendants are not liable to Plaintiff and members of the putative class because any alleged misstatements they made were forward-looking statements and/or contained sufficient cautionary language and risk disclosure.

**FIFTH DEFENSE**

Plaintiff and members of the putative class cannot show that Defendants acted with scienter.

**SIXTH DEFENSE**

Plaintiff and members of the putative class cannot show that Defendants made the allegedly false or misleading statements with actual knowledge that the statements were false or misleading.

US_ACTIVE:\44234837\1\11727.0003

**AA169**

## SEVENTH DEFENSE

Plaintiff and members of the putative class cannot show that the allegedly false or misleading statements of Defendants' opinions were statements of opinions not honestly held by Defendants.

## EIGHTH DEFENSE

Defendants acted at all times in good faith, and had no knowledge, and were not reckless or negligent in not knowing, that any alleged statement or omission was false or misleading.

## NINTH DEFENSE

No action or inaction by Defendants is the cause, in law or fact, of any injury that Plaintiff or members of the putative class suffered, and their alleged losses were not actually or proximately caused by Defendants.

## TENTH DEFENSE

Plaintiff and members of the putative class cannot show transaction causation.

## ELEVENTH DEFENSE

Plaintiff and members of the putative class cannot show loss causation. Any alleged depreciation in the price of Aéropostale stock resulted from intervening or independent causes unrelated to any alleged misstatements or omissions on the part of Defendants.

## TWELFTH DEFENSE

The allegedly false statements of material fact, and/or omissions of material fact, in Defendants' public disclosures were not material to the investment decisions of a reasonable investor.

## THIRTEENTH DEFENSE

Any alleged misstatements in the Complaint were nonactionable statements of opinion, puffery, or soft information.

**AA170**

## FOURTEENTH DEFENSE

The relief sought by Plaintiff and members of the putative class is barred, in whole or in part, by the doctrine of laches, waiver, equitable estoppel, *in pari delicto*, unclean hands, and/or other related equitable doctrines.

## FIFTEENTH DEFENSE

Plaintiff's claims, and those of the putative class, are barred in whole or in part by the applicable statutes of limitation and/or repose.

## SIXTEENTH DEFENSE

Plaintiff does not meet the adequacy or typicality requirements of Rule 23 of the Federal Rules of Civil Procedure.

## SEVENTEENTH DEFENSE

The putative Class Period is overbroad and, therefore, the putative class cannot be certified under Rule 23, and many of the putative class members are not entitled to any recovery.

## EIGHTEENTH DEFENSE

The putative class is not certifiable under Rule 23.

## NINENTEENTH DEFENSE

Plaintiff and members of the putative class at all relevant times had a duty to take reasonable action to minimize any damages allegedly sustained as a result of the facts alleged in the Complaint. Plaintiff and members of the putative class failed to comply with that duty and are therefore barred from recovering any damages that might reasonably have been avoided.

## TWENTIETH DEFENSE

Plaintiff's claims, and those of the putative class, are barred, in whole or in part, by their own actions, omissions, and/or negligence.

US_ACTIVE:\44234837\1\11727.0003

**AA171**

### TWENTY-FIRST DEFENSE

Plaintiff and members of the putative class purchased Aéropostale stock with actual or constructive knowledge of the risks involved in an investment in Aéropostale stock, and thus assumed the risk that the value would decline if such risks materialized.

### TWENTY-SECOND DEFENSE

Plaintiff and members of the putative class lack standing to maintain some or all of their claims against Defendants.

### TWENTY-THIRD DEFENSE

Plaintiff and members of the putative class are limited to those damages authorized by the Securities Exchange Act of 1934 and the Private Securities Litigation Reform Act of 1995, and therefore may not recover damages in excess of those authorized by these statues or the regulations promulgated pursuant to these statutes.

### TWENTY-FOURTH DEFENSE

Plaintiff and members of the putative class did not reasonably rely on any alleged untrue or misleading statement of material fact when purchasing or selling any Aéropostale stock.

### TWENTY-FIFTH DEFENSE

Plaintiff's claims, and those of putative class members, are barred because they knew, or in the exercise of reasonable care could have known, of the alleged untruths and/or omissions of which they complain.

### TWENTY-SIXTH DEFENSE

Plaintiff and the members of the putative class are barred from seeking to impose obligations that are inconsistent with, or in excess of, the requirements of the federal securities laws and the rules and regulations promulgated by the Securities and Exchange Commission.

34

**AA172**

## ADDITIONAL DEFENSES

Defendants assert, and expressly reserve all rights with respect to, all counterclaims, cross-claims, third-party claims, or contribution claims that may be revealed during the course of discovery. Defendants also assert and expressly reserve all rights with respect to all other defenses that may be revealed during the course of discovery. Defendants expressly reserve the right to amend and/or supplement this Answer.

WHEREFORE, Defendants pray for judgment as follows:

1.      For a judgment and decree dismissing the Complaint with prejudice;

2.      For a judgment and decree awarding costs, including attorneys' fees; and

3.      For such other and further relief as the Court may deem just and proper under the circumstances.

Dated: New York, New York
April 8, 2013

WEIL, GOTSHAL & MANGES LLP


By: /s/ Joseph S. Allerhand
Joseph S. Allerhand
Stephen A. Radin
Caroline H. Zalka


767 Fifth Avenue
New York, New York 10153
Tel:     (212) 310-8000
Fax:     (212) 310-8007
Email: joseph.allerhand@weil.com
Email: stephen.radin@weil.com
Email: caroline.zalka@weil.com

*Attorneys for Defendants Aéropostale, Inc.,*
*Thomas P. Johnson and Marc D. Miller*

US_ACTIVE:\44234837\1\11727.0003

**AA173**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

THE CITY OF PROVIDENCE, Individually   :
and on Behalf of All Others Similarly Situated, :

              Plaintiff,   :

      vs.   :

AEROPOSTALE, INC., THOMAS P.   :
JOHNSON and MARC D. MILLER,   :

            Defendants.   :

———————————————————— x

Civil Action No. 11-cv-7132 (CM) (THK)

CLASS ACTION

**LEAD PLAINTIFF'S NOTICE OF
MOTION AND MOTION FOR CLASS
CERTIFICATION**

**AA174**

PLEASE TAKE NOTICE that Lead Plaintiff The City of Providence ("Lead Plaintiff") hereby moves this Court for an Order:  (i) certifying this action to proceed as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure; (ii) appointing Lead Plaintiff to serve as Class Representative; and (iii) appointing Labaton Sucharow LLP as Class Counsel.  This motion is supported by the Memorandum of Law and the Declarations of Jonathan Gardner and Jeffrey Padwa concurrently filed herewith, and all the prior papers and proceedings herein.

DATED:  April 24, 2013

LABATON SUCHAROW LLP
JONATHAN GARDNER


_/s/ Jonathan Gardner_
JONATHAN GARDNER

Mark S. Goldman
Carol C. Villegas
Iona Evans
140 Broadway
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
jgardner@labaton.com
mgoldman@labaton.com
cvillegas@labaton.com
ievans@labaton.com

_Attorneys for Lead Plaintiff The City of Providence_

**AA175**

BARRACK, RODOS & BACINE
Daniel E. Bacine
Lisa M. Lamb
Two Commerce Square
2001 Market Street, Suite 3300
Philadelphia, PA  19103
Telephone:  215/963-0600
215/963-0838 (fax)
dbacine@barrack.com
llamb@barrack.com

*Additional Counsel*

AA176

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————— x
THE CITY OF PROVIDENCE, Individually    :    Civil Action No. 11-cv-7132 (CM) (THK)
and on Behalf of All Others Similarly Situated, :
                                        :    CLASS ACTION
               Plaintiff,               :
                                        :
       vs.                              :
                                        :
AEROPOSTALE, INC., THOMAS P.            :
JOHNSON and MARC D. MILLER,             :
                                        :
               Defendants.              :
————————————————— x


## CERTIFICATE OF SERVICE


I hereby certify that on April 24, 2013, I caused the foregoing Lead Plaintiff's Notice

of Motion and Motion for Class Certification to be served electronically on all parties listed

on the attached Electronic Mail Notice List.


                                    */s/ Jonathan Gardner*
                                    JONATHAN GARDNER


**AA177**

## Mailing Information for a Case 1:11-cv-07132-CM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,
  drosenfeld@rgrdlaw.com

- **Joseph S. Allerhand**
  joseph.allerhand@weil.com,justin.daloia@weil.com,
  Amy.Suehnholz@weil.com

- **Daniel E. Bacine**
  dbacine@barrack.com,mbonatara@barrack.com

- **Jeffrey A. Berens**
  jeff@dyerberens.com

- **Marshall Pierce Dees**
  mdees@holzerlaw.com

- **Iona Maria May Evans**
  ievans@labaton.com,electroniccasefiling@labaton.com

- **Michael Ira Fistel , Jr**
  mfistel@holzerlaw.com,cyoung@holzerlaw.com,cmoore@holzerlaw.com

- **Jonathan Gardner**
  jgardner@labaton.com,fmalonzo@labaton.com,
  electroniccasefiling@labaton.com

- **Mark S. Goldman**
  mgoldman@labaton.com

- **Christopher J. Keller**
  ckeller@labaton.com

- **Lisa M. Lamb**
  llamb@barrack.com,cbowers@barrack.com

- **Stephen Alan Radin**
  stephen.radin@weil.com,MCO.ECF@weil.com

**AA178**

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michael Walter Stocker**
  mstocker@labaton.com,electroniccasefiling@labaton.com

- **Carol Cecilia Villegas**
  cvillegas@labaton.com,electroniccasefiling@labaton.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

AA179

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) ) | |

# LEAD PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE CLASS

**AA180**

PLEASE TAKE NOTICE that Lead Plaintiff, the City of Providence ("Lead Plaintiff"), on behalf of the proposed Class, respectfully moves this Court for an Order, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, (a) preliminarily approving the proposed Settlement; (b) approving the proposed form of the Notice and Summary Notice; (c) approving the proposed methods of disseminating notice; (d) setting a date for the Settlement Hearing; and (e) such other and further relief as this Court deems just and proper.  Defendants will not oppose the motion.

Lead Plaintiff is contemporaneously filing a Memorandum and accompanying Declaration of Jonathan Gardner and exhibits attached thereto, incorporated herein by reference, in support of this Motion.

A proposed Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement is submitted herewith.

Dated:  January 29, 2014

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: _/s/ Jonathan Gardner_
Jonathan Gardner
Eric J. Belfi
Mark Goldman
140 Broadway
New York, New York 10005
Telephone:    (212) 907-0700
Facsimile:    (212) 818-0477

**AA181**

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2014, I caused the foregoing:

- Lead Plaintiff's Notice of Motion and Motion for Preliminary Approval of Settlement and Approval of Notice to the Class;

- Memorandum of Law In Support of Lead Plaintiff's Motion for Preliminary Approval of Settlement and Approval of Notice to the Class;

- Declaration of Jonathan Gardner In Support of Lead Plaintiff's Motion for Preliminary Approval of Settlement and Approval of Notice to the Class, with exhibits; and

- Proposed Preliminary Approval Order, with exhibits

to be served electronically on all parties listed on the attached Electronic Mail Notice List.

/s/ Jonathan Gardner
Jonathan Gardner

**AA182**

Mailing Information for a Case 1:11-cv-07132-CM

Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,
  drosenfeld@rgrdlaw.com

- **Joseph S. Allerhand**
  joseph.allerhand@weil.com,justin.daloia@weil.com,
  Amy.Suehnholz@weil.com

- **Daniel E. Bacine**
  dbacine@barrack.com,mbonatara@barrack.com

- **Jeffrey A. Berens**
  jeff@dyerberens.com

- **Marshall Pierce Dees**
  mdees@holzerlaw.com

- **Iona Maria May Evans**
  ievans@labaton.com,electroniccasefiling@labaton.com

- **Michael Ira Fistel , Jr**
  mfistel@holzerlaw.com,cyoung@holzerlaw.com,cmoore@holzerlaw.com

- **Jonathan Gardner**
  jgardner@labaton.com,fmalonzo@labaton.com,
  electroniccasefiling@labaton.com

- **Mark S. Goldman**
  mgoldman@labaton.com

- **Christopher J. Keller**
  ckeller@labaton.com

- **Lisa M. Lamb**
  llamb@barrack.com,cbowers@barrack.com

- **Stephen Alan Radin**
  stephen.radin@weil.com,MCO.ECF@weil.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michael Walter Stocker**
  mstocker@labaton.com,electroniccasefiling@labaton.com

- **Carol Cecilia Villegas**
  cvillegas@labaton.com,electroniccasefiling@labaton.com

- **STEPHEN R. ASTLEY**
  sastley@rgrdlaw.com

**AA183**

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) ) | |

# MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF NOTICE TO THE CLASS

AA185

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     DESCRIPTION OF THE LITIGATION .......................................................... 2

III.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL ........... 5

        A.    The Proposed Settlement Is the Result of Well-Grounded, Good Faith,
              Arm's-Length Negotiations ................................................................... 6

        B.    The Proposed Settlement Falls Within the Range of Reasonableness and
              Merits Issuance of Notice and a Hearing on Final Approval ................ 7

IV.     THE COURT SHOULD APPROVE THE FORM OF THE NOTICE AND PLAN
        FOR PROVIDING NOTICE TO THE CLASS ...................................................... 10

V.      PROPOSED SCHEDULE OF EVENTS ............................................................. 12

VI.     CONCLUSION ...................................................................................................... 12

AA186

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*In re Currency Conversion Fee Antitrust Litig.*,
MDL Nos. 1409, M 21-95, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006)..............................5

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................................10

*Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y.
Oct. 24, 2005) .....................................................................................................................9

*In re Indep. Energy Holdings PLC*,
No. 00 Civ. 6689 (SAS), 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) .........................6

*In re Initial Pub. Offering Sec. Litig.*,
243 F.R.D. 79 (S.D.N.Y. 2007) ..........................................................................................5

*In re Interpublic Sec. Litig.*,
Nos. 02-6527, 03-1194, 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004)...............................5

*Leung v. Home Boy Rest. Inc.*,
No. 07 Civ. 8779 (RJS) (DFE), 2009 WL 398861 (S.D.N.Y. Feb.18, 2009).......................6

*In re NASDAQ Market-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) .................................................................................5, 6, 9

*In re PaineWebber Ltd. P'ships Litig.*,
147 F.3d 132 (2d Cir. 1998)................................................................................................5

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) ....................................................................................6, 9

*Morris v. Affinity Health Plan, Inc.*,
No. 09 Civ. 1932 (DAB), 2011 WL 6288035 (S.D.N.Y. Dec. 15, 2011)..............................5

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005).............................................................................................5, 6

### STATUTES & RULES

15 U.S.C. §§ 78u-4 ...........................................................................................................1

15 U.S.C. § 78u-4(a)(4) .....................................................................................................9

15 U.S.C. § 78u-4(a)(7) ...................................................................................................11

AA187

Fed. R. Civ. P. 23(c)(2)(B) ....................................................................................10, 11

Fed. R. Civ. P. 23(c)(3) .............................................................................................10

Fed. R. Civ. P. 23(e) ...................................................................................................5

Fed. R. Civ. P. 23(e)(1) .......................................................................................10, 11

AA188

## I.    **PRELIMINARY STATEMENT**

Lead Plaintiff, the City of Providence ("Providence" or "Lead Plaintiff"), on behalf of itself and the Class, respectfully submits this memorandum in support of its unopposed motion seeking preliminary approval of a settlement reached with Defendants Aéropostale, Inc. ("Aéropostale" or the "Company"), Thomas P. Johnson, and Marc D. Miller (the "Individual Defendants" and collectively, together with Aéropostale, "Defendants") and other relief in connection therewith (the "Motion").[1]

After extensive investigation and discovery, including the review of over one million pages of documents and taking of fifteen depositions, as well as an arm's-length in-person mediation facilitated by the Honorable Daniel Weinstein (Ret.) ("Judge Weinstein"), an experienced and highly respected mediator and former California state court judge, Lead Plaintiff and Defendants have agreed to settle all claims against the Defendants that are based upon, arise out of, or relate to those asserted in this Action in exchange for a payment of $15,000,000.  The terms of the Settlement are set forth in the Stipulation and its accompanying exhibits.

Lead Plaintiff's Motion seeks an order:

- preliminarily approving settlement of the claims against Defendants in the Action, as set forth in the Stipulation;

- approving the form, substance, and the requirements of the proposed Notice and Summary Notice, appended as Exhibits 1 and 3 to the proposed Preliminary Approval Order submitted herewith, and the means and methods for disseminating notice, which comport with due process and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §§ 78u-4 *et seq*.; and

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Stipulation and Agreement of Settlement dated January 29, 2014 (the "Stipulation").  The Stipulation is annexed as Exhibit 1 to the Declaration of Jonathan Gardner, dated January 29, 2014 ("Gardner Decl.").

- scheduling a hearing at which final approval of the Settlement, the proposed plan of allocation, and a request for an award of attorneys' fees and expenses to Lead Counsel may be considered.

Lead Plaintiff has agreed to settle this class action with Defendants for $15 million in cash. This substantial proposed Settlement represents an excellent result for the Class, particularly given the numerous and substantial risks the Lead Plaintiff faced in this litigation. Although Lead Plaintiff believes the claims it has asserted are meritorious, and Defendants believe their defenses are meritorious and they would ultimately prevail on the merits, the Parties recognize the uncertainty and risk attendant to any litigation – especially a complex class action such as this – and the difficulties, substantial expense and length of time necessary to prosecute and/or defend the litigation through expert discovery, summary judgment motions, trial, post-trial motions and appeals. Based upon their respective consideration of these and other relevant factors, as set forth more fully in the proposed Notice, the Parties have agreed to settle the Action on the terms and conditions set forth in the Stipulation.

## II.   <u>DESCRIPTION OF THE LITIGATION</u>

This Action was commenced on October 11, 2011 by the filing of an initial complaint alleging that Defendants violated the federal securities laws. ECF No. 1. Thereafter, several putative class members, including Providence, moved pursuant to the PSLRA for appointment as lead plaintiff. By docket order dated January 11, 2012, the Court appointed Providence to be the Lead Plaintiff of this Action and approved its selection of Lead Counsel to represent the putative Class.

Following a detailed investigation that included, among other things, the interviews of numerous former Aéropostale employees, review of Aéropostale's public statements, and consultation with experts, Lead Plaintiff filed the operative Consolidated Class Action Complaint for Violations of the Federal Securities Laws on February 10, 2012 (the "Complaint"). ECF No.

**AA190**

21. The Complaint generally alleges, among other things, that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by making alleged misstatements and omissions during the Class Period relating to Aéropostale's quarterly earnings guidance and inventory management. The Complaint further alleges that Lead Plaintiff and other Class Members purchased or acquired publicly traded common stock of Aéropostale during the Class Period at artificially inflated prices and were damaged thereby.

On March 12, 2012, Defendants filed a motion to dismiss the Complaint (ECF No. 23), which Lead Plaintiff opposed on March 26, 2012 (ECF No. 26). On April 2, 2012, Defendants filed a reply brief in further support of their motion. ECF No. 27. On March 25, 2013, the Court denied Defendants' motion to dismiss. ECF No. 28.

On April 24, 2013, Lead Plaintiff moved to certify the Action as a class action. ECF No. 31. The Parties then engaged in class-related discovery, in which Defendants deposed the designated representative of Lead Plaintiff as well as two representatives of its investment advisor that was responsible for purchasing shares of common stock of Aéropostale on behalf of Lead Plaintiff.

Merits discovery commenced in May 2013, including the production of documents by Defendants and third parties, which resulted in the production of over 1.3 million pages of documents.

On July 10, 2013, Lead Plaintiff and Defendants jointly filed a Stipulation and Order Regarding Class Certification (the "Class Certification Stipulation"). ECF No. 40. On July 17, 2013, the Court endorsed the Class Certification Stipulation, ordering the Action to proceed as a class action "on behalf of all persons and entities that purchased or otherwise acquired the

**AA191**

publicly traded common stock of Aeropostale from March 11, 2011 through August 18, 2011, inclusive . . . and who were damaged thereby." *Id.*

Merits depositions commenced on September 19, 2013. Over the subsequent five weeks Lead Plaintiff deposed twelve current or former employees of Aéropostale.

Soon thereafter, Defendants and Lead Plaintiff engaged Judge Weinstein, a well-respected and highly experienced mediator, to assist them in exploring a potential negotiated resolution of the claims against Defendants. On October 29, 2013, Lead Plaintiff and Defendants met with Judge Weinstein in an attempt to reach a settlement. The mediation session involved an extended effort to settle the claims and was preceded by the exchange of mediation statements, as well as by verbal presentations by counsel to both Lead Plaintiff and Defendants.

Following a full day of arm's-length and mediated negotiation under the auspices of Judge Weinstein, Defendants and Lead Plaintiff reached an agreement in principle to settle the claims against Defendants.

Before agreeing to the Settlement, Lead Plaintiff and Lead Counsel conducted an extensive investigation into the events and transactions underlying the claims alleged in the Complaint. Lead Counsel analyzed the evidence adduced both during its investigation and through discovery, which included reviewing and analyzing publicly-available information and data concerning Aéropostale, interviewing forty (40) former Aéropostale employees and other persons with relevant knowledge, and consulting with experts on loss causation, damages, accounting and retail industry issues. Lead Counsel also researched the applicable law with respect to the claims against Defendants and their potential defenses. Thus, at the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and weaknesses of Lead Plaintiff's and Defendants' positions.

AA192

## III.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

Rule 23(e) requires judicial approval for any settlement or compromise of claims certified to proceed on a class-wide basis.  Approval of a proposed settlement is within the Court's discretion, to be exercised in accordance with public policy that strongly favors pretrial settlement of class action lawsuits.  *See In re Interpublic Sec. Litig.*, Nos. 02-6527, 03-1194, 2004 WL 2397190, at *7 (S.D.N.Y. Oct. 26, 2004); *see also In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998).

The Court "must determine whether the terms of the proposed settlement warrant preliminary approval [by] mak[ing] 'a preliminary evaluation' as to whether the settlement is fair, reasonable and adequate."  *In re Currency Conversion Fee Antitrust Litig.*, MDL Nos. 1409, M 21-95, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) (citation omitted); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).

As another court in this district has explained:

> In considering preliminary approval, courts make a preliminary evaluation of the fairness of the settlement, prior to notice.  Where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted.  Once preliminary approval is bestowed, the second step of the process ensues. . . .

*Id.* at 102 (citations omitted); *see also Morris v. Affinity Health Plan, Inc.*, No. 09-cv-1932 (DAB), 2011 WL 6288035, at *2 (S.D.N.Y. Dec. 15, 2011) ("If, after a preliminary evaluation of the proposed settlement, a court finds that it appears to fall within the range of possible approval, the court should order that the class members receive notice of the settlement") (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007).

AA193

In essence, the Court should determine whether the settlement is "at least sufficiently fair, reasonable and adequate to justify notice to those affected and an opportunity to be heard." *NASDAQ*, 176 F.R.D. at 102 (citation omitted); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("The Court's function now is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing.") (internal quotation marks omitted).

### A.   The Proposed Settlement Is the Result of Well-Grounded, Good Faith, Arm's-Length Negotiations

A presumption of fairness applies to a proposed class settlement that is the result of arm's-length negotiations between counsel knowledgeable in complex class litigation. *Wal-Mart Stores,* 396 F.3d at 116; *see also Leung v. Home Boy Rest. Inc.*, No. 07 Civ. 8779 (RJS) (DFE), 2009 WL 398861, at *1 (S.D.N.Y. Feb. 18, 2009) (preliminary approval appropriate where "the proposed settlement appears to be the product of extensive, arms-length negotiations conducted by experienced counsel with input from the parties . . ."). The Settlement is the product of such rigorous arm's-length negotiations. The Parties negotiated the Settlement in a lengthy session with Judge Weinstein, who has assisted in numerous other complex class action mediations. "[T]hat the Settlement was reached after exhaustive arm's-length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable." *In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003).

Moreover, the Settlement was reached only after completion of: (1) Lead Plaintiff's initial pre-filing factual investigation; (2) Lead Plaintiff's analysis of Aéropostale's public filings and public statements; (3) Lead Plaintiff's review of news articles and analyst reports about Aéropostale; (4) interviewing forty (40) witnesses in connection with drafting the Complaint;

**AA194**

(5) exhaustive briefing on Defendants' motion to dismiss; (6) the review and analysis of over 1 million pages of documents produced by Defendants and non-parties; (7) consultations with experts on loss causation, damages, accounting and issues relating to the retail industry; (8) researching and drafting a motion for class certification; (9) class-related discovery, including the deposition by Defendants of two representatives of the investment manager who purchased stock of Aéropostale for Lead Plaintiff during the Class Period; (10) the deposition of a designated representative of Aéropostale pursuant to Federal Rule of Civil Procedure 30(b)(6); (11) depositions by Lead Plaintiff of twelve current or former executives and/or employees of Aéropostale; and (12) intensive settlement negotiations during an all-day mediation session facilitated by a retired California Judge.  Thus, the Settlement was not achieved until the Parties had sufficient familiarity with the issues in the case to evaluate its merits and agree on a settlement figure that was both acceptable to Defendants and reasonable, fair and adequate to the Class.

### B. The Proposed Settlement Falls Within the Range of Reasonableness and Merits Issuance of Notice and a Hearing on Final Approval

The proposed $15 million Settlement is well within the range of reasonableness and is an excellent result given the numerous and substantial risks faced in this litigation.  In particular, Defendants have raised a number of arguments and defenses (which they would raise at summary judgment and trial) that there were no actionable misstatements and omissions, that Class Members did not rely on the alleged misstatements when deciding to purchase Aéropostale common stock during the Class Period, and that Lead Plaintiff would not be able to establish that Defendants acted with the requisite fraudulent intent.  For example, Defendants would have argued that, in a March 2011 investor call, well in advance of the first alleged corrective disclosure, Defendants explained to investors that the Company was aggressively clearing

**AA195**

through an "overhang" in inventory caused by "women's assortment" issues that would not be recalibrated until its "fall and holiday product." As a result of such warnings, and others, Defendants contended that the market knew, and Defendants did not conceal, the facts and risks that Lead Plaintiff claims were not disclosed.

Additionally, Defendants have maintained that any potential investment losses suffered by Lead Plaintiff and the Class were actually caused by external, independent factors, and not caused by Defendants' alleged conduct. In particular, Defendants have argued that Aéropostale's guidance misses were attributable to market forces and other macroeconomic considerations, including, among others, that during the Class Period (1) Aéropostale's competitors in the teen retail market adopted Aéropostale's "highly promotional" strategy which historically gave it a competitive edge, and (2) its core customer base had not responded to a slow and bifurcated economic recovery.

Defendants would also have argued that Lead Plaintiff could not establish liability with respect to Aéropostale's Q2 2011 earnings miss. Among the facts that did not favor Lead Plaintiff in this regard, the Company issued conservative guidance for Q2 2011, highlighted the increasingly promotional nature of the Company's competition in public statements to the market, and warned that the Company continued to face margin pressure resulting from a buildup of unsold inventory.

For the above reasons, among others, Lead Plaintiff faced undeniable challenges in establishing Defendants' liability. Against that backdrop, the Settlement represents a highly favorable recovery for the Class. In connection with the mediation, Lead Plaintiff retained an expert to analyze the damages suffered by the Class as a result of the alleged fraud. Lead Plaintiff's expert estimated that the Class had sustained damages with a range of approximately

**AA196**

$72 million (if only the corrective disclosures pertaining to Q1 2011 statements and omissions are considered) to $163 million (if 100% of all four potential corrective disclosures are considered). Measured against that yardstick, the Settlement, if approved, will compensate Class members for approximately 9.7% to 21% of their estimated losses—a substantial recovery in light of the countervailing legal arguments. *See, e.g., Hicks v. Morgan Stanley & Co*., No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (approving $10 million settlement equal to 3.8% of estimated damages). Moreover, at trial Defendants would present their own expert, who would no doubt supply the jury with a competing analysis supporting a damages range far below that calculated by Lead Plaintiff's expert.

In short, in the absence of a Settlement, the Parties would present factual and expert testimony on each of these issues, and there is considerable risk that the Court or jury would resolve the inevitable "battle of the experts" against Lead Plaintiff and the Class.

Finally, and as further indicia of its reasonableness, the Settlement exhibits none of the "obvious deficiencies" that could justify denying preliminary approval. *NASDAQ*, 176 F.R.D. at 102. In all respects, the terms embodied in the Stipulation are customary in nature. In particular, Lead Plaintiff's recovery from the Settlement Fund will be determined according to precisely the same formula as the recoveries of other Class Members, with the exception of any reimbursement to the Lead Plaintiff of the costs incurred in representing the Class and so approved by the Court, as contemplated by 15 U.S.C. § 78u-4(a)(4). *See NASDAQ*, 176 F.R.D. at 102 (settlement may be approved preliminarily where it "does not improperly grant preferential treatment to class representatives or segments of the class"); *Prudential*, 163 F.R.D. at 209 (preliminary approval is appropriate where "preliminary evaluation of the proposed

9

**AA197**

settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives . . .").

Additionally, the Settlement was negotiated under the direction and with the direct and substantial involvement of Lead Plaintiff, who attended the mediation.  This further strengthens the presumption of fairness.  *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (participation of sophisticated institutional investor lead plaintiffs in settlement process supports approval of settlement).

## IV.   THE COURT SHOULD APPROVE THE FORM OF THE NOTICE AND PLAN FOR PROVIDING NOTICE TO THE CLASS

Lead Plaintiff also requests that the Court approve the form and content of the proposed Notice and Summary Notice.  *See* Exhibits 1 and 3 to the proposed Preliminary Approval Order.  Consistent with Rules 23(c)(2)(B) and 23(e)(1), the proposed "long form" Notice apprises Class Members of the nature of the action, the definition of the Class, and the claims that will be released.  The Notice also advises that a Class Member may enter an appearance through counsel if desired, notes that the Court will exclude from the Class any Class Member who requests exclusion (and sets forth the procedures and deadline for doing so), and further describes (1) the binding effect of a judgment on Class Members under Rule 23(c)(3), (2) how to object to the proposed Settlement and/or requested attorneys' fees, and (3) how to make a claim.

The Notice also satisfies the PSLRA's separate disclosure requirements by, *inter alia*: stating the amount of the Settlement on both an aggregate and average per share basis; providing a brief statement explaining the reasons why the Parties are proposing the Settlement; stating the maximum amount of attorneys' fees and litigation expenses (both on an aggregate and average per share basis) that Lead Counsel will seek; and providing the names, addresses, and telephone numbers of representatives of the Claims Administrator and Lead Counsel who will be available

**AA198**

to answer questions from Class Members. *See* 15 U.S.C. § 78u-4(a)(7). Both forms of Notice will also disclose the date, time and location of the final Settlement Hearing and the deadlines for submitting Proof of Claim forms and any objections to the Settlement, the Plan of Allocation, or to Lead Counsel's requested attorney's fees and expenses. These disclosures are thorough and should be approved.

Lead Plaintiff also requests that the Court approve the appointment of A.B. Data Ltd. ("A.B. Data") as Claims Administrator. A.B. Data has extensive relevant experience and is a nationally recognized notice and claims administration firm. Its staff consists of experienced CPAs, IT specialists and various other professionals with substantial experience in notice and claims administration. *See* Gardner Decl. Exhibit 2.

Rule 23(c)(2)(B) requires a certified class to receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Similarly, Rule 23(e)(1) requires a court to "direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." The proposed Notice plan readily meets these standards and is typical of Notice plans in similar actions.

**AA199**

## V.    PROPOSED SCHEDULE OF EVENTS

Lead Plaintiff proposes the following schedule for the Settlement-related events in this case.[2]

| **Event** | **Proposed Due Date** |
|---|---|
| Deadline for mailing the Notice and Proof of Claim to Class Members ("Notice Date") | 20 business days after entry of Preliminary Approval Order |
| Deadline for publishing the Summary Notice | 14 calendar days after the Notice Date |
| Deadline for filing of papers in support of approval of Settlement, Plan of Allocation, and Lead Counsel's request for attorneys' fees and expenses | 35 calendar days prior to Settlement Hearing |
| Deadline for submitting exclusion requests or objections | 21 calendar days prior to Settlement Hearing |
| Deadline for filing reply papers | 7 calendar days prior to the Settlement Hearing |
| Settlement Hearing | At the Court's convenience but no less than 90 days after entry of the Preliminary Approval Order |
| Deadline for submitting claim forms | 120 calendar days after the Notice Date |

## VI.    CONCLUSION

For all of the foregoing reasons, Lead Plaintiff respectfully requests that this Court:

(1) preliminarily approve the Settlement, including approving the form and substance of the proposed forms of notice and directing that notice be given to prospective members of the Class;

(2) schedule a hearing at which approval of the Settlement, plan of allocation and an award of attorneys' fees and litigation expenses to Lead Counsel may be considered; and (3) grant such further relief as the Court deems just and proper.

---

[2] The only specific date that needs to be set by the Court is the date of the Settlement Hearing.

**AA200**

Dated:  January 29, 2014                    Respectfully submitted,

                                           **LABATON SUCHAROW LLP**

                                           By: _/s/ Jonathan Gardner_
                                           Jonathan Gardner
                                           Eric J. Belfi
                                           Mark Goldman
                                           140 Broadway
                                           New York, New York 10005
                                           Telephone:    (212) 907-0700
                                           Facsimile:    (212) 818-0477

AA201

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) <u>CLASS ACTION</u> |
| vs. | ) ) |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) |
| Defendants. | ) ) ) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2014, I caused the foregoing:

- Lead Plaintiff's Notice of Motion and Motion for Preliminary Approval of Settlement and Approval of Notice to the Class;

- Memorandum of Law In Support of Lead Plaintiff's Motion for Preliminary Approval of Settlement and Approval of Notice to the Class;

- Declaration of Jonathan Gardner In Support of Lead Plaintiff's Motion for Preliminary Approval of Settlement and Approval of Notice to the Class, with exhibits; and

- Proposed Preliminary Approval Order, with exhibits

to be served electronically on all parties listed on the attached Electronic Mail Notice List.


<u>/s/ Jonathan Gardner</u>
Jonathan Gardner

**AA202**

Mailing Information for a Case 1:11-cv-07132-CM

Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com, drosenfeld@rgrdlaw.com

- **Joseph S. Allerhand**
joseph.allerhand@weil.com,justin.daloia@weil.com, Amy.Suehnholz@weil.com

- **Daniel E. Bacine**
dbacine@barrack.com,mbonatara@barrack.com

- **Jeffrey A. Berens**
jeff@dyerberens.com

- **Marshall Pierce Dees**
mdees@holzerlaw.com

- **Iona Maria May Evans**
ievans@labaton.com,electroniccasefiling@labaton.com

- **Michael Ira Fistel , Jr**
mfistel@holzerlaw.com,cyoung@holzerlaw.com,cmoore@holzerlaw.com

- **Jonathan Gardner**
jgardner@labaton.com,fmalonzo@labaton.com, electroniccasefiling@labaton.com

- **Mark S. Goldman**
mgoldman@labaton.com

- **Christopher J. Keller**
ckeller@labaton.com

- **Lisa M. Lamb**
llamb@barrack.com,cbowers@barrack.com

- **Stephen Alan Radin**
stephen.radin@weil.com,MCO.ECF@weil.com

- **David Avi Rosenfeld**
drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com, mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michael Walter Stocker**
mstocker@labaton.com,electroniccasefiling@labaton.com

- **Carol Cecilia Villegas**
cvillegas@labaton.com,electroniccasefiling@labaton.com

- **STEPHEN R. ASTLEY**
sastley@rgrdlaw.com

**AA203**

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

**AA204**

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF JONATHAN GARDNER IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND APPROVAL OF <u>NOTICE TO THE CLASS</u>**

AA205

I, JONATHAN GARDNER, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am a partner of the law firm of Labaton Sucharow LLP, court-appointed Lead Counsel for the City of Providence ("Lead Plaintiff") and the Class, and am admitted to practice before this Court.  I respectfully submit this declaration in further support of Lead Plaintiff's motion for preliminary approval of the proposed class action settlement.  I have personal knowledge of the matters testified to herein.

2.      Annexed hereto as Exhibit 1 is a true and correct copy of the Stipulation and Agreement of Settlement, dated as of January 29, 2014, with annexed exhibits.

3.      Annexed hereto as Exhibit 2 is a true and correct copy of the resume of A.B. Data Ltd., the proposed claims administrator for the Settlement.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 29, 2014.

JONATHAN GARDNER

**AA206**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 29, 2014, I caused the foregoing:

- Lead Plaintiff's Notice of Motion and Motion for Preliminary Approval of Settlement and Approval of Notice to the Class;

- Memorandum of Law In Support of Lead Plaintiff's Motion for Preliminary Approval of Settlement and Approval of Notice to the Class;

- Declaration of Jonathan Gardner In Support of Lead Plaintiff's Motion for Preliminary Approval of Settlement and Approval of Notice to the Class, with exhibits; and

- Proposed Preliminary Approval Order, with exhibits

to be served electronically on all parties listed on the attached Electronic Mail Notice List.


<u>/s/ Jonathan Gardner</u>
Jonathan Gardner

**AA207**

Mailing Information for a Case 1:11-cv-07132-CM
Electronic Mail Notice List
The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
malba@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,
drosenfeld@rgrdlaw.com

- **Joseph S. Allerhand**
joseph.allerhand@weil.com,justin.daloia@weil.com,
Amy.Suehnholz@weil.com

- **Daniel E. Bacine**
dbacine@barrack.com,mbonatara@barrack.com

- **Jeffrey A. Berens**
jeff@dyerberens.com

- **Marshall Pierce Dees**
mdees@holzerlaw.com

- **Iona Maria May Evans**
ievans@labaton.com,electroniccasefiling@labaton.com

- **Michael Ira Fistel , Jr**
mfistel@holzerlaw.com,cyoung@holzerlaw.com,cmoore@holzerlaw.com

- **Jonathan Gardner**
jgardner@labaton.com,fmalonzo@labaton.com,
electroniccasefiling@labaton.com

- **Mark S. Goldman**
mgoldman@labaton.com

- **Christopher J. Keller**
ckeller@labaton.com

- **Lisa M. Lamb**
llamb@barrack.com,cbowers@barrack.com

- **Stephen Alan Radin**
stephen.radin@weil.com,MCO.ECF@weil.com

- **David Avi Rosenfeld**
drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Samuel Howard Rudman**
srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,
mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Michael Walter Stocker**
mstocker@labaton.com,electroniccasefiling@labaton.com

- **Carol Cecilia Villegas**
cvillegas@labaton.com,electroniccasefiling@labaton.com

- **STEPHEN R. ASTLEY**
sastley@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

EXECUTION VERSION

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>STIPULATION AND AGREEMENT OF SETTLEMENT</u>

This Stipulation and Agreement of Settlement (the "Stipulation") is made and entered

into by and between Lead Plaintiff, the City of Providence ("Providence" or "Lead Plaintiff"), on

behalf of itself and the Class (as defined below) and Aéropostale, Inc. ("Aéropostale"), Thomas

P. Johnson, and Marc D. Miller (the "Individual Defendants") (collectively, together with

Aéropostale, "Defendants").

**WHEREAS:**

A. All capitalized words or terms not otherwise defined herein shall have the

meaning set forth in Paragraph 1 of this Stipulation entitled "Definitions."

B. On October 11, 2011, a class action complaint styled *Arbuthnot v. Aeropostale,*

*Inc.*, No. 11-cv-7132, was filed in the United States District Court for the Southern District of

New York alleging claims arising under the federal securities laws as against Defendants by and

on behalf of a proposed class of all persons or entities that purchased the common stock of

Aéropostale between February 3, 2011 and August 3, 2011, inclusive, and were damaged thereby.

C.  On December 12, 2011, Providence moved pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for appointment as lead plaintiff and for the appointment of its counsel, Labaton Sucharow LLP ("Labaton") as lead counsel to represent the putative class set forth in Paragraph B.

D.  On January 11, 2012, the Court appointed Providence as Lead Plaintiff, appointed Labaton as Lead Counsel, and granted Lead Plaintiff leave to file an amended complaint within thirty (30) days.

E.  Lead Plaintiff filed the Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint"), which is the operative complaint in the Action, on February 10, 2012.  The Complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") as against Defendants on behalf of a proposed class of all persons or entities that purchased the common stock of Aéropostale between March 11, 2011 and August 18, 2011, inclusive, and were damaged thereby.

F.  On March 12, 2012, Defendants filed a motion to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, which Lead Plaintiff opposed on March 26, 2012.  On April 2, 2012, Defendants filed a reply brief in further support of their motion.

G.  On March 25, 2013, the Court denied Defendants' motion to dismiss the Complaint.

AA211

H.      On April 8, 2013, Defendants filed an Answer to the Complaint, denying its material allegations and alleging affirmative defenses thereto.

I.      On April 24, 2013, Lead Plaintiff moved for an order certifying the Action to proceed as a class action on behalf of a class of all persons or entities that purchased or otherwise acquired the publicly traded common stock of Aéropostale between March 11, 2011 and August 18, 2011, inclusive, and were damaged thereby, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("Class Certification Motion").

J.      Merits and class-related discovery commenced, including the production of documents by Defendants, Lead Plaintiff, and third parties, which resulted in the production of over 1 million pages of documents by Defendants, and the depositions of a designated representative of Lead Plaintiff and two representatives of the investment advisor that was responsible for purchasing shares of Aéropostale Common Stock on behalf of Lead Plaintiff.

K.      On July 10, 2013, Lead Plaintiff and Defendants jointly filed a stipulation regarding Plaintiff's Class Certification Motion with the Court (the "Stipulation Regarding Class Certification").

L.      On July 17, 2013, the Court endorsed the Stipulation Regarding Class Certification and certified the Action to proceed as a class action on behalf of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Aéropostale from March 11, 2011 through August 18, 2011, inclusive and who were damaged thereby. Excluded from the Class were (i) Defendants (ii) members of the Immediate Family of the Individual Defendants; (iii) any person who was an Officer or Director of Aéropostale during the Class Period; (iv) any firm, trust, partnership, corporation, or other entity in which any Defendant has or had a controlling interest during the Class Period; (v) the liability insurance

AA212

carriers of Defendants' Directors and Officers, and any affiliates or subsidiaries thereof; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

      M.     Merits depositions commenced on September 19, 2013.  Lead Plaintiff deposed twelve current or former employees of Aéropostale.

      N.     Lead Plaintiff and Defendants engaged the Honorable Daniel Weinstein (Ret.) ("Judge Weinstein"), a well-respected and highly experienced mediator, to assist them in exploring a potential negotiated resolution of the Action.

      O.     On October 29, 2013, Lead Plaintiff and Defendants met with Judge Weinstein in an attempt to reach a settlement.  The mediation session involved an extended effort to settle the Action.  Lead Plaintiff and the Class were represented by Lead Counsel and Defendants were represented by Defendants' Counsel.  Additionally, each of Defendants' insurance carriers was represented at the mediation either in person or by their own attorney(s).  Pursuant to Judge Weinstein's instructions, the Parties submitted and exchanged detailed mediation statements in advance of the session.  At the session, Lead Counsel and Defendants' Counsel voluntarily elected to make presentations to Judge Weinstein and the Parties each conferred with Judge Weinstein in private.  Following a full day of intense, hard-fought, arm's-length negotiation under the auspices of Judge Weinstein, Lead Plaintiff and Defendants reached an agreement in principle to settle the Action.

      P.     Lead Plaintiff, on behalf of itself and other Class Members, and Defendants agree that the Settlement Amount to be paid and the other terms of the Settlement set forth herein were negotiated at arm's-length and in good faith and reflect a settlement that was reached voluntarily after consultation with experienced legal counsel.

AA213

Q. Lead Plaintiff, through Lead Counsel, conducted a thorough investigation relating to the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included reviewing and analyzing: (i) documents filed publicly by Aéropostale with the SEC; (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning Aéropostale and Defendants; (iii) research reports issued by financial analysts concerning Aéropostale; (iv) over 1 million pages of documents produced by Aéropostale; (vi) over 300,000 pages of documents produced by third parties, including workpapers produced by Aéropostale's independent registered public accounting firm during the Class Period, emails and documents produced by Aéropostale's vendors, and emails and documents produced by financial analysts that followed Aéropostale during the Class Period; and (vii) the applicable law governing the claims and potential defenses. Lead Counsel also interviewed former Aéropostale employees and other persons with relevant knowledge, and consulted with experts on loss causation, damages, accounting, and retail industry issues.

R. Lead Plaintiff believes that the claims asserted in the Action have merit and that the evidence developed to date supports the claims asserted. However, Lead Plaintiff and Lead Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Action against Defendants through trial and appeals. Lead Plaintiff and Lead Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Action here, as well as the difficulties and delays inherent in such litigation. Lead Counsel also is mindful of the inherent problems of proof and the possible defenses to the claims alleged in the Action. Based on their evaluation, Lead Plaintiff and Lead Counsel believe that the Settlement set forth in this Stipulation confers

AA214

substantial monetary benefits upon the Class and is in the best interests of Lead Plaintiff and the Class.

S.      Defendants have denied and continue to deny (i) all the claims alleged by Lead Plaintiff on behalf of the Class, including all claims in the complaints, referenced in Paragraphs B and E above; (ii) all allegations of wrongdoing, fault, liability, or damages to Lead Plaintiff and the Class; and (iii) that they have committed any act or omission giving rise to any liability or violation of law, including the federal securities laws. Defendants believe they acted at all times properly, in good faith, and consistent with their legal duties and obligations.  Although Defendants believe that the claims in the Action lack merit and that they ultimately would prevail at summary judgment or at trial, to eliminate the significant burden, expense, and distraction of further litigation, Defendants wish to settle and resolve the Action on the terms and conditions set forth in this Stipulation and to put the claims to rest finally and forever without in any way acknowledging any wrongdoing, fault, liability, or damages to Lead Plaintiff or the other Class Members.

T.      This Stipulation, whether or not consummated, any proceedings relating to any settlement, or any of the terms of any settlement, whether or not consummated, shall in no event be construed as, or deemed to be evidence of, an admission or concession on the part of Defendants with respect to any fact or matter alleged in the Action, or any claim of fault or liability or wrongdoing or damage whatsoever, or any infirmity in any claim or defense that has been or could have been asserted.  Defendants are entering into this Settlement solely to eliminate the burden, expense, uncertainty, and distraction of further litigation.

U.      Subject to the terms and conditions set forth herein, and the Court's approval pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Settlement embodied herein is

AA215

intended by the Parties to (i) be a full and final disposition of the Action; and (ii) fully, finally, and forever resolve, discharge, dismiss, and settle the Released Plaintiffs' Claims against the Released Defendant Parties.

      **NOW THEREFORE**, without any concession by Lead Plaintiff that the Action lacks merit, and without any concession by Defendants of any liability or wrongdoing or the lack of merit in any of their defenses, it is hereby **STIPULATED AND AGREED** by and between Lead Plaintiff, on behalf of itself and the Class Members, and Defendants, by and through their undersigned counsel, subject to approval by the Court pursuant to Rule 23 of the Federal Rules of Civil Procedure, that, in consideration of the benefits flowing to the Parties, all Released Claims as against all Released Parties shall be fully, finally, and forever settled, released, discharged, and dismissed with prejudice, and without costs, as set forth below:

**DEFINITIONS**

      1.     As used in this Stipulation and the exhibits appended hereto, the following terms shall have the meanings set forth below.  In the event of any inconsistency between any definition set forth below and any definition in any other document related to the Settlement, the definition set forth below shall control.

      (a)     "Action" means the civil action captioned *The City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132, pending in the United States District Court for the Southern District of New York before the Honorable Colleen McMahon.

      (b)     "Aéropostale" means Aéropostale, Inc. (NYSE: ARO).

      (c)     "Aéropostale Common Stock" means the publicly traded common stock of Aéropostale (CUSIP No. 007865108).

      (d)     "Alternative Judgment" means a form of Final judgment that may be entered by the Court in this Action in a form other than the Judgment provided for in this

- 7 -

**AA216**

Stipulation where under such circumstances none of the Parties hereto elects to terminate this Settlement in accordance with Paragraph 49.

(e)    "Authorized Claimant" means a Class Member that timely submits a valid Proof of Claim and Release form to the Claims Administrator in accordance with the terms of the Stipulation that is accepted for payment by the Court.

(f)    "Claims Administrator" means the firm designated by Lead Counsel, subject to Court approval, to provide all notices approved by the Court to Class Members, to process Proofs of Claim and to administer the Settlement.

(g)    "Class" or "Class Member" means any and each Person who purchased or otherwise acquired Aéropostale Common Stock from March 11, 2011 through August 18, 2011, inclusive, and who were damaged thereby.  Excluded from the Class are (i) Defendants; (ii) members of the Immediate Family of the Individual Defendants; (iii) any person who was an Officer or Director of Aéropostale during the Class Period; (iv) any firm, trust, partnership, corporation, or other entity in which any Defendant has or had a controlling interest during the Class Period; (v) the liability insurance carriers of Defendants' Directors and Officers, and any affiliates or subsidiaries thereof; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.  Also excluded from the Class is any Person that otherwise qualifies as a Class Member but properly excludes himself, herself, or itself by timely submitting a valid request for exclusion from the Class in accordance with the requirements set forth in this Stipulation and in the Notice.

(h)    "Class Period" means the period from March 11, 2011 through August 18, 2011, inclusive.

**AA217**

       (i)    "Court" means the United States District Court for the Southern District of New York.

       (j)    "Defendants" means Aéropostale, Inc., Thomas P. Johnson, and Marc D. Miller.

       (k)    "Defendants' Counsel" means the law firm of Weil, Gotshal & Manges LLP.

       (l)    "Director" means any member of the board of directors of any of the Defendants.

       (m)    "Distribution Order" means an order of the Court approving the Claims Administrator's determinations concerning the acceptance and rejection of the claims submitted and approving any fees and expenses not previously paid, including the fees and expenses of the Claims Administrator and, if the Effective Date has occurred, directing payment of the Net Settlement Fund to Authorized Claimants.

       (n)    "Effective Date" means the date upon which the Settlement shall become effective, as set forth in Paragraph 47 below.

       (o)    "Escrow Account" means one or more separate escrow account(s) designated by Lead Counsel into which the Settlement Amount will be deposited for the benefit of the Class.

       (p)    "Escrow Agent" means Lead Counsel.

       (q)    "Fee and Expense Application" means Lead Counsel's application for an award from the Settlement Fund of attorneys' fees and reimbursement of litigation expenses incurred in prosecuting the Action in an amount not to exceed the attorneys' fees and expense reimbursement disclosure contained in the Notice.

AA218

(r)     "Final," with respect to a court order, means the later of: (i) if there is an appeal from a court order, the date of final affirmance on appeal and the expiration of the time for any further judicial review whether by appeal, reconsideration, or a petition for a *writ of certiorari* and, if *certiorari* is granted, the date of final affirmance of the order following review pursuant to the grant; or (ii) the date of final dismissal of any appeal from the order or the final dismissal of any proceeding on *certiorari* to review the order; or (iii) the expiration of the time for the filing or noticing of any appeal or petition for *certiorari* from the order (or, if the date for taking an appeal or seeking review of the order shall be extended beyond this time by order of the issuing court, by operation of law, or otherwise, or if such extension is requested, the date of expiration of any such extension if any appeal or review is not sought).  However, any appeal or proceeding seeking subsequent judicial review pertaining solely to the Plan of Allocation of the Net Settlement Fund, or to the Court's award of attorneys' fees or expenses, shall not in any way delay or affect the time set forth above for the Judgment or Alternative Judgment to become Final, or otherwise preclude the Judgment or Alternative Judgment from becoming Final.

(s)     "Immediate Family" or "Immediate Families" means, as set forth in 17 C.F.R. § 229.404, children, stepchildren, parents, stepparents, spouses, siblings, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law, and sisters-in-law.  "Spouse" as used in this definition also means a husband, a wife, or a partner in a state-recognized domestic partnership, civil union, or marriage.

(t)     "Individual Defendants" means Thomas P. Johnson and Marc D. Miller.

(u)     "Judgment" means the proposed judgment and order (i) finally approving the Settlement and (ii) dismissing the Action with prejudice, which, subject to the approval of the Court, shall be substantially in the form attached hereto as Exhibit B.

AA219

(v)     "Lead Counsel" means the law firm of Labaton Sucharow LLP.

(w)     "Lead Plaintiff" means the City of Providence.

(x)     "Net Settlement Fund" means the Settlement Fund less: (i) Court-awarded attorneys' fees and expenses; (ii) Notice and Administration Expenses; (iii) Taxes; and (iv) any other fees or expenses approved by the Court, including any award to Lead Plaintiff for reasonable costs and expenses (including lost wages) pursuant to the PSLRA.

(y)     "Notice" means the Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses, which, subject to approval of the Court, will be sent to Class Members and shall be substantially in the form attached hereto as Exhibit 1 to Exhibit A hereto.

(z)     "Notice and Administration Expenses" means all costs, fees, and expenses incurred in connection with providing notice to the Class and the administration of the Settlement, including but not limited to: (i) providing notice of the proposed Settlement, by mail, publication, and other means, to Class Members; (ii) receiving and reviewing claims; (iii) applying the Plan of Allocation; (iv) communicating with Persons regarding the proposed Settlement and claims administration process; (v) distributing the proceeds of the Settlement; and (vi) fees related to the Escrow Account and investment of the Settlement Fund.

(aa)    "Officer" means any officer of any of the Defendants as the term Officer is defined in 17 C.F.R. § 240.16a-1(f).

(bb)    "Party" or "Parties" means any and each of Lead Plaintiff, the other Class Members, and Defendants.

(cc)    "Person" or "Persons" means any and each individual, corporation (including all divisions and subsidiaries), general or limited partnership, association, joint stock

- 11 -

**AA220**

company, joint venture, limited liability company, professional corporation, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any other business or legal entity, as well as each of their spouses, heirs, predecessors, successors, representatives, agents, trustees, administrators, executors, or assigns.

(dd)    "Plan of Allocation" means the proposed Plan of Allocation of Net Settlement Fund, which, subject to the approval of the Court, shall be substantially in the form described in the Notice.

(ee)    "Preliminary Approval Order" means the proposed Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement, which, subject to the approval of the Court, shall be substantially in the form attached hereto as Exhibit A.

(ff)    "Proof of Claim" means the Proof of Claim and Release form for submitting a claim, which, subject to approval of the Court, shall be substantially in the form attached as Exhibit 2 to Exhibit A hereto.

(gg)    "Released Claims" means collectively Released Plaintiffs' Claims and Released Defendants' Claims.

(hh)    "Released Defendant Party" or "Released Defendant Parties" means Defendants, their past or present or future subsidiaries, parents, affiliates, principals, successors and predecessors, assigns, Officers, Directors, trustees, general partners, limited partners, agents, fiduciaries, contractors, employees, attorneys, auditors, insurers; the spouses, members of the Immediate Families, representatives, and heirs of the Individual Defendants, as well as any trust of which any Individual Defendant is the settlor or which is for the benefit of any of their

**AA221**

Immediate Family members; any Person in which any Defendants have a controlling interest; and any of the legal representatives, heirs, successors in interest, or assigns of the Defendants.

(ii)    "Released Defendants' Claims" means all claims, rights, issues, controversies, causes of action, duties, obligations, demands, actions, debts, sums of money, suits, contracts, agreements, promises, damages, and liabilities of every kind, nature, and description, including both known claims and Unknown Claims (as defined below), whether arising under federal, state, or foreign law, or statutory, common, or administrative law, or any other law, rule, or regulation, whether asserted as claims, cross-claims, counterclaims, or third-party claims, whether fixed or contingent, choate or inchoate, accrued or not accrued, matured or unmatured, liquidated or unliquidated, perfected or unperfected, whether class-wide or individual in nature, that previously existed, currently exist, or that exist as of the date of the Court's approval of the Settlement, or that may arise in the future, that the Released Defendant Parties could have asserted against any of the Released Plaintiff Parties that arise out of or relate to the commencement, prosecution, or settlement of the Action (other than claims to enforce the Settlement).

(jj)    "Released Party" or "Released Parties" means individually and collectively the Released Defendant Parties and the Released Plaintiff Parties.

(kk)    "Released Plaintiffs' Claims" means any and all claims, rights, issues, controversies, causes of action, duties, obligations, demands, actions, debts, sums of money, suits, contracts, agreements, promises, damages, and liabilities of every kind, nature, and description, including both known claims and Unknown Claims (as defined below), whether arising under federal, state, or foreign law, or statutory, common, or administrative law, or any other law, rule, or regulation, whether asserted as claims, cross-claims, counterclaims, or third-

AA222

party claims, whether fixed or contingent, choate or inchoate, accrued or not accrued, matured or

unmatured, liquidated or unliquidated, perfected or unperfected, whether class-wide or individual

in nature, that previously existed, currently exist, or that exist as of the date of the Court's

approval of the Settlement, or that may arise in the future, that Lead Plaintiff or any other Class

Member asserted or could have asserted in the Action or any other action or in any forum

including, without limitation, any federal or state court, or in any other court, arbitration,

administrative agency, or other forum in the United States or elsewhere, that in any way arise out

of, are based upon, relate to, or are in connection with the claims, allegations, transactions, facts,

events, acts, disclosures, statements, representations, or omissions or failures to act alleged, set

forth, referred to, involved in any of the complaints filed in the Action, or which could have been

raised in the Action, and that in any way arise out of, are based upon, relate to, or concern the

purchase, acquisition, or sale of Aéropostale Common Stock during the Class Period.  Released

Claims do not include: (i) claims to enforce the Settlement; and (ii) any claims asserted in the

lawsuit styled *Bell v. Geiger, et al.*, No. 652931/2011 (N.Y. Sup. Ct.)

(ll)     "Released Plaintiff Party" or "Released Plaintiff Parties" means Lead

Plaintiff, Lead Counsel, and each and every Class Member, regardless of whether that person

actually submits a Proof of Claim, seeks or obtains a distribution from the Net Settlement Fund,

is entitled to receive a distribution under the Plan of Allocation, or is entitled to receive payment

from the Fee and Expense Application; their respective past, current, or future trustees, Officers,

Directors, employees, contractors, auditors, principals, agents, attorneys, predecessors,

successors, assigns, parents, subsidiaries, divisions, joint ventures, general or limited partners or

partnerships, and limited liability companies; and the spouses, members of the Immediate

Families, representatives, and heirs of any Released Plaintiff Party, as well as any trust of which

- 14 -

**AA223**

any such Released Plaintiff Party is the settlor or which is for the benefit of any of their

Immediate Family members; any Person in which any Released Plaintiff Party has a controlling

interest; and any other Person who has the right, ability, standing, or capacity to assert,

prosecute, or maintain on behalf of any Class Member any of the Released Plaintiffs' Claims (or

to obtain the proceeds of any recovery therefrom), whether in whole or in part.

(mm)    "Settlement" means the resolution of the Action in accordance with the

terms and provisions of this Stipulation.

(nn)    "Settlement Amount" means the total principal amount of fifteen million

dollars ($15,000,000) in cash.  For the avoidance of doubt, under no circumstances shall the total

that Aéropostale pays, or causes to be paid, under this Stipulation exceed the Settlement Amount.

(oo)    "Settlement Fund" means the Settlement Amount deposited in the Escrow

Account under the terms of this Stipulation and any interest earned thereon.

(pp)    "Settlement Hearing" means the hearing to be held by the Court to

determine whether the proposed Settlement is fair, reasonable, adequate and should be finally

approved.

(qq)    "Stipulation" means this Stipulation and Agreement of Settlement.

(rr)    "Summary Notice" means the Summary Notice of Pendency of Class

Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses, which, subject to

approval of the Court, will be published in *Investor's Business Daily* and transmitted over *PR

Newswire*, and shall be substantially in the form attached as Exhibit 3 to Exhibit A hereto.

(ss)    "Taxes" means all federal, state, or local taxes of any kind on any income

earned by or imposed on payments of the Settlement Fund, including withholding taxes, and

reasonable expenses and costs incurred in connection with the taxation of the Settlement Fund

AA224

(including, without limitation, interest, penalties, and the reasonable expenses of tax attorneys and accountants).

## SCOPE AND EFFECT OF SETTLEMENT

2.       Subject to approval by the Court, and such approval becoming Final, the obligations incurred pursuant to this Stipulation are in full and final disposition of the Released Claims.

3.       By operation of the Judgment or Alternative Judgment, as of the Effective Date, Lead Plaintiff and each and every other Class Member, regardless of whether that Person actually submits a Proof of Claim, seeks or obtains a distribution from the Net Settlement Fund, or is entitled to receive a distribution under the Plan of Allocation, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom) (i) have and shall be deemed to have fully, finally, and forever waived, released, relinquished, discharged, and dismissed each and every one of the Released Plaintiffs' Claims against each and every one of the Released Defendant Parties; (ii) have and be deemed to have covenanted not to sue, directly or indirectly, any of the Released Defendant Parties with respect to any and all of the Released Plaintiffs' Claims; and (iii) shall forever be barred and enjoined from directly or indirectly filing, commencing, instituting, prosecuting, maintaining, intervening in, participating in (as a class member or otherwise) (except as a witness compelled by subpoena or court order and no remuneration is received for such action(s)), or receiving any benefits or other relief, from any action, suit, cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, whether in the United States or elsewhere, on their own or in a

AA225

representative capacity, that is based upon, arises out of, or relates to any and all of the Released Plaintiffs' Claims against any and all of the Released Defendant Parties.

4.     By operation of the Judgment or Alternative Judgment, as of the Effective Date, the Released Defendant Parties shall be deemed to have fully, finally, and forever waived, released, discharged, and dismissed each and every one of the Released Defendants' Claims against each and every one of the Released Plaintiff Parties and shall forever be barred and enjoined from commencing, instituting, prosecuting, or maintaining any of the Released Defendants' Claims against any of the Released Plaintiff Parties.

5.     By operation of the Judgment or Alternative Judgment, as of the Effective Date, in accordance with 15 U.S.C. § 78u-4(f)(7)(A), except as provided in Paragraph 44(b), any and all Persons are permanently barred and enjoined, to the fullest extent permitted by law, from commencing, prosecuting, or asserting any and all claims for contribution or indemnity (or any other claim when the alleged injury to that Person is that Person's actual or threatened liability to the Class or a Class Member in the Action) based upon, relating to, or arising out of the Released Plaintiffs' Claims, against each and every one of the Released Defendant Parties, whether arising under state, federal, common, or foreign law, as claims, cross-claims, counterclaims, or third-party claims, in this Action or a separate action, in this Court, any federal or state court, or in any other court, arbitration proceeding, administrative proceeding, or other forum, whether in the United States or elsewhere; and, except as provided in Paragraph 44(b), the Released Defendant Parties are permanently barred and enjoined, to the fullest extent permitted by law, from commencing, prosecuting, or asserting any and all claims for contribution or indemnity (or any other claim when the alleged injury to the Released Defendant Party is that Released Defendant Party's actual or threatened liability to the Class or a Class Member in the Action) based upon,

**AA226**

relating to, or arising out of the Released Plaintiffs' Claims, against any Person, other than a Person whose liability to the Class has been extinguished pursuant to the Settlement and the Judgment, whether arising under state, federal, common, or foreign law, as claims, cross-claims, counterclaims, or third-party claims, in this Action or a separate action, in this Court, any federal or state court, or in any other court, arbitration proceeding, administrative proceeding, or other forum, whether in the United States or elsewhere.

6.     The Released Claims expressly includes any and all claims that Lead Plaintiff, each and every other Class Member, or the Released Defendant Parties do not know or suspect to exist in his, her, or its favor at the time of the release of the Released Claims, which if known by him, her, or it might have affected his, her, or its decision(s) with respect to the Settlement, including the decision to exclude himself, herself, or itself from the Class, or to object or not to object to any aspect of the Settlement (collectively, "Unknown Claims"). With respect to any and all Released Claims, Lead Plaintiff and each and every other Class Member, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom), and the Released Defendant Parties stipulate and agree that, upon the Effective Date, they each shall be deemed to have, and by operation of the Judgment or Alternative Judgment shall have, to the fullest extent permitted by law, expressly waived and relinquished any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code § 1542, which provides:

**AA227**

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Lead Plaintiff and each and every other Class Member, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom), and the Released Defendant Parties acknowledge that they may hereafter discover facts, legal theories, or authorities in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but they each nevertheless intend to and shall expressly, fully, finally, and forever settle and release, and upon the Effective Date and by operation of the Judgment or Alternative Judgment shall be deemed to have settled and released, fully, finally, and forever, any and all Released Claims as applicable, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts, legal theories, or authorities. Lead Plaintiff and the Released Defendant Parties acknowledge, and other Class Members, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain

**AA228**

the proceeds of any recovery therefrom), by operation of law shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definition of Released Plaintiffs' Claims and Released Defendants' Claims was separately bargained for and was a material element of the Settlement.

## THE SETTLEMENT CONSIDERATION

7.      In full settlement of the Released Plaintiffs' Claims and in consideration of the releases specified in Paragraph 3, above, Aéropostale shall pay, or cause to be paid, the Settlement Amount into the Escrow Account on or before twenty (20) business days after both (i) the Court has entered the Preliminary Approval Order  and (ii) Lead Counsel has provided to Defendants' Counsel all information necessary to effectuate a transfer of funds, including, but not limited to, wiring instructions, payment address, and a complete, accurate, and signed W-9 form for the Settlement Fund that reflects a valid taxpayer identification number.

8.      The Settlement Amount represents the entirety of the Released Defendant Parties' financial obligations under this Stipulation and in connection with this Settlement, meaning that it includes all attorneys' fees and expenses, Notice and Administration Expenses, Taxes, and any other costs of any kind whatsoever associated with the Settlement. The payment of the Settlement Amount into the Escrow Account by Aéropostale in accordance with Paragraph 7 above fully discharges the Released Defendant Parties' financial obligations under this Stipulation and in connection with the Settlement, meaning that no other Released Defendant Parties shall have any obligation to make, or cause to make, any payment into the Escrow Account or to any Class Member or any other Person under this Stipulation or as part of the Settlement.  For the avoidance of doubt, under no circumstances shall the total to be paid, or caused to be paid, by Released Defendant Parties under this Stipulation exceed the Settlement Amount.

**AA229**

9.      With the sole exception of Aéropostale's obligation to pay the Settlement Amount into the Escrow Account in accordance with Paragraph 7, the Released Defendant Parties and Defendants' Counsel shall have no responsibility for, interest in, or liability whatsoever with respect to: (i) any act, omission, or determination by Lead Counsel, the Escrow Agent, or the Claims Administrator, or any of their respective designees or agents, in connection with the administration of the Settlement or otherwise; (ii) the management, investment, or distribution of the Settlement Fund; (iii) the Plan of Allocation, or its implementation, administration, or interpretation; (iv) the determination, administration, calculation, or payment of any claims asserted against the Settlement Fund; (v) any losses suffered by, or fluctuations in value of, the Settlement Fund; or (vi) the payment or withholding of any Taxes, expenses, and/or costs incurred in connection with the Settlement Fund or the filing of any federal, state, or local tax returns.

## USE AND TAX TREATMENT OF SETTLEMENT FUND

10.      The Settlement Fund shall be used as follows and only as follows: (i) to pay any Taxes; (ii) to pay Notice and Administration Expenses; (iii) to pay any attorneys' fees and expenses awarded by the Court; (v) to pay any other costs, fees, or expenses approved  by the Court, including any award to Lead Plaintiff permitted by the PSLRA; and (vi) to pay the Net Settlement Fund to Authorized Claimants.

11.      The Net Settlement Fund shall be distributed to Authorized Claimants as provided in Paragraphs 23-35  hereof.  The Net Settlement Fund shall remain in the Escrow Account prior to the Effective Date unless the Settlement is terminated under the provisions of this Stipulation, the Settlement is not approved, or the Effective Date otherwise does not occur.  All funds held in the Escrow Account shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until such time as the funds shall be disbursed or returned, pursuant

**AA230**

to the terms of this Stipulation, and/or further order of the Court.  The Escrow Agent shall invest funds in the Escrow Account in instruments backed by the full faith and credit of the United States Government (or a mutual fund invested solely in such instruments), or deposit some or all of the funds in non-interest bearing transaction account(s) that are fully insured by the Federal Deposit Insurance Corporation ("FDIC") in amounts that are up to the limit of FDIC insurance, and shall collect and reinvest any and all interest accrued thereon in the same instruments.  The Released Defendant Parties and Defendants' Counsel shall have no responsibility for, interest in, or liability whatsoever with respect to investment decisions executed by the Escrow Agent.  All risks related to the investment of the Settlement Fund shall be borne solely by the Settlement Fund.

12.     Lead Plaintiff intends to treat the Settlement Fund, as a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1.  Lead Counsel shall timely make, or cause to be made, such elections as necessary or advisable to carry out the provisions of this Paragraph, including the "relation-back election" (as defined in Treas. Reg. § 1.468B-1) back to the earliest permitted date.  Such election shall be made in compliance with the procedures and requirements contained in applicable regulations.  It shall be the sole responsibility of Lead Counsel to timely and properly prepare and deliver, or cause to be prepared and delivered, the necessary documentation for signature by all necessary parties, and thereafter take all such action(s) as may be necessary or appropriate to cause the appropriate filing(s) to occur.  The Parties agree to cooperate with Lead Counsel, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this Paragraph.

(a)     For the purposes of Section 468B of the Internal Revenue Code of 1986, as amended, and Treas. Reg. § 1.468B promulgated thereunder, the "administrator" shall be Lead

**AA231**

Counsel or its successor(s), who shall timely and properly file, or cause to be filed, all informational and other federal, state, or local tax returns necessary or advisable with respect to the earnings on the funds deposited in the Escrow Account (including without limitation the returns described in Treas. Reg. § 1.468B-2(k)). Such tax returns (as well as the election described above) shall be consistent with this subparagraph and in all events shall reflect that all Taxes (including any estimated taxes, earnings, or penalties) on the income earned on the funds deposited in the Escrow Account shall be paid out of such funds as provided in subparagraph (c) of this Paragraph.

(b) All Taxes shall be paid by the Escrow Agent solely out of the Settlement Fund. In all events, the Released Defendant Parties and Defendants' Counsel shall have no liability or responsibility whatsoever for the Taxes or the filing of any tax returns or other documents with the Internal Revenue Service or any other state or local taxing authority. In the event any Taxes of any kind whatsoever, including but not limited to any Taxes payable by reason of indemnification, are owed by any of the Released Defendant Parties on any earnings on the funds on deposit in the Escrow Account, such amounts shall also be paid out of the Settlement Fund. Any Taxes or tax expenses owed on any earnings on the Settlement Amount prior to its transfer to the Escrow Account shall be the sole responsibility of Aéropostale or the party that deposits the Settlement Amount into the Escrow Account.

(c) Taxes shall be treated as, and considered to be, a cost of administration of the Settlement and shall be timely paid, or caused to be paid, by the Escrow Agent out of the Settlement Fund without prior order from the Court or approval by the Released Defendant Parties, and the Escrow Agent and the Claims Administrator shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds

AA232

necessary to pay such amounts (as well as any amounts that may be required to be withheld under Treas. Reg. § 1.468B-2(1)(2)).

**ATTORNEYS' FEES AND EXPENSES**

13.     Lead Counsel will apply to the Court for an award from the Settlement Fund of attorneys' fees and reimbursement of litigation expenses incurred in prosecuting the Action in an amount not to exceed the attorneys' fees and expenses reimbursement disclosure contained in the Notice, plus any earnings on such amounts at the same rate and for the same periods as earned by the Settlement Fund.  The Settlement Fund shall be the sole source of payment from the Released Defendant Parties for the award of attorneys' fees and litigation expenses ordered by the Court.  The Released Defendant Parties shall take no position with respect to the Fee and Expense Application, provided it is consistent with the terms of the Stipulation.

14.     The amount of attorneys' fees and litigation expenses awarded by the Court is within the sole discretion of the Court.  Any attorneys' fees and litigation expenses awarded by the Court shall be paid from the Settlement Fund to Lead Counsel immediately upon entry of the order awarding such attorneys' fees and litigation expenses, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof.

15.     Any payment of attorneys' fees and litigation expenses pursuant to Paragraphs 13-14 above shall be subject to Lead Counsel's  obligation to make refunds or repayments to the Settlement Fund of any paid amounts, plus accrued earnings at the same net rate and for the same periods as is earned by the Settlement Fund, if (i) the Settlement is terminated pursuant to the terms of this Stipulation or fails to become effective for any reason; or (ii) as a result of any appeal or further proceedings on remand, or successful collateral attack, the award of attorneys' fees and/or litigation expenses is reduced, vacated, or reversed by Final non-appealable court

AA233

order.  If any one or more of the events set forth above in this Paragraph occur, Lead Counsel shall refund or repay the full amount of attorneys' fees and/or litigation expenses that is reversed, vacated, or, as applicable, the amount by which any award of attorneys' fees and/or litigation expenses is reduced or modified, no later than thirty (30) calendar days after receiving notice of such events, including, as applicable, notice of termination of the Settlement, or of the Court's decision to not approve the Settlement, or of any reduction, vacatur, or reversal of the award of attorneys' fees and/or litigation expenses, by Final non-appealable court order. It shall be the responsibility and obligation of Lead Counsel (or its successor(s)) to ensure repayment under this Paragraph, and Lead Counsel (or its successor(s)) submit itself to the jurisdiction of the Court in the event of any dispute in connection with this Paragraph.  If Lead Counsel does not comply with its obligation to refund and repay within the thirty (30) calendar day period of this Paragraph, Lead Counsel shall pay any expenses or fees (including attorneys' fees) incurred by the Released Defendant Parties in connection with enforcing that obligation.  The obligations in this Paragraph shall survive and remain in full force and effect and shall be binding in all respects on the Parties even if this Stipulation is terminated, the Settlement is not approved, or the Effective Date does not occur.

16.    With the sole exception of Aéropostale's obligation to pay, or cause to be paid, the Settlement Amount into the Escrow Account in accordance with Paragraph 7, the Released Defendant Parties and Defendants' Counsel shall have no responsibility for, and no liability whatsoever with respect to, any payment whatsoever to Lead Counsel in the Action that may occur at any time.  Lead Plaintiff, Lead Counsel, and each and every other Class Member shall have no recourse against the Released Defendant Parties for the payment of any attorneys' fees and/or litigation expenses.

**AA234**

17.     The Released Defendant Parties and Defendants' Counsel shall have no responsibility for, and no liability whatsoever with respect to, any allocation of any attorneys' fees or expenses between or among Lead Counsel and any other Person who may assert some claim thereto, or any fee or expense awards the Court may make in the Action.

18.     The Released Defendant Parties and Defendants' Counsel shall have no responsibility for, and no liability whatsoever with respect to, any attorneys' fees, costs, or expenses incurred by or on behalf of the Class Members, whether or not paid from the Escrow Account.

19.     The procedure for and the allowance or disallowance by the Court of any Fee and Expense Application are not part, or a necessary term, of the Settlement set forth in this Stipulation, are separate from the Court's consideration of, and shall not affect the validity or finality of, this Stipulation or the Settlement.  Any order or proceeding relating to any Fee and Expense Application, including an award of attorneys' fees, costs, or expenses in an amount less than the amount requested by Lead Counsel, or any appeal from any order relating thereto, or reversal or modification thereof, shall not operate to terminate, cancel, or in any way affect this Stipulation or the Settlement, impose any obligation on the Released Defendant Parties or any other Person to increase the consideration paid in connection with the Settlement, or affect or delay the Effective Date or finality of the Judgment or Alternative Judgment approving the Settlement, including, but not limited to, the release, discharge, and relinquishment of the Released Plaintiffs' Claims against the Released Defendant Parties, or any other orders entered pursuant to this Stipulation.  Lead Plaintiff, either on its own behalf or on behalf of the Class, and Lead Counsel may not cancel or terminate the Stipulation, whether in accordance with this Stipulation or otherwise, based on the Court's or any appellate court's ruling with respect to the

**AA235**

Fee and Expense Application or any application for the award of attorneys' fees or litigation expenses in the Action.

20.     All proceedings with respect to any disputes arising under Paragraphs 13-19 of this Stipulation, including but not limited to any proceedings concerning Lead Counsel's repayment obligations under Paragraph 15, shall be subject to the jurisdiction of the Court.

## ADMINISTRATION EXPENSES

21.     Except as otherwise provided herein, the Settlement Fund shall be held in the Escrow Account until the Effective Date.

22.     Prior to the Effective Date, without further approval from Defendants or further order of the Court, Lead Counsel may expend up to $250,000 from the Settlement Fund to pay Notice and Administration Expenses actually and reasonably incurred.  Taxes and fees related to the Escrow Account and investment of the Settlement Fund may be paid as incurred, without further approval of the Released Defendant Parties or further order of the Court.  After the Effective Date, Notice and Administration Expenses may be paid as incurred, without further approval of the Released Defendant Parties or further order of the Court.

## DISTRIBUTION TO AUTHORIZED CLAIMANTS

23.     Lead Counsel will apply to the Court for a Distribution Order, on notice to Defendants' Counsel, approving the Claims Administrator's determinations concerning the acceptance and rejection of the claims submitted pursuant to this Stipulation, and, if the Effective Date has occurred, directing the payment of the Net Settlement Fund to Authorized Claimants. The Released Defendant Parties will take no position with respect to the Plan of Allocation, provided it is consistent with the terms of the Stipulation.

**AA236**

24.     The allocation and distribution of the Net Settlement Fund to Class Members shall be subject to the Plan of Allocation, which Lead Plaintiff shall propose in its discretion, subject to notice to the Class members and approval by the Court.

25.     The Claims Administrator shall administer the Settlement under Lead Counsel's supervision in accordance with the terms of this Stipulation and subject to the jurisdiction of the Court.

26.     With the sole exception of Aéropostale's obligation to pay, or cause to be paid, the Settlement Amount into the Escrow Account in accordance with Paragraph 7, the Released Defendant Parties and Defendants' Counsel shall have no responsibility for, interest in, or liability whatsoever with respect to, the administration of the Settlement or the actions or decisions of the Claims Administrator, and shall have no liability to the Class in connection with such administration.

27.     The Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Loss, as defined in the Plan of Allocation included in the Notice, or in such other plan of allocation as the Court may approve.

28.     The Plan of Allocation is a matter separate and apart from the proposed Settlement, and any decision by the Court concerning the Plan of Allocation shall not affect the validity or Finality of this Stipulation or the Settlement.  The Plan of Allocation is not a necessary term of this Stipulation, the Settlement, the Preliminary Approval Order, or the Judgment or Alternative Judgment, and it is not a condition of this Stipulation or the Settlement that any particular plan of allocation be approved by the Court or any appellate court.  Lead Plaintiff, either on its own behalf or on behalf of the Class, and Lead Counsel may not cancel or

**AA237**

terminate the Stipulation or the Settlement, whether in accordance with this Stipulation or otherwise, based on the Court's or any appellate court's ruling with respect to the Plan of Allocation or any plan of allocation in the Action. The Released Defendant Parties and Defendants' Counsel shall have no responsibility for, and no liability whatsoever with respect to, reviewing or challenging claims, the allocation of the Net Settlement Fund, or the distribution of the Net Settlement Fund.

29.    Payment pursuant to the Distribution Order shall be deemed final and conclusive against any and all Class Members. All Class Members whose claims are not approved by the Court shall be barred from participating in distributions from the Net Settlement Fund, but otherwise shall be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment or Alternative Judgment to be entered in the Action and the releases provided for herein and therein, and will be barred from bringing any action against the Released Defendant Parties that is based upon, arises out of, or relates to any and all of the Released Plaintiffs' Claims.

30.    All proceedings with respect to the administration, processing, and determination of claims described by this Stipulation and the determination of all controversies relating thereto, including disputed questions of law and fact with respect to the validity of claims, shall be subject to the jurisdiction of the Court, but shall not in any event delay or affect the finality of the Judgment or Alternative Judgment.

31.    No Person shall have any claim of any kind against the Released Defendant Parties or Defendants' Counsel with respect to the matters set forth in Paragraphs 23-30 of this Stipulation, or otherwise related in any way to the administration of the Settlement, including, without limitation, the processing of claims and distributions.

AA238

32.     No Person shall have any claim against Lead Plaintiff or Lead Counsel or the Claims Administrator, or other agent designated by Lead Counsel, based on distributions made substantially in accordance with this Stipulation and the Settlement contained herein, the Plan of Allocation, or further order(s) of the Court.

33.     No Person that other than a Class Member, including without, limitation, those who timely and validly exclude themselves from the Class, shall have any right to any share of the Net Settlement Fund or to receive any distribution therefrom.

34.     This is not a claims-made settlement.  As of the Effective Date, the Released Defendant Parties and/or such other persons or entities funding the Settlement on behalf of the Released Defendant Parties, shall not have any right to the return of the Settlement Fund or any portion thereof for any reason.

35.     If there is any balance remaining in the Net Settlement Fund after at least six (6) months from the date of distribution of the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), Lead Counsel shall, if feasible and economical, reallocate such balance among Authorized Claimants who have cashed their checks in an equitable and economic fashion until it is no longer feasible or economical to do so.  Any balance that still remains in the Net Settlement Fund, after payment of Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, shall be contributed to non-sectarian, not-for-profit charitable organizations serving the public interest, designated by Lead Plaintiff and approved by the Court.

## ADMINISTRATION OF THE SETTLEMENT

36.     Any Class Member who fails to timely submit a valid Proof of Claim  will not be entitled to receive any of the proceeds from the Net Settlement Fund, except as otherwise ordered by the Court, but will otherwise be bound by all of the terms of this Stipulation and the

AA239

Settlement, including the terms of the Judgment or Alternative Judgment to be entered in the Action and all releases provided for herein and therein, and will be barred from bringing any action against the Released Defendant Parties that is based upon, arises out of, or relates to any and all of the Released Plaintiffs' Claims.

37.     Upon receiving any request(s) for exclusion pursuant to the Notice, Lead Counsel shall promptly notify Defendants' Counsel of such request(s) for exclusion upon receiving each request for exclusion, and certainly no later than five (5) calendar days after receiving a request for exclusion or fifteen (15) calendar days prior to the Settlement Hearing, whichever is earlier, and provide copies of such request(s) for exclusion and any documentation accompanying them by email.

38.     Lead Counsel shall be solely responsible for designating the Claims Administrator, subject to the approval of the Court, and for supervising the administration of the Settlement and disbursement of the Net Settlement Fund by the Claims Administrator.  Lead Counsel shall have the right, but not the obligation, to advise the Claims Administrator to waive what Lead Counsel deems to be *de minimis* or formal or technical defects in any Proofs of Claim submitted.  The Released Defendant Parties and Defendants' Counsel shall have no responsibility for, and no liability whatsoever with respect to, the administration of the Settlement, the allocation of the Net Settlement Fund, or the reviewing or challenging of claims of Class Members.

39.     For purposes of determining the extent, if any, to which a Class Member shall be treated as an Authorized Claimant, the following conditions shall apply:

(a)     Each Class Member shall be required to submit a Proof of Claim, substantially in the form attached hereto as Exhibit 2 to Exhibit A, supported by such documents

**AA240**

as are designated therein, including proof of the claimant's loss, or such other documents or proof as the Claims Administrator or Lead Counsel, in their discretion, may deem acceptable;

(b)     All Proofs of Claim must be submitted by the date set by the Court in the Preliminary Approval Order and specified in the Notice, unless such deadline is extended by Lead Counsel in their discretion or by Order of the Court.  Any Class Member who fails to submit a Proof of Claim by such date shall be barred from receiving any distribution from the Net Settlement Fund or payment pursuant to this Stipulation unless, by Order of the Court or the discretion of Lead Counsel, late-filed Proofs of Claim are accepted, but shall in all other respects be bound by all of the terms of this Stipulation and the Settlement, including the terms of the Judgment or Alternative Judgment and all releases provided for herein and therein, and will be permanently barred and enjoined from bringing any action, claim, or other proceeding of any kind against any Released Defendant Parties.  Provided that it is received before the motion for the Distribution Order is filed, a Proof of Claim shall be deemed to be submitted when mailed, if received with a postmark on the envelope and if mailed by first-class or overnight U.S. Mail and addressed in accordance with the instructions thereon.  In all other cases, the Proof of Claim shall be deemed to have been submitted when actually received by the Claims Administrator;

(c)     Each Proof of Claim shall be submitted to and reviewed by the Claims Administrator, under the supervision of Lead Counsel, who shall determine in accordance with this Stipulation the extent, if any, to which each claim shall be allowed, subject to review by the Court;

(d)     Proofs of Claim that do not meet the submission requirements may be rejected.  Prior to rejecting a Proof of Claim in whole or in part, the Claims Administrator shall communicate with the claimant in writing to give the claimant the chance to remedy any curable

**AA241**

deficiencies in the Proof of Claim submitted. The Claims Administrator, under supervision of Lead Counsel, shall notify, in a timely fashion and in writing, all claimants whose claims the Claims Administrator proposes to reject in whole or in part for curable deficiencies, setting forth the reasons therefor, and shall indicate in such notice that the claimant whose claim is to be rejected has the right to a review by the Court if the claimant so desires and complies with the requirements of subparagraph (e) below;

(e) If any claimant whose claim has been rejected in whole or in part for curable deficiency desires to contest such rejection, the claimant must, within twenty (20) calendar days after the date of mailing of the notice required in subparagraph (d) above, serve upon the Claims Administrator a notice and statement of reasons indicating the claimant's grounds for contesting the rejection along with any supporting documentation, and requesting a review thereof by the Court. If a dispute concerning a claim cannot be otherwise resolved, Lead Counsel shall thereafter present the request for review to the Court; and

(f) The determinations of the Claims Administrator accepting or rejecting disputed claims shall be presented to the Court, on notice to Defendants' Counsel, for approval by the Court in the Distribution Order.

40. Each claimant who submits a Proof of Claim shall be deemed to have submitted to the jurisdiction of the Court with respect to the claimant's claim, including but not limited to all releases provided for herein and in the Judgment or Alternative Judgment, and the claim will be subject to investigation and discovery under the Federal Rules of Civil Procedure, provided that such investigation and discovery shall be limited to the claimant's status as a Class Member and the validity and amount of the claimant's claim. In connection with processing the Proofs of Claim, no discovery shall be allowed on the merits of the Action or the Settlement.

**AA242**

## TERMS OF THE PRELIMINARY APPROVAL ORDER

41.     Concurrently with its application for preliminary Court approval of the Settlement contemplated by this Stipulation and promptly upon execution of this Stipulation, Lead Counsel and Defendants' Counsel shall jointly apply to the Court for entry of the Preliminary Approval Order, which shall be substantially in the form attached hereto as Exhibit A.  The Preliminary Approval Order will, *inter alia*, set the date for the Settlement Hearing and prescribe the method for giving notice of the Settlement to the Class.

42.     Within ten (10) days of the entry of the Preliminary Approval Order by the Court, Aéropostale shall use its best efforts to provide, or cause to be provided, to Lead Counsel or the Claims Administrator a searchable list in electronic form of the names and addresses of Persons that were record holders of Aéropostale Common Stock during the Class Period.

## TERMS OF THE JUDGMENT

43.     If the Settlement contemplated by this Stipulation is approved by the Court, Lead Counsel and Defendants' Counsel shall jointly request that the Court enter a Judgment substantially in the form annexed hereto as Exhibit B.

44.     The proposed Judgment shall include, and the Parties agree to the entry by the Court of an order including, a Bar Order that contains the following provisions:

(a)     In accordance with 15 U.S.C. § 78u-4(f)(7)(A), upon the Effective Date, except as provided in subparagraph (b), any and all Persons are permanently barred and enjoined, to the fullest extent permitted by law, from commencing, prosecuting, or asserting any and all claims for contribution or indemnity (or any other claim when the alleged injury to that Person is that Person's actual or threatened liability to the Class or a Class Member in the Action) based upon, relating to, or arising out of the Released Plaintiffs' Claims, against each and every one of the Released Defendant Parties, whether arising under state, federal, common, or foreign law, as

**AA243**

claims, cross-claims, counterclaims, or third-party claims, in this Action or a separate action, in this Court, any federal or state court, or in any other court, arbitration proceeding, administrative proceeding, or other forum, whether in the United States or elsewhere; and, except as provided in subparagraph (b), the Released Defendant Parties are permanently barred and enjoined, to the fullest extent permitted by law, from commencing, prosecuting, or asserting any and all claims for contribution or indemnity (or any other claim when the alleged injury to the Released Defendant Party is that Released Defendant Party's actual or threatened liability to the Class or a Class Member in the Action) based upon, relating to, or arising out of the Released Plaintiffs' Claims, against any Person, other than a Person whose liability to the Class has been extinguished pursuant to the Settlement and the Judgment, whether arising under state, federal, common, or foreign law, as claims, cross-claims, counterclaims, or third-party claims, in this Action or a separate action, in this Court, any federal or state court, or in any other court, arbitration proceeding, administrative proceeding, or other forum, whether in the United States or elsewhere.

        (b)     Notwithstanding the Bar Order in subparagraph (a), and for the avoidance of doubt, nothing in this Judgment shall (i) bar any action by any of the Parties to enforce or effectuate the terms of this Stipulation, the Settlement, the Preliminary Approval Order, or the Judgment or Alternative Judgment; or (ii) bar any action by the Released Defendant Parties to enforce the protections from liability granted to them under this Stipulation; or (iii) bar the Released Defendant Parties from asserting any claims against their own insurers.

      45.     The proposed Judgment shall also contain the releases provided in Paragraphs 3-4 of this Stipulation and the following provisions:

**AA244**

       (a)     Upon the Effective Date, Lead Plaintiff and each and every other Class Member, regardless of whether that Person actually submits a Proof of Claim, seeks or obtains a distribution from the Net Settlement Fund, or is entitled to receive a distribution under the Plan of Allocation, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom) (i) have and shall be deemed to have fully, finally, and forever waived, released, relinquished, discharged, and dismissed each and every one of the Released Plaintiffs' Claims against each and every one of the Released Defendant Parties; (ii) have and be deemed to have covenanted not to sue, directly or indirectly, any of the Released Defendant Parties with respect to any and all of the Released Plaintiffs' Claims; and (iii) shall forever be barred and enjoined from directly or indirectly filing, commencing, instituting, prosecuting, maintaining, intervening in, participating in (as a class member or otherwise) (expect as a witness compelled by subpoena or court order and no remuneration is received for such action(s)), or receiving any benefits or other relief, from any action, suit, cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, whether in the United States or elsewhere, on their own behalf or in a representative capacity, that is based upon, arises out of, or relates to any and all of the Released Plaintiffs' Claims against any and all of the Released Defendant Parties.

       (b)     Upon the Effective Date, the Released Defendant Parties shall be deemed to have fully, finally, and forever waived, released, discharged, and dismissed each and every one of the Released Defendants' Claims against each and every one of the Released Plaintiff

AA245

Parties and shall forever be barred and enjoined from commencing, instituting, prosecuting, or maintaining any of the Released Defendants' Claims against any of the Released Plaintiff Parties.

46.     Nothing in this Stipulation shall prevent any Person that timely submits a valid request for exclusion from commencing, prosecuting, or asserting any of the Released Plaintiffs' Claims against any of the Released Defendant Parties.  If any such Person commences, prosecutes, or asserts any of the Released Plaintiffs' Claims against any of the Released Defendant Parties, nothing in this Stipulation shall prevent the Released Defendant Parties from asserting any claim of any kind against such Person, including any of the Released Defendants' Claims, or from seeking contribution or indemnity from any Person, including another Released Defendant Party, in respect of the claim of that Person who is excluded from the Class pursuant to a timely and valid request for exclusion.

## EFFECTIVE DATE OF SETTLEMENT

47.     The Effective Date of this Settlement shall be the first business day on which all of the following shall have occurred or been waived:

(a)     entry of the Preliminary Approval Order, which shall be in all material respects substantially in the form set forth in Exhibit A annexed hereto;

(b)     payment of the Settlement Amount into the Escrow Account;

(c)     approval by the Court of the Settlement, following notice to the Class and the Settlement Hearing, as prescribed by Rule 23 of the Federal Rules of Civil Procedure;

(d)     a Judgment, which shall be in all material respects substantially in the form set forth in Exhibit B annexed hereto, has been entered by the Court and has become Final; or, in the event that an Alternative Judgment has been entered and none of the Parties elects to

**AA246**

terminate the Settlement by reason of such variance, the Alternative Judgment has become Final; and

        (e)     expiration of the time for Lead Plaintiff and Defendants, as applicable, to exercise their termination rights set forth in Paragraphs 49-56 of this Stipulation and/or the Supplemental Agreement (as defined below).

48.     For the avoidance of doubt, the time set forth in Paragraph 47 for the Effective Date to occur shall not be affected in any respect whatsoever by any appeal or proceeding seeking judicial review pertaining to: (i) Court approval of the Plan of Allocation; (ii) the Fee and Expense Application; or (iii) the Court's findings and/or conclusions under Section 21D(c)(1) of the Exchange Act, 15 U.S.C. § 78u-4(c)(1).

## **TERMINATION**

49.     Defendants and Lead Plaintiff shall have the right to terminate the Settlement and this Stipulation by providing written notice of their election to do so ("Termination Notice"), through counsel, to all other Parties hereto within fourteen (14) calendar days of: (i) the Court's Final refusal to enter the Preliminary Approval Order in any material respect; (ii) the Court's Final refusal to approve this Stipulation or any material part of it including, without limitation, by making any material changes to the releases or Bar Order set forth in Paragraphs 3-5 and 44-45; (iii) the Court's Final refusal to enter the Judgment in any material respect including, without limitation by making any material changes to the releases or Bar Order set forth in Paragraphs 3-4 and 44-45; or (iv) the date upon which the Judgment or Alternative Judgment is vacated, modified or reversed in any material respect by a Final order of the United States Court of Appeals or the Supreme Court of the United States.

**AA247**

50. For the avoidance of doubt, Lead Plaintiff shall not have the right to terminate the Settlement due to any decision, ruling, or order respecting an application for attorneys' fees or litigation expenses or any plan of allocation.

51. Simultaneously herewith, Defendants' Counsel and Lead Counsel are executing a Confidential Supplemental Agreement (the "Supplemental Agreement"). The Supplemental Agreement sets forth certain conditions under which Defendants shall have the option, which must be exercised unanimously, to terminate the Settlement and render this Stipulation null and void in the event that requests for exclusion from the Class exceed certain agreed-upon criteria (the "Termination Threshold"). The Parties agree to maintain the confidentiality of the Termination Threshold in the Supplemental Agreement, which, unless otherwise ordered by the Court, shall not be filed with the Court, but it may be examined *in camera*, if so requested by the Court (unless otherwise required by court rule).

52. Lead Plaintiff shall have the right to terminate the Settlement in the event that Aéropostale does not pay, or cause to be paid, the Settlement Amount in the time period provided for in Paragraph 7 of this Stipulation, by providing written notice of its election to terminate to all other Parties and, thereafter, Aéropostale fails to pay, or cause to be paid, the Settlement Amount within fourteen (14) calendar days of such written notice.

53. If, before the Judgment or Alternative Judgment becomes Final, a court of competent jurisdiction determines that the transfer of money or any portion thereof to the Settlement Fund by or on behalf of a Defendant to be a preference, voidable transfer, fraudulent transfer, or similar transaction and any portion thereof is required to be returned by court order or under applicable law, and such amount is not deposited into the Settlement Fund by others within thirty (30) calendar days from the date of such determination, then, at the election of Lead

AA248

Plaintiff, the Parties shall jointly move the Court to vacate and set aside the Judgment or Alternative Judgment entered, and the Parties shall be restored to their respective litigation positions immediately prior to the date of the mediation, October 29, 2013.

54.     If an option to withdraw from and terminate this Stipulation and Settlement arises under any of Paragraphs 49-52 above: (i) neither the Defendants nor Lead Plaintiff (as the case may be) will be required for any reason, or under any circumstance, to exercise that option; and (ii) any exercise of that option shall be made in good faith.

55.     In the event the Settlement is terminated in accordance with this Stipulation, the Settlement is not approved by the Court, the Effective Date does not occur, or the Settlement otherwise fails for any reason, then: (i) any Settlement Fund, including the Settlement Amount together with any accrued interest or earnings thereon, less any Taxes paid or due, and less Notice and Administration Expenses actually incurred and paid or payable, shall be returned or refunded to the Person(s) that made the deposit(s) within twenty (20) business days after written notification of such event(s); (ii) Lead Counsel shall refund the amount of any award of attorneys' fees and/or litigation expenses already paid to Lead Counsel from the Settlement Fund, plus accrued earnings at the same net rate and for the same periods as is earned by the Settlement Fund, no later than thirty (30) calendar days after receiving notice of the events in Paragraph 15; (iii) the Settlement shall be null, void, and without prejudice, and none of its terms shall have any further force or effect or be enforceable except as specifically provided herein; (iv) the Parties shall be deemed to have reverted to their respective litigation positions in the Action immediately prior to the date of the mediation, October 29, 2013; (v) the Parties in the Action shall proceed in all respects as if this Stipulation had not been entered and all negotiations, discussions, acts, Court orders, and other proceedings in connection therewith

**AA249**

treated as if they never occurred or existed; (vi) any judgment(s) or order(s) entered by the Court in accordance with and a result of the terms of this Stipulation and Settlement shall be treated as vacated, *nunc pro tunc*; and (vii) the facts and terms of this Stipulation, or any aspect of the discussions or negotiations leading to this Stipulation, shall not be admissible in this Action or any other action, or used in any court filings, depositions, at trial, or otherwise.

56.     In the event the Settlement is terminated in accordance with this Stipulation, the Settlement is not approved by the Court, the Effective Date does not occur, or the Settlement otherwise fails for any reason, the Escrow Agent or its designee shall, at the request of Aéropostale, apply for any tax refund owed on the amounts in the Settlement Fund and pay the proceeds, less Notice and Administration Expenses actually  incurred in connection with such application(s), for refund to the Person(s) that made the deposit(s) or as otherwise directed by Defendants' Counsel.

57.     If either of the Parties terminates the Settlement and this Stipulation (whether in accordance with the provisions hereof or otherwise) but the other disputes the basis for that termination, the Parties agree that (i) in the first instance, they shall consult with Judge Weinstein (or, if he is not available, a mediator agreed upon by the Parties) in a good-faith effort to achieve a mediated resolution of the dispute; and (ii) if that mediation is unsuccessful, then they shall submit that dispute to the Court, which shall have exclusive jurisdiction to resolve and rule on the right of the party seeking termination to terminate the Settlement and this Stipulation.

## NO ADMISSION OF WRONGDOING

58.     Defendants have denied and continue to deny, *inter alia*, that Lead Plaintiff and putative Class Members have suffered any or all damages alleged in the Complaint; that the price of Aéropostale Common Stock was artificially inflated by reason of any alleged misrepresentations, omissions, or otherwise; that Defendants acted fraudulently or wrongfully in

**AA250**

any way; or that the alleged harm suffered by Lead Plaintiff and other Class Members, if any, was causally linked to any alleged misrepresentations or omissions.  In addition, Defendants maintain that they have meritorious defenses to all claims alleged in the Action.

59.     Nonetheless, Defendants have concluded that further litigation of the Action, especially given the complexity of cases such as this one, would be protracted, burdensome, and expensive, and that it is desirable and beneficial to them that they secure releases to the fullest extent permitted by law and that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Stipulation.

60.     Except as set forth in Paragraph 61 below, this Stipulation, whether or not consummated, and whether or not approved by the Court, and any discussions, negotiations, acts performed, proceedings, communications, drafts, documents, or agreements relating to this Stipulation, the Settlement, and any matters arising in connection with settlement discussions or negotiations, proceedings, or agreements, shall not be offered or received against or to the prejudice of the Parties for any purpose other than in an action to enforce the terms hereof, and in particular:

(a)     do not constitute, shall not be described as, construed as, or offered or received against, or to the prejudice of Defendants as evidence of, or deemed to be evidence of, any presumption, concession, or admission by any Defendants with respect to (i) the truth of any allegation by Lead Plaintiff on behalf of the Class or in any complaint in the Action; (ii) the validity of any claim that has been or could have been asserted in the Action or in any litigation or proceeding in any forum, including but not limited to the Released Plaintiffs' Claims; (iii) the deficiency of any defense that has been or could have been asserted in the Action or in any other

AA251

litigation or proceeding in any forum; or (iv) of any liability, damages, negligence, fault, or wrongdoing of the Defendants or any Person whatsoever;

(b)     do not constitute, shall not be described as, construed as, or offered or received against or to the prejudice of Defendants as evidence of, or deemed to be evidence of, any presumption, concession, or admission of any fault, misrepresentation, or omission with respect to any statement or written document approved or made by Defendants, or against or to the prejudice of Lead Plaintiff or any Class Member as evidence of any infirmity in the claims of Lead Plaintiff or the other Class Member;

(c)     do not constitute, shall not be described as, construed as, or offered or received against or to the prejudice of Defendants, Lead Plaintiff, or any Class Member, as evidence of, or deemed to be evidence of, any presumption, concession, or admission with respect to any liability, damages, negligence, fault, infirmity, or wrongdoing, or in any way referred to for any other reason against or to the prejudice of any of the Parties, in any other civil, criminal, or administrative action or proceeding;

(d)     do not constitute, shall not be described as, construed as, or offered or received against or to the prejudice of Defendants, Lead Plaintiff, or any Class Member, as evidence of (or deemed to be evidence of) any presumption, concession, or admission that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial; and

(e)     do not constitute, shall not be described as, construed as, or offered or received against or to the prejudice of Lead Plaintiff or any Class Member, as evidence of, or deemed to be evidence of, any presumption, concession, or admission that any of their claims are

AA252

without merit or infirm or that damages recoverable under the Complaint would not have exceeded the Settlement Amount.

61.     Notwithstanding Paragraph 60, the Released Defendant Parties and Released Plaintiff Parties may file this Stipulation and/or the Judgment or Alternative Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, statute of limitations, statute of repose, good-faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim, or to effectuate any liability protection granted to them. The Released Defendant Parties and Released Plaintiff Parties may file or refer to this Stipulation and/or the Judgment or Alternative Judgment in any action that may be brought to enforce the terms of this Stipulation and/or the Judgment or Alternative Judgment. All Released Defendant Parties and Released Plaintiff Parties submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement.

## MISCELLANEOUS PROVISIONS

62.     All of the exhibits to the Stipulation, except any plan of allocation and the Supplemental Agreement, are material and integral parts hereof and are fully incorporated herein by reference.

63.     Defendants warrant that, at the time of payment of the Settlement Amount, Defendants will not be insolvent, nor will payment, if made by Defendants themselves, render Defendants insolvent, within the meaning of and/or for the purposes of the United States Bankruptcy Code, including Sections 101 and 547 thereof.

64.     Pending final determination of whether the Settlement should be approved, Lead Plaintiff, all Class Members, and each of them, and anyone who acts or purports to act on their behalf, shall not institute, commence, participate in, or prosecute any action or proceeding that

**AA253**

asserts, whether directly or indirectly, any of Released Plaintiffs' Claims against the Released Defendant Parties.

65.    The Parties intend the Settlement to be the full, final, and complete resolution of all claims asserted or which could have been asserted by the Parties with respect to the Released Claims.  The Parties agree that the amount paid and the other terms of the Settlement were negotiated at arm's-length and in good faith by the Parties and their respective counsel in connection with a mediation conducted under the auspices of Judge Weinstein, and reflect a settlement that was reached voluntarily based upon adequate information and after consultation with experienced legal counsel.

66.    Accordingly, the Parties agree not to assert in any forum that the Action was brought, prosecuted, or defended in bad faith or without a reasonable basis.  The Parties and their counsel agree that each has complied fully with Rule 11 of the Federal Rules of Civil Procedure in connection with the maintenance, prosecution, defense, and settlement of the Action and agree not to make any applications for sanctions, pursuant to Rule 11 or other court rule or statute, with respect to any claims or defenses in this Action.

67.    The Parties agree that the terms of this Stipulation and the fact that it has been executed are strictly confidential until this Stipulation has been filed with the Court, except to the extent required by law or as mutually agreed to by the Parties hereto in writing.

68.    While maintaining their position that the claims asserted in the Action are meritorious, Lead Plaintiff and Lead Counsel shall not make any public statements or statements (whether or not for attribution) that disparage the business, conduct, or reputation of any Defendants based on the subject matter of the Action, provided that this sentence does not apply to statements in any judicial proceeding.  While maintaining their position that the claims

AA254

asserted in the Action are not meritorious, Defendants and Defendants' Counsel shall not make any public statements or statements (whether or not for attribution) that disparage the business, conduct, or reputation of Lead Plaintiff or Lead Counsel based on the subject matter of the Action, provided that this sentence does not apply to statements in any judicial proceeding. In all events, Lead Plaintiff, Lead Counsel, and Defendants and Defendants' Counsel, shall not make any accusations of wrongful or actionable conduct by any party to the Action concerning the resolution of the Action, and shall not otherwise suggest that the Settlement constitutes an admission of any claim or defense alleged. The obligations in this Paragraph shall survive and remain in full force and effect and be binding in all respects on the Parties even if this Stipulation is terminated, the Settlement is not approved, or the Effective Date does not occur.

69. This Stipulation, along with its exhibits, and the Supplemental Agreement, may not be modified or amended, nor may any of its provisions be waived, except by a writing signed by all Parties hereto or their successors.

70. The headings herein are used for the purpose of convenience only and are not meant to have legal effect.

71. The administration and consummation of the Settlement as embodied in this Stipulation shall be under the authority of the Court, and the Court shall retain jurisdiction for the purpose of entering orders providing for awards of attorneys' fees and any expenses, and implementing and enforcing the terms of this Stipulation.

72. Any condition contained in this Stipulation may be waived by the party entitled to enforce the condition in a writing signed by that party or his, her, or its counsel. The waiver by one Party of any breach of this Stipulation by any other Party shall not be deemed a waiver of any other prior, contemporaneous, or subsequent breach of this Stipulation.

AA255

73.     This Stipulation, its exhibits, and the Supplemental Agreement constitute the entire agreement between and among the Parties concerning the Settlement, and no representations, warranties, or inducements have been made by any Party concerning this Stipulation and its exhibits other than those contained and memorialized in such documents. In entering into this Stipulation, none of the Parties is relying on any promise, warranty, inducement, or representation other than those set forth in this Stipulation and Supplemental Agreement and the Parties disclaim the existence of any such promise, warranty, inducement, or representation.

74.     Nothing in the Stipulation, or the negotiations relating thereto, is intended to or shall be deemed to constitute a waiver of any applicable privilege or immunity, including, without limitation, attorney-client privilege, joint defense privilege, or work product protection.

75.     Without further order of the Court, the Parties may agree to reasonable extensions of time to carry out any of the provisions of this Stipulation.

76.     All designations and agreements made, or orders entered during the course of the Action relating to the confidentiality of documents or information shall survive and remain in full force and effect and be binding in all respects on the Parties even if this Stipulation is terminated, the Settlement is not approved, or the Effective Date does not occur.  Within sixty (60) days after receiving notice of entry of an order, judgment, or decree finally ending the Action, including without limitation any appeals therefrom, or the running of time to take such an appeal, if later, all persons having received Discovery Material, as defined in the Stipulation and Order for the Production and Use of Confidential Information, entered May 1, 2013, which shall survive this Stipulation and the Settlement, shall identify and destroy all such Discovery Material, including all copies thereof and material derived therefrom, or upon request of the

**AA256**

Producing Party, return such materials to the Producing Party or their counsel, and Lead Counsel shall confirm in writing that it has complied with the requirements of this Paragraph including, but not limited to, that notice was sent to any other Persons that have or had, at any point in time, access to such Discovery Material, and that all such Discovery Material, whether within the possession, custody, or control of Lead Plaintiff or other Persons, has been destroyed or returned.

77.    This Stipulation may be executed in one or more counterparts.  All executed counterparts and each of them shall be deemed to be one and the same instrument.  Signatures sent by facsimile or by pdf via e-mail shall be deemed originals.

78.    This Stipulation shall be binding when signed, but the Settlement shall be effective only on the condition that the Effective Date occurs.

79.    This Stipulation shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties.

80.    The construction, interpretation, operation, effect, and validity of this Stipulation, and all documents necessary to effectuate it, shall be governed by and construed according to the internal laws of the State of New York without regard to conflicts of laws, except to the extent that federal law requires that federal law govern.

81.    This Stipulation shall not be construed more strictly against one Party than another merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of the Parties, it being recognized that it is the result of arm's-length negotiations among the Parties, and all the Parties have contributed substantially and materially to the preparation of this Stipulation.

82.    All counsel and any other person executing this Stipulation and any of the exhibits hereto, or any related Settlement documents, warrant and represent that they have the

**AA257**

full authority to do so, and that they have the authority to take appropriate action required or permitted to be taken pursuant to the Stipulation to effectuate its terms.

83.     The Parties and their counsel agree to cooperate fully with one another in promptly seeking Court approval of the Settlement, and to agree promptly upon and execute all such other documentation as reasonably may be required to obtain Final approval by the Court of the Settlement.

84.     If any disputes arise out of the finalization of the settlement documentation or the Settlement itself prior to joint submission to the Court of the application for preliminary approval of the Settlement as set forth in Paragraphs 41-42 above, those disputes will be resolved by Judge Weinstein first by way of expedited telephonic mediation and, if unsuccessful, then by way of final, binding, non-appealable resolution.  This agreement to submit disputes to Judge Weinstein for binding resolution shall not apply to any attempts by any Party to alter any of the terms expressly agreed to in the Stipulation.

85.     The provisions of and obligations in Paragraphs 15, 60, 68 and 76 shall survive and remain in full force and effect and be binding in all respects on the Parties even if this Stipulation is terminated, the Settlement is not approved, or the Effective Date does not occur.

86.     Whenever this Stipulation requires or contemplates that a Party shall or may give notice to the other, notice shall be provided by electronic mail or next-day express delivery service as follows and shall be deemed effective upon such transmission or delivery, as set forth below:

If to Defendants, then to:

> Joseph S. Allerhand (joseph.allerhand@weil.com)
> Caroline H. Zalka (caroline.zalka@weil.com)
> Justin D. D'Aloia (justin.daloia@weil.com)
> **WEIL, GOTSHAL & MANGES LLP**

**AA258**

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

If to Lead Plaintiff, then to:

Jonathan Gardner (jgardner@labaton.com)
Mark S. Goldman (mgoldman@labaton.com)
Carol C. Villegas (cvillegas@labaton.com)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 1000
Telephone: (212) 907-0700

87.    Except as otherwise provided herein, each Party shall bear its own costs.

**IN WITNESS WHEREOF**, the Parties have caused this Stipulation to be executed, by their duly authorized attorneys, as of January 29, 2014.

LABATON SUCHAROW LLP

Jonathan Gardner
Eric J. Belfi
Mark S. Goldman
Carol C. Villegas
Matthew C. Moehlman
140 Broadway
New York, NY 10005
Tel:    (212) 907-0700
Fax:    (212) 818-0477
jgardner@labaton.com
ebelfi@labaton.com
mgoldman@labaton.com
cvillegas@labaton.com
mmoehlman@labaton.com

*Lead Counsel for Lead Plaintiff The City of
Providence*

AA259

WEIL, GOTSHAL & MANGES LLP

_____

Joseph S. Allerhand
Christopher L. Garcia
Caroline Hickey Zalka
Justin D. D'Aloia
767 Fifth Avenue
New York, New York 10153
Tel:    (212) 310-8000
Fax:    (212) 310-8007
joseph.allerhand@weil.com
christopher.garcia@weil.com
caroline.zalka@weil.com
justin.daloia@weil.com

*Attorneys for Defendants Aéropostale, Inc.,
Thomas P. Johnson and Marc D. Miller*

**AA260**

**Exhibit A-1**

AA261

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE CITY OF PROVIDENCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 11-CV-7132 (CM)(GWG) |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | NOTICE OF PENDENCY OF CLASS ACTION AND |
| AEROPOSTALE, INC., THOMAS P. JOHNSON and MARC D. MILLER, | ) ) ) | PROPOSED SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND EXPENSES |
| Defendants. | ) ) ) | |

**If you purchased or otherwise acquired the publicly traded common stock of Aéropostale, Inc. ("Aéropostale" or the "Company") from March 11, 2011 through August 18, 2011, inclusive (the "Class Period"), and were damaged thereby, you may be entitled to a payment from a class action settlement.**

*A federal court authorized this Notice. This is not a solicitation from a lawyer.*

The purpose of this Notice is to inform you of (1) the pendency of the above-captioned class action (the "Action"); (2) the proposed settlement of the Action; and (3) the hearing to be held by the Court to consider (a) whether the settlement should be approved; (b) the application by plaintiffs' counsel for attorneys' fees and expenses; and (c) certain other matters (the "Settlement Hearing"). This Notice describes important rights you may have and what steps you must take if you wish to participate in the settlement or wish to be excluded from the Class (defined below).[1]

- If approved by the Court, the Settlement will provide a $15 million cash settlement fund for the benefit of Class Members (after the deduction of Court-approved expenses and

---

[1] All capitalized terms not otherwise defined herein have the meanings set forth in the Stipulation and Agreement of Settlement (the "Stipulation"), dated as of January 29, 2014. To the extent there is any conflict between the definitions of capitalized terms in this Notice and the Stipulation, the definition in the Stipulation controls. A copy of the Stipulation is available by contacting the Claims Administrator or visiting its website, as more fully set forth herein.

**AA262**

fees) and will resolve all claims in the Action.

- The Settlement (1) resolves claims by the City of Providence ("Providence" or "Lead Plaintiff") that Aéropostale, Thomas P. Johnson, and Marc D. Miller ("Defendants") misled investors about Aéropostale's quarterly earnings guidance and inventory management between March 11, 2011 and August 18, 2011 (claims that Defendants deny), (2) avoids the costs and risks of continuing the litigation, (3) pays money to investors like you, and (4) releases Defendants from liability.

- Your legal rights may be affected whether you act or do not act. Read this Notice carefully.

- The Court will review the Settlement at the Settlement Hearing to be held on _____, 2014.

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM BY _____, 2014** | The only way to get a payment. |
| **EXCLUDE YOURSELF BY _____, 2014** | Get no payment. This is the only option that allows you to ever bring or be part of any other lawsuit about the Released Plaintiffs' Claims (defined below) against Defendants and the other Released Defendant Parties (defined below). |
| **OBJECT BY _____, 2014** | Write to the Court about why you do not like the Settlement, the proposed Plan of Allocation, and/or the request for attorneys' fees and expenses. If you object you will still be a member of the Class (defined below). |
| **GO TO A HEARING ON _____, 2014** | Ask to speak in Court about the Settlement at the Settlement Hearing. You do not need to appear at the Settlement Hearing in order to participate in the Settlement. |
| **DO NOTHING** | Get no payment. Give up your rights. |

- These rights and options—and the deadlines to exercise them—are explained more fully in this Notice.

2

**AA263**

- The Court in charge of this case still has to decide whether to approve the Settlement. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

If you have any questions about this Notice, the Settlement, or your eligibility to participate in the Settlement, please DO NOT contact the Court, Defendants, or their counsel. All questions should be directed to Lead Counsel or the Claims Administrator (*see* Question 24 below)

## SUMMARY OF THIS NOTICE

**(a)   Statement of Plaintiffs' Recovery**

Pursuant to this proposed Settlement, a Settlement Fund consisting of $15 million in cash ("Settlement Amount"), plus any accrued interest, has been established. Based on Lead Plaintiff's estimate of the number of shares of the publicly traded common stock of Aéropostale (CUSIP No. 0078651080 ("Aéropostale Common Stock") entitled to participate in the Settlement, and assuming that all such shares entitled to participate do so, Lead Plaintiff estimates an average recovery per allegedly damaged share of publicly traded common stock of Aéropostale of $0.50 per share, before deduction of Court-approved expenses, such as attorneys' fees and expenses and administrative costs.[2] A Class Member's actual recovery will be a portion of the Net Settlement Fund, determined by comparing his, her, or its "Recognized Loss" to the total Recognized Losses of all Class Members who timely submit acceptable Proofs of Claim, as described more fully herein. An individual Class Member's actual recovery will depend on, for example: (1) the total amount of Recognized Losses of other Class Members; (2) how many shares of Aéropostale Common Stock you purchased or acquired during the Class Period; (3) the purchase price(s) paid; (4) the date of the purchase(s); and (5) whether and when you sold

---

[2] An allegedly damaged share might have been traded more than once during the Class Period, and the average recovery indicated above represents the estimated average for each purchase or acquisition of a share that allegedly incurred damages.

**AA264**

your shares.  *See* the Plan of Allocation beginning on page [___] for information on your Recognized Loss.

**(b)**      **Statement of Potential Outcome if the Action Continued to Be Litigated**

The Parties disagree on both liability and damages and the average amount of damages, if any, that would be recoverable if Lead Plaintiff were to prevail on each claim alleged.  The issues on which the Parties disagree include, but are not limited to: (1) whether Defendants made any material misstatements or omissions in Aéropostale's public statements within the meaning of the federal securities laws; (2) whether Defendants acted with the required state of mind; (3) the amount by which Aéropostale Common Stock was allegedly artificially inflated (if at all) during the Class Period; (4) the extent to which the various matters that Lead Plaintiff alleged were false and misleading influenced (if at all) the trading price of Aéropostale Common Stock at various times during the Class Period; (5) whether any purchasers/acquirers of Aéropostale Common Stock have suffered damages as a result of the alleged misstatements and omissions in Aéropostale's public statements; (6) the extent of such damages, assuming they exist; (7) the appropriate economic model for measuring damages; and (8) the extent to which external factors, such as general market and industry conditions, influenced the trading price of Aéropostale Common Stock at various times during the Class Period.

Defendants have denied and continue to deny (1) all of the claims alleged on behalf of the Class, including all claims in the complaints filed in the Action; (2) all allegations of wrongdoing, fault, liability, or damages to Lead Plaintiff and/or the Class; and (3)  that they have committed any act or omission giving rise to any liability or violation of law,  including the federal securities laws..  Defendants believe that they acted at all times properly, in good faith, and consistent with their legal duties and obligations. While Lead Plaintiff believes that it has meritorious claims, it recognizes that there are significant obstacles in the way to recovery.

**(c)**      **Statement of Attorneys' Fees and Litigation Expenses Sought**

Labaton Sucharow LLP ("Lead Counsel") intends to make a motion asking the Court to award attorneys' fees not to exceed 33% of the Settlement Fund and approve payment of

**AA265**

litigation expenses incurred to date in prosecuting this Action in an amount not to exceed $650,000, plus any interest on such amounts at the same rate and for the same periods as earned by the Settlement Fund ("Fee and Expense Application"). Lead Counsel's Fee and Expense Application may include a request for an award to Lead Plaintiff for reimbursement of its reasonable costs and expenses, including lost wages, directly related to its representation of the Class in an amount not to exceed $15,000.

If the Court approves the Fee and Expense Application, the average cost per allegedly damaged share of Aéropostale Common Stock for such fees and expenses would be approximately per $0.19 per share. The average cost per damaged share will vary depending on the number of acceptable claims submitted. Lead Counsel have expended considerable time and effort in the prosecution of this litigation without receiving any payment, and have advanced the expenses of the litigation, such as the cost of experts, in the expectation that if they were successful in obtaining a recovery for the Class they would be paid from such recovery. In this type of litigation it is customary for counsel to be awarded a percentage of the common fund recovered as attorneys' fees.

**(d)     Further Information**

Further information regarding this Action and this Notice may be obtained by contacting the Claims Administrator: *The City of Providence v. Aeropostale, Inc.*, c/o _____, ___-___-____, www.___; or Lead Counsel: Labaton Sucharow LLP, (888) 219-6877, www.labaton.com, settlementquestions@labaton.com.

**Do Not Call the Court, Defendants, or Defendants' Counsel with Questions About the Settlement. All Questions Should Be Directed to Lead Counsel or the Claims Administrator.**

**(e)     Reasons for the Settlement**

For Lead Plaintiff, the principal reason for the Settlement is the immediate benefit to the Class. This benefit must be compared to the risk that no recovery might be achieved after anticipated motions for summary judgment and/or a contested trial and likely appeals, possibly years into the future.

**AA266**

Defendants have denied and continue to deny all allegations of wrongdoing or liability whatsoever and believe that they would ultimately prevail in the Action. They are entering into the Settlement solely to eliminate the burden, expense, uncertainty, and distraction of further litigation.

[END OF COVER PAGE]

## A.    BASIC INFORMATION

| 1.    Why did I get this notice package? |
| --- |

You or someone in your family may have purchased or otherwise acquired Aéropostale Common Stock during the period between March 11, 2011 and August 18, 2011, inclusive.

The Court in charge of the Action is the United States District Court for the Southern District of New York.  The lawsuit is known as *The City of Providence v. Aeropostale, Inc.*, No. 11-cv-07132 (CM)(GWG) (S.D.N.Y.) and is assigned to the Honorable Colleen McMahon, United States District Judge.  The people who sued are called plaintiffs, and the companies and persons they sued are called defendants.

Lead Plaintiff in the Action, representing the Class, is the City of Providence.  Defendants are Aéropostale, Thomas P. Johnson ("Johnson"), and Marc D. Miller ("Miller") (collectively, without Aéropostale, the "Individual Defendants".

The Court directed that this Notice be sent to potential Class Members because they have a right to know about a proposed settlement of a class action lawsuit, and about all of their options, before the Court decides whether to approve the Settlement.  The Court will review the Settlement at a Settlement Hearing on _____, 2014, at the United States District Court for the Southern District of New York in the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007-1312 at __:___ ___.m.  If the Court approves the Settlement, and after objections and appeals are resolved, a claims administrator appointed by the Court will make the payments that the Settlement allows.

**AA267**

This package explains the Action, the Settlement, Class Members' legal rights, what benefits are available, who is eligible for them, and how to get them.

| | |
|---|---|
| **2.** | **What is this lawsuit about and what has happened so far?** |

This Action was commenced on October 11, 2011, by the filing of a class action complaint in the United States District Court for the Southern District of New York against Defendants alleging that Defendants violated the federal securities laws.

On January 11, 2012, the Court appointed Lead Plaintiff, approved its selection of Lead Counsel to represent the putative class, and granted Lead Plaintiff permission to file an amended complaint within thirty (30) days.

Following a detailed investigation that included, among other things, the interviews of numerous former Aéropostale employees and review of Aéropostale's public statements, on February 10, 2012, Lead Plaintiff filed the operative Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint"). The Complaint principally alleges, among other things, that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") by making alleged misstatements and omissions during the Class Period regarding the Company's quarterly earnings guidance and inventory management. The Complaint further alleges that Lead Plaintiff and other Class Members purchased or otherwise acquired Aéropostale Common Stock during the Class Period at artificially-inflated prices and were damaged thereby.

On March 12, 2012, Defendants filed a motion to dismiss the Complaint, which Lead Plaintiff opposed on March 26, 2012. On April 2, 2012, Defendants filed a reply brief in further support of their motion. On March 25, 2013, the Court denied Defendants' motion to dismiss.

**AA268**

On April 8, 2013, Defendants filed an Answer to the Complaint, denying its material allegations and alleging affirmative defenses thereto. On April 24, 2013, Lead Plaintiff moved for an order certifying the Action to proceed as a class action. Shortly thereafter, merits and class-related discovery commenced, including the production of documents by Defendants, Lead Plaintiff, and third parties, which resulted in the production of over 1 million pages of documents by Defendants, and depositions of Lead Plaintiff, Defendants, and third parties.

On July 10, 2013, Lead Plaintiff and Defendants jointly filed a Stipulation and Order Regarding Class Certification (the "Class Certification Order"). On July 17, 2013, as set forth in the Class Certification Order, the Court certified the Action to proceed as a class action on behalf of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Aéropostale during the Class Period and were damaged thereby (the "Class").

Defendants and Lead Plaintiff engaged the Honorable Daniel Weinstein (Ret.), a well-respected and highly experienced mediator, to assist them in exploring a potential negotiated resolution of the Action. On October 29, 2013, Lead Plaintiff and Defendants met with Judge Weinstein in an attempt to reach a settlement. The mediation session involved an extended effort to settle the Action and was informed by the exchange of mediation statements in advance of the session, as well as by presentations by counsel for both Lead Plaintiff and Defendants during the session. Following a full day of arm's-length and mediated negotiation under the auspices of Judge Weinstein, Lead Plaintiff and Defendants reached an agreement in principle to settle the Action.

Before agreeing to the Settlement, Lead Plaintiff, through Lead Counsel, conducted a thorough investigation relating to the claims, defenses, and underlying events and transactions that are the subject of the Action. This process included reviewing and analyzing: (i) documents filed publicly by the Company with the SEC; (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and Defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) over

**AA269**

1 million pages of documents produced by Aéropostale; (vi) over 300,000 pages of documents produced by third parties, including work papers produced by Aéropostale's independent registered public accounting firm during the Class Period, emails and documents produced by Aéropostale's vendors, and emails and documents produced by financial analysts that followed the Company during the Class Period; and (vii) the applicable law governing the claims and potential defenses. Lead Counsel also interviewed former Aéropostale employees and other persons with relevant knowledge, and consulted with experts on loss causation, damages, accounting, and retail industry issues. Thus, at the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and weaknesses of the Parties' positions.

On _____ __, 2014, the Court entered the Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement, which, among other things, preliminarily approved the Settlement, authorized that this Notice be sent to potential Class Members, and scheduled the Settlement Hearing to consider whether to grant final approval to the Settlement.

| | |
|---|---|
| **3.** | **Why is this a class action?** |

In a class action, one or more people called class representatives (in this case Lead Plaintiff) sue on behalf of people who have similar claims. The people who have similar claims are known as class members. Here, the Court certified the Action to proceed as a class action on behalf of the Class. Bringing a case as a class action allows adjudication of many similar claims of persons and entities that might be economically too small to bring individually. One court resolves the issues for all class members, except for those who properly exclude themselves from the class.

**AA270**

| 4. | What are the reasons for a settlement? |

The Court did not finally decide in favor of Lead Plaintiff or Defendants. Instead, both sides agreed to a settlement with the assistance of Judge Weinstein.

Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants have merit. Lead Plaintiff and Lead Counsel recognize, however, the expense and length of continued proceedings necessary to pursue their claims against Defendants through trial and appeals, as well as the difficulties in establishing liability. Lead Plaintiff and Lead Counsel have considered the uncertain outcome and the risk of any litigation, especially in complex lawsuits like this one, as well as the difficulties and delays inherent in such litigation. For example, Defendants have raised a number of arguments and defenses (which they would raise at summary judgment and trial), including that Defendants did not make any material misstatements or omissions, the alleged misstatements and omissions were not material, that Lead Plaintiff would not be able to establish that Defendants acted with the requisite fraudulent intent, and that Class Members, including Lead Plaintiff, did not rely on the alleged misstatements and omissions when they purchased Aéropostale Common Stock during the Class Period. Even assuming Lead Plaintiff could establish liability, Defendants maintained that any potential investment losses suffered by Lead Plaintiff and the Class were caused by external, independent factors, and not caused by Defendants' alleged conduct. In the absence of a settlement, the Parties would present factual and expert testimony on each of these issues, and there is considerable risk that the Court or a jury would resolve the inevitable "battle of the experts" against Lead Plaintiff and the Class.

In light of the amount of the Settlement and the immediate recovery to the Class, Lead Plaintiff and Lead Counsel believe that the proposed Settlement is fair, reasonable, and adequate, and in the best interests of the Class. The Settlement Amount, which totals $15 million in cash (less the

**AA271**

various deductions described in this Notice), provides substantial benefits now as compared to the risk that a similar or smaller recovery would be achieved after trial and appeal, possibly years in the future, or that no recovery would be achieved at all.

Defendants have denied and continue to deny (1) all of the claims alleged by Lead Plaintiff on behalf of the Class; (2) any and all allegations of wrongdoing, fault, liability, or damages to Lead Plaintiff and/or the Class; and (3) that they have committed any act or omission giving rise to any liability or violation of law, including the federal securities laws.  Although Defendants believe that the claims asserted by Lead Plaintiff on behalf of the Class lack merit and that they would prevail at summary judgment, or at trial, Defendants agreed to enter into the Settlement solely to eliminate the burden, expense, uncertainty, and distraction of further litigation.

## B.      WHO IS IN THE SETTLEMENT

To see if you will get money from this Settlement, you first have to decide if you are a Class Member.

| 5.      How do I know if I am part of the Settlement? |
| --- |

The Court directed that everyone who fits the following description is a "Class Member," unless they are an excluded person or they take steps to exclude themselves from the Class (*see* Question 13 below): all persons and entities that purchased or otherwise acquired the publicly traded common stock of Aéropostale from March 11, 2011 through August 18, 2011, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

| 6.      Are there exceptions to being included in the Class? |
| --- |

Excluded from the Class are (i) Defendants; (ii) members of the Immediate Family of the Individual Defendants; (iii) any person who was an Officer or Director of Aéropostale during the Class Period; (iv) any firm, trust, partnership, corporation, or other entity in which any

**AA272**

Defendant has or had a controlling interest during the Class Period; (v) the liability insurance carriers of Defendants' Directors and Officers, and any affiliates or subsidiaries thereof; and (vi) the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.  Also excluded from the Class is any Person that otherwise qualifies as a Class Member but properly excludes himself, herself, or itself by timely submitting a valid request for exclusion in accordance with the requirements explained in Question 13 below.

If one of your mutual funds purchased or acquired Aéropostale Common Stock during the Class Period, that alone does not make you a Class Member.  You are eligible to be a Class Member only if you individually purchased or acquired Aéropostale Common Stock during the Class Period.  Check your investment records or contact your broker to see if you have eligible purchases/acquisitions.

If you only sold Aéropostale Common Stock during the Class Period, your sale alone does not make you a Class Member.  You are eligible to be a Class Member only if you **purchased or otherwise acquired** Aéropostale Common Stock during the Class Period.

| 7. | What if I am still not sure if I am included? |
|---|---|

If you are still not sure whether you are included, you can ask for free help.  You can call ___-___-____ or visit **www.___** for more information.  Or you can fill out and return the Proof of Claim and Release form ("Proof of Claim"), described in Question 10, to see if you qualify.

## C.    THE SETTLEMENT BENEFITS—WHAT YOU GET

| 8. | What does the Settlement provide? |
|---|---|

In exchange for the Settlement and the release of the Released Plaintiffs' Claims (defined below) against the Released Defendant Parties (defined below), Defendants have agreed to create a $15 million cash fund, which will earn interest, to be divided, after deduction of Court-awarded

**AA273**

attorneys' fees and expenses, settlement administration costs, and any applicable taxes (the "Net Settlement Fund"), among all Class Members who send in valid and timely Proofs of Claim.

| 9. | **How much will my payment be?** |
|---|---|

Your share of the Net Settlement Fund will depend on several things, including: (1) the total amount of Recognized Losses of other Class Members; (2) how many shares of Aéropostale Common Stock you purchased or acquired during the Class Period; (3) how much you paid for them; (4) when you bought them; and (5) whether or when you sold your publicly traded common stock of Aéropostale, and, if so, for how much.

Your Recognized Loss will be calculated according to the formula shown below in the Plan of Allocation. It is unlikely that you will get a payment for your entire Recognized Loss, given the number of potential Class Members. After all Class Members have sent in their Proofs of Claim, the payment you get will be a portion of the Net Settlement Fund based on your Recognized Loss divided by the total of Recognized Losses of other Class Members. *See* the Plan of Allocation in Question 25 for more information on your Recognized Loss.

## D. HOW YOU GET A PAYMENT—SUBMITTING A PROOF OF CLAIM

| 10. | **How can I get a payment?** |
|---|---|

To qualify for a payment, you must submit a completed Proof of Claim. A Proof of Claim is being circulated with this Notice. You may also get a Proof of Claim on the Internet at the websites for the Claims Administrator or Lead Counsel: www.___.com or www.labaton.com. The Claims Administrator can also help you if you have questions about the Proof of Claim. Please read the instructions carefully, fill out the Proof of Claim, include all the documents the form asks for, sign it, and mail or submit it so that it is **postmarked or received no later than _____, 2014.**

**AA274**

| 11. | When will I receive my payment? |
|---|---|

The Court will hold a Settlement Hearing **on _____, 2014**, to decide, among other things, whether to approve the Settlement.  Even if the Court approves the Settlement, there may still be appeals, which can take time to resolve, perhaps more than a year.  It also takes time for all the Proofs of Claim to be processed.  All Proofs of Claim need to be postmarked or received no later than **_____, 2014**.

Once all the Proofs of Claim are processed and claims are calculated, Lead Counsel, without further notice to the Class, will apply to the Court for an order distributing the Net Settlement Fund to eligible Class Members.  Lead Counsel will also ask the Court to approve payment of the Claims Administrator's fees and expenses incurred in connection with giving notice and administering the Settlement.  Please be patient.

| 12. | What am I giving up to get a payment and by staying in the Class? |
|---|---|

Unless you exclude yourself (described more fully in Question 13), you will stay in the Class, which means that upon the "Effective Date" you will release all "Released Plaintiffs' Claims" (as defined below) against the "Released Defendant Parties" (as defined below).

"Released Party" or "Released Parties" means individually and collectively the Released Defendant Parties and the Released Plaintiff Parties.

"Released Defendant Party" or "Released Defendant Parties" means Defendants, their past or present or future subsidiaries, parents, affiliates, principals, successors and predecessors, assigns, Officers, Directors, trustees, general partners, limited partners, agents, fiduciaries, contractors, employees, attorneys, auditors, insurers; the spouses, members of the Immediate Families, representatives, and heirs of the Individual Defendants, as well as any trust of which any Individual Defendant is the settlor or which is for the benefit of any of their Immediate Family

**AA275**

members; any Person in which any Defendants have a controlling interest; and any of the legal representatives, heirs, successors in interest, or assigns of the Defendants.

"Released Plaintiff Party" or "Released Plaintiff Parties" means Lead Plaintiff, Lead Counsel, and each and every Class Member, regardless of whether that person actually submits a Proof of Claim, seeks or obtains a distribution from the Net Settlement Fund, is entitled to receive a distribution under the Plan of Allocation, or is entitled to receive payment from the Fee and Expense Application; their respective past, current, or future trustees, Officers, Directors, employees, contractors, auditors, principals, agents, attorneys, predecessors, successors, assigns, parents, subsidiaries, divisions, joint ventures, general or limited partners or partnerships, and limited liability companies; and the spouses, members of the Immediate Families, representatives, and heirs of any Released Plaintiff Party, as well as any trust of which any such Released Plaintiff Party is the settlor or which is for the benefit of any of their Immediate Family members; any Person in which any Released Plaintiff Party has a controlling interest; and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom), whether in whole or in part.

"Released Claims" means collectively Released Plaintiffs' Claims and Released Defendants' Claims

"Released Defendants' Claims" means all claims, rights, issues, controversies, causes of action, duties, obligations, demands, actions, debts, sums of money, suits, contracts, agreements, promises, damages, and liabilities of every kind, nature, and description, including both known claims and Unknown Claims (as defined below), whether arising under federal, state, or foreign law, or statutory, common, or administrative law, or any other law, rule, or regulation, whether asserted as claims, cross-claims, counterclaims, or third-party claims, whether fixed or contingent, choate or inchoate, accrued or not accrued, matured or unmatured, liquidated or

**AA276**

unliquidated, perfected or unperfected, whether class-wide or individual in nature, that previously existed, currently exist, or that exist as of the date of the Court's approval of the Settlement, or that may arise in the future, that the Released Defendant Parties could have asserted against any of the Released Plaintiff Parties that arise out of or relate to the commencement, prosecution, or settlement of the Action (other than claims to enforce the Settlement).

"Released Plaintiffs' Claims" means any and all claims, rights, issues, controversies, causes of action, duties, obligations, demands, actions, debts, sums of money, suits, contracts, agreements, promises, damages, and liabilities of every kind, nature, and description, including both known claims and Unknown Claims (defined below), whether arising under federal, state, foreign law, or statutory, common, or administrative law, or any other law, rule, or regulation, whether asserted as claims, cross-claims, counterclaims, or third-party claims, whether fixed or contingent, choate or inchoate, accrued or not accrued, matured or unmatured, liquidated or unliquidated, perfected or unperfected, whether class or individual in nature, that previously existed, currently exist, or that exist as of the date of the Court's approval of the Settlement, or that may arise in the future, that Lead Plaintiff or any other Class Member asserted or could have asserted in the Action or any other action or in any forum including, without limitation, any federal or state court, or in any other court, arbitration, administrative agency, or other forum in the United States or elsewhere, that in any way arise out of, are based upon, relate to, or are in connection with the claims, allegations, transactions, facts, events, acts, disclosures, statements, representations, or omissions or failures to act alleged, set forth, referred to, involved in any of the complaints filed in the Action, or which could have been raised in the Action, and that in any way arise out of, are based upon, relate to, or concern the purchase, acquisition, or sale of Aéropostale Common Stock during the Class Period. Released Claims do not include: (i) claims to enforce the Settlement; and (ii) any claims asserted in the lawsuit styled *Bell v. Geiger, et al.*, No. 652931/2011 (N.Y. Sup. Ct.).

**AA277**

"Unknown Claims" means any and all claims that Lead Plaintiff, each and every other Class Member, or the Released Defendant Parties do not know or suspect to exist in his, her, or its favor at the time of the release of the Released Claims, which if known by him, her, or it might have affected his, her, or its decision(s) with respect to the Settlement, including the decision to exclude himself, herself, or itself from the Class, or to object or not to object to any aspect of the Settlement. With respect to any and all Released Claims, Lead Plaintiff and each and every other Class Member, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom), and the Released Defendant Parties stipulate and agree that, upon the Effective Date, they each shall be deemed to have, and by operation of the Judgment or Alternative Judgment shall have, to the fullest extent permitted by law, expressly waived and relinquished any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code § 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Lead Plaintiff and each and every other Class Member, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom), and the Released Defendant Parties acknowledge that they may hereafter discover facts, legal theories, or authorities in addition to or different from those which he, she, or it now knows or believes to be true with respect to the subject matter of the Released Claims, but they each nevertheless intend

**AA278**

to and shall expressly, fully, finally, and forever settle and release, and upon the Effective Date and by operation of the Judgment or Alternative Judgment shall be deemed to have settled and released, fully, finally, and forever, any and all Released Claims as applicable, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts, legal theories, or authorities. Lead Plaintiff and the Released Defendant Parties acknowledge, and other Class Members, on behalf of themselves and each of their respective past, current, or future heirs, executors, trustees, administrators, predecessors, successors, representatives, agents, assigns, and any other Person who has the right, ability, standing, or capacity to assert, prosecute, or maintain on behalf of any Class Member, any of the Released Plaintiffs' Claims (or to obtain the proceeds of any recovery therefrom), by operation of law shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definition of Released Plaintiffs' Claims and Released Defendants' Claims was separately bargained for and was a material element of the Settlement.

The "Effective Date" will occur when an Order by the Court approving the Settlement becomes Final and is not subject to appeal as set out more fully in the Stipulation on file with the Court and available at www._____ or www.labaton.com.

If you remain a member of the Class, all of the Court's orders about the Settlement will apply to you and legally bind you.

## E. EXCLUDING YOURSELF FROM THE SETTLEMENT

If you do not want a payment from this Settlement, but you want to keep any right you may have to sue or continue to sue Defendants and other Released Defendant Parties, on your own, about

**AA279**

the Plaintiffs' Released Claims, then you must take steps to remove yourself from the Class. This is called excluding yourself from—or "opting out" of—the Class. Defendants may withdraw from and terminate the Settlement if requests for exclusion from the Class exceed certain agreed-upon criteria.

---

**13.     How do I get out of the proposed Settlement?**

---

To exclude yourself from the Class, you must send a signed letter by mail stating that you request to be "excluded from the Class in *The City of Providence v. Aéropostale, Inc.*, No. 11-cv-07132 (CM)(GWG) (S.D.N.Y.)." Your letter must state, the date(s), price(s), and number(s) of shares of all your purchases, acquisitions, and sales of Aéropostale Common Stock during the Class Period. In addition, you must include your name, address, telephone number, and your signature. You must submit your exclusion request by mail so that it is received **no later than _____, 2014**, to:

*Aéropostale Securities Action*

Claims Administrator

c/o _____

_____

_____

You cannot exclude yourself by telephone or by email. Your exclusion request must comply with these requirements in order to be valid. If you write to request to be excluded, you will not get any settlement payment, and you cannot object to the Settlement. You will not be legally bound by anything that happens in connection with this Settlement, and you may be able to sue (or continue to sue) Defendants or the other Released Defendant Parties in the future.

**AA280**

**14.    If I do not exclude myself, can I sue the Defendants or the other Released Defendant Parties for the same thing later?**

No.  Unless you exclude yourself, you give up any rights to sue Defendants and the other Released Defendant Parties for any and all Released Plaintiffs' Claims.  If you have a pending lawsuit speak to your lawyer in that case **immediately**.  **You must exclude yourself from *this* Class to continue your own lawsuit.**  Remember, the exclusion deadline is _____, **2014**.

**15.    If I exclude myself, can I get money from the proposed Settlement?**

No.  If you exclude yourself, do not send in a Proof of Claim to ask for any money.  But you may exercise any right you may have to sue, continue to sue, or be part of a different lawsuit against Defendants and the other Released Defendant Parties about the Released Plaintiffs' Claims.

## F.    THE LAWYERS REPRESENTING YOU

**16.    Do I have a lawyer in this case?**

The Court appointed the law firm of Labaton Sucharow LLP to represent all Class Members.  These lawyers are called Lead Counsel.  You will not be separately charged for these lawyers.  The Court will determine the amount of Lead Counsel's fees and expenses, which will be paid from the Settlement Fund.  If you want to be represented by your own lawyer, you may hire one at your own expense.

**17.    How will the lawyers be paid?**

Lead Counsel have not received any payment for their services in pursuing the claims against Defendants on behalf of the Class, nor have they been paid for their litigation expenses.  At the Settlement Hearing, or at such other time as the Court may order, Lead Counsel will ask the Court to award them, from the Settlement Fund, attorneys' fees of no more than 33% of the Settlement Fund, plus any interest on such amount at the same rate and for the same periods as

**AA281**

earned by the Settlement Fund, and litigation expenses (such as the cost of experts) that have been incurred in pursuing the Action. The request for litigation expenses will not exceed $650,000, plus interest on the expenses at the same rate as may be earned by the Settlement Fund.

### G.     OBJECTING TO THE SETTLEMENT

You can tell the Court that you do not agree with the Settlement or some part of it.

| **18.     How do I tell the Court that I do not like the proposed Settlement?** |
| --- |

If you are a Class Member you can object to the Settlement or any of its terms, the proposed Plan of Allocation, and/or the Fee and Expense Application by Lead Counsel. You may write to the Court setting out your objection. You may give reasons why you think the Court should not approve any part or all of the Settlement terms or arrangements. The Court will only consider your views if you file a proper written objection within the deadline and according to the following procedures.

To object, you must send a signed letter stating that you object to the proposed settlement in "*The City of Providence v. Aeropostale, Inc.*, No. 11-cv-07132 (CM)(GWG) (S.D.N.Y.)." Be sure to include your name, address, telephone number, and your signature, identify the date(s), price(s) and number(s) of shares of all purchases, acquisitions, and sales of Aéropostale Common Stock you made during the Class Period, and state the reason(s) why you object to the Settlement and which part(s) of the Settlement you object to. **Unless otherwise ordered by the Court, any Class Member who does not object in the manner described herein will be deemed to have waived any objection and shall be forever foreclosed from making any objection to the proposed settlement and the application for attorneys' fees and expenses.**

Your objection must be filed with the Court and mailed to all the following so that is received **no later than _____, 2014**:

**AA282**

**COURT:**

Clerk of the Court
United States District Court of the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

**LEAD COUNSEL:**

Jonathan Gardner
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005

**DEFENDANTS' COUNSEL:**

Joseph S. Allerhand
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

| 19. | What is the difference between objecting and seeking exclusion? |
|---|---|

Objecting is simply telling the Court that you do not like something about the proposed Settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you do not want to be part of the Class. If you exclude yourself, you have no basis to object because the Settlement no longer affects you.

## H.    THE COURT'S SETTLEMENT HEARING

The Court will hold a hearing to decide whether to approve the proposed Settlement. You may attend, and you may ask to speak, but you do not have to do so.

| 20. | When and where will the Court decide whether to approve the proposed Settlement? |
|---|---|

The Court will hold a Settlement Hearing at _____ __.m. on _____, **2014**, at the Daniel Patrick Moynihan United States Courthouse, Courtroom _____, 500 Pearl Street, New York, New York 10007-1312.

22

**AA283**

At this hearing, the Honorable Colleen McMahon will consider whether the Settlement is fair, reasonable, and adequate. The Court also will consider the proposed Plan of Allocation for the Net Settlement Fund and Lead Counsel's Fee and Expense Application. The Court will take into consideration any written objections filed in accordance with the instructions set out in Question 18 above. The Court also may listen to people who have properly indicated, within the deadline identified above, an intention to speak at the Settlement Hearing, but all decisions regarding the conduct of the Settlement Hearing will be made by the Court. *See* Question 22 for more information about speaking at the Settlement Hearing. After the Settlement Hearing, the Court will decide whether to approve the Settlement, and, if the Settlement is approved, how much attorneys' fees and expenses should be awarded. We do not know how long these decisions will take.

You should be aware that the Court may change the date and time of the Settlement Hearing without another notice being sent. If you want to come to the hearing, you should check the Claims Administrator's website at _____ or contact Lead Counsel before coming to be sure that the date and/or time has not changed.

---

### 21. Do I have to come to the Settlement Hearing?

No. Lead Counsel will answer questions the Court may have. But, you are welcome to come at your own expense. Class Members do not need to appear at the Settlement Hearing or take any other action to indicate their approval. If you submit an objection, you do not have to come to Court to talk about it. As long as you filed and sent your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it is not necessary.

---

### 22. May I speak at the Settlement Hearing?

If you object to the Settlement, you may ask the Court for permission to speak at the Settlement Hearing. To do so, you must include with your objection (*see* Question 18 above) a statement

**AA284**

stating that it is your "Notice of Intention to Appear in *The City of Providence v. Aeropostale, Inc.,* No. 11-cv-07132 (CM)(GWG) (S.D.N.Y.)." Persons who intend to object to the Settlement, the Plan of Allocation, and/or Lead Counsel's Fee and Expense Application and desire to present evidence at the Settlement Hearing must also include in their written objections the identity of any witness they may call to testify and exhibits they intend to introduce into evidence at the Settlement Hearing. You cannot speak at the Settlement Hearing if (1) you excluded yourself from the Class or (2) you have not provided written notice of your objection and intention to speak at the Settlement Hearing in accordance with the procedures described in Questions 18 and 22.

## I.    IF YOU DO NOTHING

| 23.    What happens if I do nothing at all? |
| --- |

If you do nothing and you are a member of the Class, you will get no money from this Settlement and you will be precluded from starting a lawsuit, continuing with a lawsuit, or being part of any other lawsuit against Defendants and the other Released Defendant Parties about the Released Plaintiffs' Claims, ever again. To share in the Net Settlement Fund you must submit a Proof of Claim (*see* Question 10). To start, continue or be a part of any *other* lawsuit against Defendants and the other Released Defendant Parties about the Released Plaintiffs' Claims in this case you *must* exclude yourself from the Class (*see* Question 13).

## J.    GETTING MORE INFORMATION

| 24.    Are there more details about the proposed Settlement? |
| --- |

This Notice summarizes the proposed Settlement. More details are in the Stipulation, dated _____ __, 2014.

You also can call the Claims Administrator toll free at ___-___-____; write to *Aéropostale Securities Action,* c/o _____, **Claims Administrator, _____, ____, __, _____;** or visit the

**AA285**

websites of the Claims Administrator or Lead Counsel at www.____ and www.labaton.com, where you can find answers to common questions about the Settlement, download copies of the Stipulation or Proof of Claim, and locate other information to help you determine whether you are a Class Member and whether you are eligible for a payment.

You may also review the Stipulation filed with the Court or documents filed in the case during business hours at the Office of the Clerk of the United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007-1312.

**Please Do Not Call the Court, Any of the Defendants, or Defendants' Counsel with Questions About the Settlement. All Questions Should Be Directed to Lead Counsel or the Claims Administrator**

### K.    PLAN OF ALLOCATION OF NET SETTLEMENT FUND AMONG CLASS MEMBERS

| **25.    How will my claim be calculated?** |
| --- |

The Net Settlement Fund will be distributed to Class Members according to the Plan of Allocation. The purpose of the Plan of Allocation is to distribute settlement proceeds equitably to those Class Members who suffered economic losses resulting from the alleged misrepresentations and omissions by Defendants during the Class Period.

The $15 million Settlement Amount and any interest it earns is called the Settlement Fund.  The Settlement Fund, minus all taxes, costs, fees and expenses is called the Net Settlement Fund. The Net Settlement Fund will be distributed according to the Plan of Allocation (described below) only to Class Members who timely submit valid Proofs of Claim that show a Recognized Loss ("Authorized Claimants"), and have an aggregate net trading loss on all Class Period transactions in Aéropostale Common Stock.  Class Members who do not timely submit valid Proofs of Claim will not share in the Net Settlement Fund, but will otherwise be bound by the terms of the Settlement and all orders and judgments entered in the Action and will give up any

**AA286**

right to prosecute the Released Plaintiffs' Claims in this Action or elsewhere. The Court may approve the Plan of Allocation, or modify it, without additional notice to the Class. Any order modifying the Plan of Allocation will be posted on the settlement website at: _____ and at www.labaton.com.

The Plan of Allocation is the basis upon which the Net Settlement Fund will be proportionately divided among all Authorized Claimants. Because the Net Settlement Fund is less than the total estimated losses allegedly suffered by Class Members, the formulas described below for calculating Recognized Losses are not intended to estimate the amount that will actually be paid to Authorized Claimants. The Claims Administrator will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Loss," as described below. The Plan of Allocation is not intended to estimate or represent the amount a Class Member may have been able to recover after trial. The Court will be asked to approve the Claims Administrator's determinations before the Net Settlement Fund is distributed to Authorized Claimants. **No distributions to Authorized Claimants who would receive less than $10.00 will be made, given the administrative expenses of processing and mailing such checks.**

Defendants, Defendants' Counsel, and all other Released Defendant Parties had no involvement in the proposed Plan of Allocation and will have no responsibility or liability whatsoever for the investment of the Settlement Fund, the distribution of the Net Settlement Fund, the Plan of Allocation, or the payment of any claim. Lead Plaintiff and Lead Counsel likewise will have no liability for their reasonable efforts to execute, administer, and distribute the Settlement.

The following Plan of Allocation reflects the allegations that the price of Aéropostale Common Stock was artificially inflated during the Class Period by reason of allegedly false and misleading statements made by Defendants about Aéropostale's earnings guidance and inventory management. Defendants deny that Class Members have suffered any damages as a result of any

**AA287**

alleged misrepresentation, omission, public statement or other action by Aéropostale during the Class Period; that the price of Aéropostale Common Stock was artificially inflated during the Class Period by reason of any alleged misrepresentation, omission, or otherwise; that Defendants acted fraudulently or wrongfully in any way; or that the alleged harm suffered by Lead Plaintiff and other Class Members, if any, was causally linked to any alleged misrepresentation or omission.

## A.  ADDITIONAL DEFINITIONS

This Plan is based on the following principles and additional definitions (listed alphabetically), among others:

1.  "Inflation" is the amount by which the price of Aéropostale common stock was allegedly overvalued on each day in the Class Period because of the alleged misrepresentations and omissions.

2.  "Inflation Loss" is the amount of loss calculated based on the amount of Inflation in the price of Aéropostale common stock based on the methodology described below.

3.  A "Net Trading Loss (Gain)" for each Claimant will be computed by adding up all Trading Losses and subtracting all Trading Gains for all transactions in Aéropostale common stock that qualify to participate in the Plan as described herein.

4.  The "PSLRA 90-Day Lookback Period" is the period from August 19, 2011 through November 16, 201, ninety calendar days beginning on the trading day following the end of the Class Period .

5.  The "PSLRA 90-Day Lookback Price" is the average of the closing prices for Aéropostale common stock over the PSLRA 90-Day Lookback Period and equals $12.55 per share.

6.  A "purchase" is the acquisition of Aéropostale common stock by any means other than a gift, inheritance, or operation of law (as discussed below) or a purchase transaction conducted for the purpose of covering a "short sale" transaction.

7.  "Purchase Amount" is the Purchase Price Per Share multiplied by the number of shares of Aéropostale common stock purchased in each transaction by a Claimant during the Class Period.

8.  "Purchase Price Per Share" is the amount paid per share by a Claimant to purchase shares of Aéropostale common stock.

**AA288**

9.     "Recognized Claim" is the amount of the Net Settlement Fund that an Authorized Claimant is entitled to after calculation of the Authorized Claimant's *pro rata* share of the Net Settlement Fund.

10.     "Recognized Loss" is the amount of a claim under this Plan and is the number used to calculate an Authorized Claimant's Recognized Claim.

11.     A "sale" is the disposition of Aéropostale common stock by any means other than a gift, inheritance or operation of law (as discussed below) or a "short sale" transaction.

12.     "Sale Price Per Share" is the amount received per share by a Claimant upon the sale of shares of Aéropostale common stock.

13.     "Sales Proceeds" equals the number of shares of Aéropostale common stock purchased in each transaction by a Claimant during the Class Period by a Claimant multiplied by: (i) Sale Price Per Share if sold during the Class Period or the PSLRA 90-Day Lookback Period; or (ii) the PSLRA 90-Day Lookback Price of $12.55 per share, if unsold at the end of the PSLRA 90-Day Lookback Period.

14.     A "Total Inflation Loss" for each Claimant will be computed by adding up all Inflation Losses for all transactions in Aéropostale common stock by such Claimant that qualify to participate in the Plan as described herein.

15.     "Trading Gain" means the amount by which the Sales Proceeds exceeds the Purchase Amount for each transaction by a Claimant in Aéropostale common stock.

16.     "Trading Loss" means the amount by which the Purchase Amount exceeds the Sales Proceeds for each transaction by a Claimant in Aéropostale common stock.

## B.  PRINCIPLES

1.     *Eligible Purchases*:  Claimants must have purchased or otherwise acquired shares of Aéropostale common stock between March 11, 2011 and August 18, 2011, inclusive (the Class Period).  Further, the market price of Aéropostale common stock purchased must have declined due to disclosure of the alleged misrepresentations and omissions.  Accordingly, in order for a Claimant to be eligible to share in the distribution, the shares of Aéropostale common stock must have been purchased during the Class Period and held until at least the close of trading on at least one day when the amount of Inflation in Aéropostale stock price was reduced (specifically, May 5, 2011, May 20, 2011, August 4, 2011, and August 19, 2011).  Also, the Claimant must have suffered a Net Trading Loss, as described below.

2.     *FIFO Matching*:  For purposes of computing Inflation Losses, and Trading Losses (Gains) for a Claimant's multiple purchases or sales of Aéropostale common stock, purchases will be matched to sales using the "first-in/first-out" ("FIFO") inventory method, which matches sales to purchases based on the dates of those transactions.  Specifically, when any Proof of Claim includes a sale of shares of Aéropostale common stock either during the Class Period or the PSLRA 90-Day Lookback Period, the earliest sale will be matched first against the

**AA289**

Claimant's opening position on the first day of the Class Period, if any, and then matched chronologically thereafter against each purchase or acquisition during the Class Period. Sales matched to shares of Aéropostale common stock from a Claimant's opening position are excluded from the calculation of Inflation Loss and Trading Loss (Gain). In addition, all sales prior to May 5, 2011 and purchases matched to such sales are excluded from the calculation of Inflation Loss. Note: Short sales and purchases to cover short sales (whether they occurred before, during, or after the Class Period) are not included when calculating Inflation Loss or Trading Loss (Gain).

3. *Effect of shares acquired from the exercise of call options*: Aéropostale common stock acquired during the Class Period through the exercise of an exchange-traded call option shall be treated as a purchase of Aéropostale common stock on the date of exercise. The purchase price paid for such stock shall be the closing price of Aéropostale common stock on the date of exercise.

4. *Effect of shares disposed of from the exercise of put options*: Aéropostale common stock delivered during the Class Period or the PSLRA 90-Day Lookback Period pursuant to the exercise of an exchange-traded put option shall be treated as a sale of Aéropostale common stock on the date of exercise. The sale price received for such stock shall be the closing price of Aéropostale common stock on the date of exercise.

5. *Effect of open-market purchases at prices lower than the lowest trading price for the day and open-market sales at prices higher than the highest trading price for the day*: Inflation Loss will be reduced dollar-for-dollar to the extent that: (i) shares of Aéropostale common stock were purchased or acquired at a price below the lowest trading or published price on the date during the Class Period on which the purchase or acquisition was made; or (ii) shares of Aéropostale common stock were sold at a price above the highest trading or published price on the date during the Class Period or the PSLRA 90-Day Lookback Period on which the sale was made.

6. *Treatment of the Acquisition or Disposition of Shares by Means of a Gift, Inheritance or Operation of Law*: The receipt or grant by gift, inheritance or operation of law of a share shall not be deemed a purchase, acquisition or sale for the calculation of a Claimant's Recognized Loss or Recognized Gain, nor shall such receipt or grant be deemed an assignment of any claim relating to the purchase/sale of any such share, unless (i) the donor or decedent purchased or acquired such share during the Class Period; (ii) no Proof of Claim was submitted on behalf of the donor, on behalf of the decedent, or by anyone else with respect to such share; and (iii) it is specifically so provided in the instrument of gift or assignment.

## C. COMPUTATION OF INFLATION LOSS AND TRADING LOSS

1. ***Inflation Loss***

For each purchase of Aéropostale common stock during the Class Period, the Inflation Loss for each purchase transaction will be computed (using FIFO matching of purchases to sales) as follows:

i) If purchased during the Class Period on or before May 4, 2011 and:

AA290

a)   *if sold on or before May 4, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the first corrective disclosure, the Inflation Loss for purchased shares matched to such sales is zero;

b)   *if sold on or after May 5, 2011, but on or before May 19, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the second corrective disclosure, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $4.43 per share, the amount of Inflation removed from Aéropostale stock price on May 5, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

c)   *if sold on or after May 20, 2011, but on or before August 3, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the third corrective disclosure, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $6.81 per share, the total amount of Inflation removed from Aéropostale stock price on May 5, 2011, and May 20, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

d)   *if sold on or after August 4, 2011, but on or before August 18, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the fourth and final corrective disclosure, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $9.94 per share, the total amount of Inflation removed from Aéropostale stock price on May 5, 2011, May 20, 2011, and August 4, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

e)   *if sold on or after August 19, 2011, but on or before November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $11.47 per share, the total amount of Inflation removed from Aéropostale stock price on May 5, 2011, May 20, 2011, August 4, 2011, and August 19, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

f)   *if held as of the close of trading on November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such shares held in such transaction multiplied by the lesser of: (i) $11.47 per share, the total amount of

**AA291**

Inflation removed from Aéropostale stock price on May 5, 2011, May 20, 2011, August 4, 2011, and August 19, 2011; or (iii) the difference between the purchase price per share and the PSLRA 90-Day Lookback Price of $12.55 per share.

ii) If purchased on or after May 5, 2011, but on or before May 19, 2011, and:

a) *if* sold *on or before May 19, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the second corrective disclosure, the Inflation Loss for purchased shares matched to such sales is zero;

b) *if sold on or after May 20, 2011, but on or before August 3, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the third corrective disclosure, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $2.38 per share, the amount of Inflation removed from Aéropostale stock price on May 20, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

c) *if sold on or after August 4, 2011, but on or before August 18, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the fourth and final corrective disclosure, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $5.51 per share, the total amount of Inflation removed from Aéropostale stock price on May 20, 2011, and August 4, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

d) *if sold on or after August 19, 2011, but on or before November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $7.04 per share, the total amount of Inflation removed from Aéropostale stock price on May 20, 2011, August 4, 2011, and August 19, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

e) *if held as of the close of trading on November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such shares held in such transaction multiplied by the lesser of: (i) $7.04 per share, the total amount of Inflation removed from Aéropostale stock price on May 20, 2011, August 4, 2011, and August 19, 2011; or (iii) the difference between the purchase price per share and the PSLRA 90-Day Lookback Price of $12.55 per share.

**AA292**

iii)  If purchased on or after May 20, 2011, but on or before August 3, 2011, and:

a)  *if* sold *on or before August 3, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the third corrective disclosure, the Inflation Loss for purchased shares matched to such sales is zero;

b)  *if sold on or after August 4, 2011, but on or before August 18, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the fourth and final corrective disclosure, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $3.13 per share, the amount of Inflation removed from Aéropostale stock price on August 4, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

c)  *if sold on or after August 19, 2011, but on or before November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $4.66 per share, the total amount of Inflation removed from Aéropostale stock price on August 4, 2011, and August 19, 2011; or (iii) the difference between the purchase price per share and the sale price per share;

d)  *if held as of the close of trading on November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such shares held in such transaction multiplied by the lesser of: (i) $4.66 per share, the total amount of Inflation removed from Aéropostale stock price on August 4, 2011 and August 19, 2011; or (iii) the difference between the purchase price per share and the PSLRA 90-Day Lookback Price of $12.55 per share.

iv)  If purchased on or after August 4, 2011, but on or before August 18, 2011 and:

a)  *if* sold *on or before August 18, 2011*, the last day before the amount of Inflation in Aéropostale stock price was reduced from the fourth and final corrective disclosure, the Inflation Loss for purchased shares matched to such sales is zero;

b)  *if sold on or after August 19, 2011, but on or before November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such sales in such transaction multiplied by the lesser of: (i) $1.53 per share, the amount of Inflation removed from Aéropostale stock price on August 19, 2011; or

**AA293**

(iii) the difference between the purchase price per share and the sale price per share;

c) *if held as of the close of trading on November 16, 2011*, the last day of the PSLRA 90-Day Lookback Period, the Inflation Loss equals the number of shares purchased matched to such shares held in such transaction multiplied by the lesser of: (i) $1.53 per share, the amount of Inflation removed from Aéropostale stock price on August 19, 2011; or (iii) the difference between the purchase price per share and the PSLRA 90-Day Lookback Price of $12.55 per share.

If the Inflation Loss is greater than zero, then the Claimant has an Inflation Loss for that purchase transaction.

If the Inflation Loss is less than zero, then the Claimant has no Inflation Loss for that purchase transaction.

Total Inflation Loss for a Claimant is the sum of all Inflation Losses for all transactions in Aéropostale common stock.

If a Claimant has a Total Inflation Loss for a Claimant's purchases of Aéropostale common stock, the Claims Administrator will then compute the Trading Loss (Gain), as indicated below.

2. ***Trading Loss (Gain)***

For each purchase of Aéropostale common stock during the Class Period, the Trading Loss (Gain) for each purchase transaction (using FIFO matching of purchases to sales) will be computed as follows:

i) *if sold on or before November 16, 2011*, the Trading Loss (Gain) equals the number of shares purchased matched to such sales in such transaction multiplied by the difference between the purchase price per share and the sale price per share; or

ii) *if held as of the close of trading on November 16, 2011*, the Trading Loss (Gain) equals the number of shares purchased matched to such shares held in such transaction multiplied by the difference between the purchase price per share and the PSLRA 90-Day Lookback Price of $12.55 per share.

If the Trading Loss is greater than zero, then the Claimant has a Trading Loss for that purchase transaction.

If the Trading Loss is less than zero, then the Claimant has a Trading Gain (negative Trading Loss) for that purchase transaction.

Net Trading Loss (Gain) for each Claimant will be the sum of all Trading Losses and Trading Gains (negative Trading Losses) for all transactions in Aéropostale common stock for that Claimant.

**AA294**

If a Claimant has a Net Trading Gain (Total Trading Gains exceed or are equal to Total Trading Losses) for the transactions in Aéropostale common stock, the Claimant will not be eligible to receive a distribution from the Net Settlement Fund.

If there is a Total Inflation Loss and a Net Trading Loss for a Claimant's purchases of Aéropostale common stock, the Claims Administrator will then compute the Recognized Loss (and Recognized Claim), as indicated below.

## D.   RECOGNIZED LOSS AND RECOGNIZED CLAIM

### 1.   *Recognized Loss*

For transactions in Aéropostale common stock, if a Claimant has a Total Inflation Loss and a Net Trading Loss, the Recognized Loss for each Claimant will be the **lesser** of such Claimant's: (i) Total Inflation Loss; or (ii) Net Trading Loss.

### 2.   *Recognized Claim*

The Recognized Claim for an Authorized Claimant will be based on the Claimant's *pro rata* share of the Net Settlement Fund.  The Claimant's Recognized Claim will be calculated by multiplying the Net Settlement Fund by a fraction, the numerator of which is the Claimant's Recognized Loss for transactions in Aéropostale common stock and the denominator of which is the aggregate Recognized Losses of **all** Authorized Claimants for **all** transactions in Aéropostale common stock.

Payments made pursuant to this Plan of Allocation shall be conclusive against all Authorized Claimants.  No Person shall have any claim against the Lead Plaintiff, Lead Counsel or any experts and consultants retained by Lead Plaintiff or Lead Counsel, or any claims administrator or Defendants (or any person designated by Lead Plaintiff or Lead Counsel or Defendants or Defendants' Counsel) based on distributions made substantially in accordance with this Plan or further orders of the Court.  Claimants who fail to complete and file a valid and timely Proof of Claim form shall be barred from participating in distributions from the Net Settlement Fund, unless the Court otherwise orders.  Class Members who do not either timely submit a valid request for exclusion or timely submit a valid Proof of Claim will nevertheless be bound by the Settlement and the Judgment of the Court dismissing this Action.

Distributions to eligible Authorized Claimants will be made after all claims have been processed and after the Court has approved the Claims Administrator's determinations.  After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund after at least six (6) months from the date of distribution of the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), Lead Counsel shall, if feasible and economical, reallocate such balance among Authorized Claimants who have cashed their checks in an equitable and economic fashion.  Any balance that still remains in the Net Settlement Fund, after payment of Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, shall be contributed to non-sectarian not-for-profit charitable organizations serving the public interest, designated by Lead Plaintiff and approved by the Court.

Each claimant is deemed to have submitted to the jurisdiction of the United States District Court for the Southern District of New York with respect to his, her, or its Proof of Claim.

**AA295**

*Please note that the term "Recognized Loss" is used solely for calculating the amount of participation by Authorized Claimants in the Net Settlement Fund. It is not the actual amount an Authorized Claimant can expect to recover.*

## L.   SPECIAL NOTICE TO SECURITIES BROKERS AND OTHER NOMINEES

If you purchased Aéropostale Common Stock during the period between March 11, 2011 and August 18, 2011, inclusive, for the beneficial interest of a person or organization other than yourself, the Court has directed that, WITHIN SEVEN (7) CALENDAR DAYS OF YOUR RECEIPT OF THIS NOTICE, you either: (1) provide to the Claims Administrator the name and last known address of each person or organization for whom or which you purchased Aéropostale Common Stock during such time period or; (2) request additional copies of this Notice and the Proof of Claim form, which will be provided to you free of charge, and, within seven (7) calendar days of receipt of such copies, mail the Notice and Proof of Claim form directly to the beneficial owners of Aéropostale Common Stock.

If you elect to send the Notice and Proof of Claim to beneficial owners, the Court has directed that, upon such mailing, you shall send a statement to the Claims Administrator confirming that the mailing was made as directed.  You are entitled to reimbursement from the Settlement Fund of your reasonable expenses actually incurred in connection with the foregoing, including reimbursement of postage and the cost of ascertaining the names and addresses of beneficial owners.  Those expenses will be paid upon request and submission of appropriate supporting documentation.   All communications concerning the foregoing should be addressed to the Claims Administrator:

*Aéropostale Securities Action*

Claims Administrator

c/o _____

_____

_____

Phone: ____-____-____; Fax: ____-____-_____

**AA296**

[e-mail]

www._____

Dated: _____, 2014

BY ORDER OF THE COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**AA297**